**Docket No. 21-15604**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

E. OHMAN J:OR FONDER AB and STICHTING PENSIOENFONDS PGB, Lead Plaintiffs,

*Plaintiffs-Appellants,*

IRON WORKERS LOCAL 580 JOINT FUNDS,

*Plaintiff,*

v.

NVIDIA CORPORATION, JENSEN HUANG, COLETTE KRESS and JEFF FISHER,

*Defendants-Appellees,*

OAKLAND COUNTY EMPLOYEES' RETIREMENT SYSTEM, OAKLAND COUNTY VOLUNTARY EMPLOYEES' BENEFIT ASSOCIATION TRUST and OAKLAND COUNTY EMPLOYEES' RETIREMENT SYSTEM TRUST,

*Defendants.*

*Appeal from a Decision of the United States District Court for the Northern District of California, No. 4:18-cv-07669-HSG · Honorable Haywood S. Gilliam, Jr.*

## APPELLANTS' OPENING BRIEF

GREGORY P. JOSEPH, ESQ.
RACHEL M. CHERINGTON, ESQ.
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
(212) 407-1200 Telephone
gjoseph@jhany.com
rcherington@jhany.com

*Attorneys for Appellants,*
*E. Ohman J:or Fonder AB and*
*Stichting Pensioenfonds PGB*

**Additional Counsel Listed Inside Cover**

COUNSEL PRESS · (213) 680-2300 PRINTED ON RECYCLED PAPER

Eric Gerard, Esq.
Matthew L. Mustokoff, Esq.
Andrew L. Zivitz, Esq.
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706 Telephone
egerard@ktmc.com
mmustokoff@ktmc.com
azivitz@ktmc.com

John Browne, Esq.
Michael Mathai, Esq.
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
1251 Avenue of the Americas, 44th Floor
New York, New York 10020
(212) 554-1400 Telephone
johnb@blbglaw.com
michael.mathai@blbglaw.com

Jennifer L. Joost, Esq.
KESSLER TOPAZ MELTZER & CHECK, LLP
One Sansome Street, Suite 1850
San Francisco, California 94104
(415) 400-3000 Telephone
jjoost@ktmc.com

Lauren M. Cruz, Esq.
Jonathan D. Uslaner, Esq.
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
2121 Avenue of the Stars, Suite 2575
Los Angeles, California 90067
(310) 819-3470 Telephone
lauren.cruz@blbglaw.com
jonathanu@blbglaw.com

*Attorneys for Appellants E. Ohman J:or Fonder AB and Stichting Pensioenfonds PGB*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

E. Öhman J:or AB, a privately held entity, is the ultimate parent of E. Öhman J:or Fonder AB ("**Öhman Fonder**"). No publicly held corporation owns 10% of more of Öhman Fonder's stock.

Stichting Pensioenfonds PGB ("**PGB**") does not have a parent corporation. No publicly held corporation owns 10% or more of PGB's stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................iv

PRELIMINARY STATEMENT....................1

STATEMENT OF JURISDICTION....................4

ISSUES PRESENTED....................5

STATEMENT OF THE CASE....................6

A. Parties....................6

B. Five Former Employees....................7

C. NVIDIA Depends Heavily on Gaming and the China Market....................9

D. GPU Sales Skyrocket When Cryptocurrency Prices Rise....................10

E. GeForce GPU Sales to Miners Drive NVIDIA's Increase In Gaming Segment Revenues....................11

F. Multiple Sources of Information Alerted Defendants to Cryptocurrency-Related GeForce GPU Demand....................14

1. Centralized Sales Database Tracked Miners' Demand for GeForce GPUs....................14

2. Defendants Received GeForce Experience Data Showing that the Majority of GeForce GPU Sales Were to Miners....................16

3. Defendants Received Detailed Accounts Quantifying Crypto-Related GeForce GPU Sales in China....................16

4. Defendants Reviewed Crypto-Related GeForce GPU Sales Data at Meetings....................18

5. Huang Received Weekly Top 5 Emails Highlighting the Impact of Crypto-Related Demand on Global GeForce GPU Sales.....19

G. Defendants Inform Investors NVIDIA Was Monitoring Sales to Miners ....................20

H. Defendants Mislead the Market About Significance of Mining to NVIDIA's Revenue Growth ....................21

1. Defendants Falsely Report Mining Concentrated in OEM Segment ....................22

2. Defendants Falsely Describe Crypto-mining as an Inconsequential Revenue Source ....................24

I. NVIDIA Stock Plummets When Defendants Reveal the Truth .......26

J. Procedural Background ....................28

SUMMARY OF THE ARGUMENT ....................31

STANDARD OF REVIEW ....................32

ARGUMENT ....................33

I. VIEWED HOLISTICALLY, PLAINTIFFS' ALLEGATIONS PROVIDED A POWERFUL NARRATIVE OF FRAUD ....................35

A. Plaintiffs Provide a Compelling Narrative of Fraud....................36

B. The District Court Erred in Failing to Conduct a Holistic Review....................41

1. Plaintiffs Directly Tied False Statements to Contemporaneous Data Contradicting Those Statements....................41

a. Centralized Sales Database Contradicted Defendants' Statements ....................43

b. GeForce Experience Data Contradicted Defendants' False Statements ....................46

2. The District Court Discounted or Ignored Allegations Contributing to the Powerful Narrative of Fraud ....................50

II. REJECTION OF CORE OPERATIONS THEORY WAS ERROR....................52

A. Core Operations' "Absurdity" Test Satisfied....................53

B. "Actual Access" Test Satisfied....................56

III. FAILURE TO ASSESS RECKLESSNESS....................62

IV. PLAINTIFFS ADEQUATELY ALLEGED PRIMARY VIOLATIONS UNDERLYING THE SECTION 20(a) CLAIMS....................64

CONCLUSION....................65

CERTIFICATE OF COMPLIANCE....................67

STATEMENT OF RELATED CASES....................68

STATUTORY ADDENDUM

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ....................................................49, 53, 54, 55

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017)...........................................................41 n.2

*Di Donato v. Insys Therapeutics Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017) ..........................................56 n.8

*ESG Capital Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ..................................................................1, 34

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019)....................................................59 n.9

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ..................................................................62, 64

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ..................................................40, 48 n.4, 53, 54

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ......................................................................56

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ............................................................*passim*

*In re Silicon Graphics Inc.*,
183 F.3d 970 (9th Cir. 1999),
*superseded on other grounds by S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ....................................................33, 47, 48, 51

*In re Toyota Motor Corp. Sec. Litig.*,
2012 WL 3791716 (C.D. Cal. Mar. 12, 2012) ............................................60

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ..........................................................35, 41, 63

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ......................................................................64

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ..................................................................51

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)...........................................................................33, 35

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020).................................................... 57-58

*N.M. State Inv. Council v. Ernst & Young LLP*,
641 F.3d 1089 (9th Cir. 2011) ..............................................................32, 33

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ..........................................................42, 55, 64

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) .......................................48 n.5

*Nursing Home Pension Fund v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ...........................................................*passim*

*Okla. Police Pension & Ret. Sys. v. Lifelock, Inc.*,
780 F. App'x 480 (9th Cir. 2019)....................................................40, 50 n.6

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014),
*overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017)...........*passim*

*Roberti v. OSI Sys., Inc.*,
2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ........................................56 n.8

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ................................................................*passim*

*S. Ferry LP #2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009) ....................................................61

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017)..........................................................48

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009),
*aff'd*, 563 U.S. 27 (2011).......................................................................48 n.4, 62

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................*passim*

*Webb v. SolarCity Corp.*,
884 F.3d 844 (9th Cir. 2018) ......................................................................59

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ..............................................................34, 35, 41

**Rules & Statutes**

17 C.F.R. § 240.10b-5............................................................................................4

FED. R. APP. P. 4(a)(1)...........................................................................................5

FED. R. CIV. P. 12(b)(1).........................................................................................32

15 U.S.C. § 78aa ...................................................................................................4

15 U.S.C. § 78j(b) .......................................................................................4, 29, 64

15 U.S.C. § 78t(a) ........................................................................................4, 29, 64

15 U.S.C. § 78u-4(b)(2)(A)..................................................................................33

28 U.S.C. § 1291 ...................................................................................................4

28 U.S.C. § 1331 ...................................................................................................4

28 U.S.C. § 1337 ...................................................................................................4

## PRELIMINARY STATEMENT[1]

As the Supreme Court has recognized, private securities actions are "an essential supplement" to enforcement actions brought by the government. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Accordingly, although the Public Securities Litigation Reform Act ("**PSLRA**") strengthened the requirements for pleading scienter, that bar is not intended to be insurmountable. *Id.* at 324. A plaintiff is not required to *prove* its case at the outset; nor must a plaintiff plead "irrefutable," "smoking-gun" evidence of scienter. *Id.* The allegations in a complaint must be reviewed *holistically* and, as this Court has held, *collectively* must "provide a narrative of fraud—facts which, if true, substantiate an explanation *at least* as plausible as a nonfraudulent alternative." *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). Here, the District Court applied a far too stringent standard to Plaintiffs' scienter allegations. Viewed holistically, Plaintiffs provided a narrative of fraud vastly more compelling than any nonfraudulent alternative. The District Court's dismissal for failure to plead scienter should be reversed.

1 "#-**ER**-#" refers to Excerpts of Record. Emphasis is added to, and internal citations, quotation marks, and brackets are omitted from, quoted material, unless otherwise indicated.

Plaintiffs allege that in early 2017, skyrocketing sales of Defendant NVIDIA Corporation's ("**NVIDIA**") flagship product—a brand of graphics processors, designed for videogames, called "**GeForce GPUs**"—were generating record-breaking revenue growth for the company. Plaintiffs also allege that individual defendants Jensen Huang, Collette Kress, and Jeff Fisher (together, "**Individual Defendants**")—who publicly declared that "we know the [cryptocurrency market's] every single move"—knew by 2017 that GeForce GPU sales were surging as a result of cryptocurrency-related demand, *not* demand in NVIDIA's principal market, gaming. Defendants also knew that, unlike gaming, cryptocurrency demand was enormously volatile—a characteristic concerning to analysts and investors.

Unwilling to either relinquish such sales or admit that mining demand was driving NVIDIA's soaring revenues, Defendants instead sought to misleadingly assuage investor concerns while simultaneously courting substantial mining sales. First, in response to the growing mining demand that they were tracking, Defendants introduced a new product ("**Crypto SKU**") designed for cryptocurrency miners, and then publicly reported revenues attributable to that product separately from GeForce revenues. Second, Defendants announced—falsely—that nearly all mining demand for NVIDIA's GPUs was satisfied by Crypto SKU, thereby misleading investors about NVIDIA's true reliance on

mining to generate GeForce revenues, and alleviating investor concern that these extraordinary revenues would crash—as they ultimately did—when cryptocurrency prices fell and the mining market for GPUs evaporated.

The Individual Defendants knew their public claims were false—with miners continuing to purchase GeForce GPUs in droves, Crypto SKU did *not* satisfy the vast majority of crypto-related demand for NVIDIA's products. Plaintiffs have identified *multiple sources* of internal reports and data contradicting Defendants' public statements, including (i) an internal sales database—which the Individual Defendants could and did access—showing that, in China alone (NVIDIA's largest market), mining-related sales made up 60% of GeForce GPU sales in 2017, (ii) an internal study commissioned by Defendant Fisher—revealing that in the same quarter NVIDIA claimed that its $150 million in Crypto SKU sales accounted for the "vast" majority of its mining-related sales, there was at least another $120 million in unreported mining-related sales of GeForce GPUs in China alone, and (iii) GeForce usage data, collected from software bundled with NVIDIA's GeForce GPUs and monitored by Huang and touted by Kress, revealing that during the Class Period, 60% of the users of GeForce GPUs were miners, not gamers. To further buttress their claims, Plaintiffs included accounts from five former employees—all confirming that, as the Individual Defendants themselves

told the market, Defendants actively monitored sales to miners and knew that NVIDIA's revenue growth was highly dependent on mining-related sales.

Because Defendants knew that NVIDIA's revenue growth was dependent on mining-related sales, they knew their statements were false. At a minimum, it was deliberately reckless for Defendants to repeatedly and consistently respond to pointed questions by analysts concerning the size and impact of mining-related sales without first obtaining data—which NVIDIA had—to confirm their statements were true.

The Supreme Court requires that scienter be reviewed holistically—and, collectively, the allegations in Plaintiffs' First Amended Consolidated Class Action Complaint (the "**FAC**") paint a compelling narrative of fraud. The District Court's dismissal for failure to plead scienter should be reversed.

## STATEMENT OF JURISDICTION

This is an appeal from the dismissal of a securities class action alleging violations of Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5). The District Court had jurisdiction under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331 and 1337. On March 2, 2021, the District Court dismissed the FAC with prejudice and entered judgment for Defendants. 1-ER-4-25; 1-ER-3. This Court has jurisdiction under 28 U.S.C. § 1291 because, on March 30, 2021,

Plaintiffs filed a timely Notice of Appeal (3-ER-583) of the judgment entered below (1-ER-3). *See* FED. R. APP. P. 4(a)(1).

## ISSUES PRESENTED

(1) Did the District Court err in holding that Plaintiffs failed to adequately plead scienter where Plaintiffs identified multiple internal reports and data, of which Defendants were aware, contradicting Defendants' public statements, and included specifics of those reports?

(2) Did the District Court err in holding the core operations theory inapplicable where: (i) Individual Defendants had senior roles within NVIDIA, (ii) NVIDIA experienced billion-dollar growth in sales of its most important product, and (iii) Defendants had access to—and admitted to reviewing—multiple sources of granular data showing that that growth was the result of sales of GeForce GPUs to miners, not gamers?

(3) Did the District Court err in failing to consider whether Defendants were deliberately reckless in publicly quantifying NVIDIA's mining-related sales without first ascertaining whether such quantifications were complete and accurate?

## STATEMENT OF THE CASE

### A. Parties

***Plaintiffs.*** Co-Lead Plaintiffs are E. Öhman J:or Fonder AB ("**Öhman Fonder**"), a Stockholm-based institutional investor, and Stichting Pensioenfonds PGB ("**PGB**"), an Amsterdam-based pension fund. 3-ER-332-33 ¶¶27-28. Öhman Fonder and PGB purchased NVIDIA stock between May 10, 2017 and November 14, 2018 (the "**Class Period**"). *Id.*; 3-ER-402 ¶247.

***NVIDIA.*** NVIDIA is a global technology company that sells graphics processing units ("**GPUs**"), a type of processor that electronics manufacturers incorporate into their devices—including graphics cards for video games—and that can perform computationally intensive tasks. 3-ER-323 ¶1; 3-ER-333 ¶¶28-29; 3-ER-336 ¶38. NVIDIA's flagship product is its GeForce GPU, a favorite among video-game enthusiasts ("**gamers**"). 3-ER-323 ¶1. NVIDIA does not sell its products directly to end-users. It sells them to other device manufacturers ("**partners**"), who then incorporate NVIDIA's GPUs into their own products, which they sell into their respective distribution channels. 3-ER-337 ¶¶42-43.

***Huang.*** Huang was NVIDIA's President, CEO, a member of its Board of Directors and, throughout the Class Period, a signatory of NVIDIA's SEC filings. Former employees have described Huang as very "hands-on" and a "micromanager." 3-ER-333 ¶30; 3-ER-351 ¶92; 3-ER-352-53 ¶95.

***Kress***. Kress was Executive Vice President and CFO and, throughout the Class Period, a signatory of NVIDIA's SEC filings. 3-ER-334 ¶31

***Fisher***. Fisher is Executive Vice President of NVIDIA, SVP of NVIDIA's GeForce Business Unit, and is "responsible for the positioning and go-to-market strategy of GeForce GPUs." 3-ER-334 ¶32; 3-ER-336-37 ¶41. As "one of NVIDIA's oldest employees," Fisher reported directly to Huang, and they met on a weekly basis. 3-ER-334 ¶32. Huang has said that "Fish and I grew up together." *Id.* Fisher was one of five employees representing NVIDIA on investor days. *Id.*

**B. Five Former Employees**

The FAC's allegations are supported by accounts from five former NVIDIA employees ("**FEs**") with personal knowledge of (i) the magnitude of NVIDIA's cryptocurrency-related GPU sales during the Class Period, and (ii) Defendants' active monitoring of sales to miners.

***FE-1***. FE-1 worked at NVIDIA as Senior Account Manager in China for more than 10 years, until December 2017. 3-ER-334-35 ¶33. As one of roughly four account managers for China, FE-1 covered several large accounts for NVIDIA's "partners." *Id.* FE-1 repeatedly communicated directly with Fisher and other NVIDIA executives about GPU sales to miners. He provided detailed information on Defendants' tracking and analyzing of cryptocurrency-related GPU sales. *Id.*; 3-ER-347-48 ¶¶79-81; 3-ER-349 ¶¶83-84; 3-ER-350 ¶¶86-88; 3-ER-

354-55 ¶¶103-04; 3-ER-356-64 ¶¶109-27; 3-ER-392-93 ¶¶220-22; 3-ER-395 ¶227; 3-ER-396 ¶229.

***FE-2.*** FE-2 was a Senior Products Director based in NVIDIA's headquarters in Santa Clara, California. 3-ER-335 ¶34. FE-2 worked at NVIDIA for several years, leaving in May 2017, and retained contact with former employees after his departure. *Id.* FE-2 reported to two managers who reported directly to Huang. *Id.* FE-2 (i) met with Huang on a monthly basis, (ii) attended meetings where Huang explicitly discussed miners' preference for GeForce GPUs, (iii) reported that Huang regularly reviewed GeForce GPU sales data, (iv) reported that Fisher was aware of massive bulk orders for GeForce GPUs from mining firms, and (v) was included on a weekly e-mail distribution chain, with Huang, in which sales of GeForce GPUs to miners were reported ("**Top 5 Emails**"). *Id.*; 3-ER-349-50 ¶85; 3-ER-351-52 ¶¶92-93; 3-ER-353 ¶96; 3-ER-364-65 ¶¶128-30; 3-ER-393 ¶¶221-22; 3-ER-396 ¶229; 3-ER-399 ¶236.

***FE-3.*** FE-3 held senior marketing positions at NVIDIA, where he worked from January 2011 to November 2018. 3-ER-335 ¶35. FE-3's roles included marketing and public relations strategy, with a focus on promoting GeForce GPUs. *Id.*; 3-ER-347 ¶77. FE-3 was based in NVIDIA's headquarters in Santa Clara. 3-ER-335 ¶35.

***FE-4.*** FE-4, a Community Manager in Moscow, Russia, from 2015 to August 2018, promoted NVIDIA's gaming products in Russia through social media and promotional events and, through conversations with retailers, obtained information about demand for NVIDIA products. 3-ER-335 ¶36; *see also* 3-ER-365 ¶131; 3-ER-396 ¶229.

***FE-5.*** FE-5, based in India, was NVIDIA's Head of Consumer Marketing for South Asia from April 2014 to June 2019. 3-ER-335 ¶37. As Head of Consumer Marketing for South Asia, FE-5 (i) was included on weekly emails reporting crypto-related GeForce sales to Huang, (ii) attended quarterly meetings with regional leaders tasked with presenting sales data and forecasts to Huang, and (iii) personally presented GeForce sales data to Huang during one of Huang's visits to India. *Id.*; 3-ER-348-49 ¶82; 3-ER-351 ¶¶89-91; 3-ER-352-54 ¶¶94-98; 3-ER-355 ¶¶105-06; 3-ER-365-66 ¶¶132-33; 3-ER-393-94 ¶¶222-24; 3-ER-396 ¶229; 3-ER-398 ¶234; 3-ER-399 ¶236.

### C. NVIDIA Depends Heavily on Gaming and the China Market

NVIDIA reports revenues from five discrete segments—only two of which are relevant here. The gaming segment ("**Gaming Segment**") is NVIDIA's most important business by far, accounting for more revenues than its four other segments combined; its success is largely due to sales of its GeForce GPUs. 3-ER-336 ¶¶39-40. The OEM segment ("**OEM Segment**") is a catch-all business that

includes certain low-end GPUs and intellectual-property assets. 3-ER-325 ¶6; 3-ER-336 ¶¶39-40.

NVIDIA's business is concentrated geographically. More revenues come from the China market than from NVIDIA's other four regions combined. 3-ER-347-48 ¶79. China is critical to the Gaming Segment, accounting for 40-50% of NVIDIA's GeForce GPU sales. 3-ER-347-48 ¶79 n.5.

**D. GPU Sales Skyrocket When Cryptocurrency Prices Rise**

After the 2008 financial crisis, online blockchain networks—which allow transactions in digital cryptocurrencies outside the traditional monetary system—began to develop. 3-ER-337-39 ¶¶44-50. Cryptocurrencies allow network users to record financial transactions by solving cryptographic puzzles through laborious trial-and-error computations, a process called mining. 3-ER-338 ¶¶46-47. Miners who solve these cryptographic puzzles are rewarded with tokens of the cryptocurrency. *Id.*

Since the introduction of cryptocurrencies, their prices have fluctuated wildly. For example, during a six-month period from 2013 to 2014, the price of Bitcoin surged from $91 to approximately $1,200 per token. 3-ER-341 ¶56. As the value of Bitcoin tokens increased, miners poured in to cash in on the boom and extract as many tokens as possible. 3-ER-341 ¶57. Mining operations eventually consolidated into large commercial firms running huge mining datacenters,

typically in places like China where energy costs are lower. 3-ER-339-40 ¶¶52-53. When the value of cryptocurrencies is high enough to offset the costs of mining, these firms buy massive quantities of GPUs, which can efficiently run the repetitive algorithmic computations needed to unlock cryptocurrency tokens. 3-ER-338-41 ¶¶49-54.

Because cryptocurrencies are prone to dramatic price swings, demand for GPUs by miners is extraordinarily volatile. 3-ER-341 ¶55. For example, in 2013-2014, AMD (NVIDIA's main competitor in the GPU market) experienced this volatility firsthand—enjoying supercharged revenues when Bitcoin prices skyrocketed, only to see its revenues and share price crater when the price of Bitcoin dropped. 3-ER-341 ¶¶56-58.

### E. GeForce GPU Sales to Miners Drive NVIDIA's Increase In Gaming Segment Revenues

Although different technologies later replaced GPUs for mining Bitcoin, GPUs remained standard for mining other cryptocurrencies, including Ether, which was launched in July 2015. 3-ER-341 ¶56 n.4; 3-ER-342 ¶60. As Ether's price rose as high as $1400 following its launch, miners increasingly turned to NVIDIA's GeForce GPUs, purchasing them in droves. 3-ER-341-42 ¶¶59-61; 3-ER-372-74 ¶152.

With Ether's price surging, NVIDIA Gaming Segment revenues—where it reported GeForce GPU sales—rose to unprecedented levels. On May 9, 2017,

NVIDIA reported $1.02 billion in first quarter Gaming Segment sales—a 49% year-over-year increase and 52.8% of the company's total revenues. 3-ER-342-43 ¶63.

Defendants were fully aware that cryptocurrency was fueling NVIDIA's staggering revenue growth. As confirmed by multiple FEs, Defendants not only knew that mining had ignited NVIDIA's GeForce GPU business—they actively discussed, tracked, and sought to bolster NVIDIA's mining-related sales. 3-ER-346-67 ¶¶76-138. In May 2017, to capitalize on mining-related sales, NVIDIA launched Crypto SKU, a special GPU designed for mining. 3-ER-325 ¶6; 3-ER-345 ¶72.

Defendants were also aware that the market for cryptocurrency was volatile, and that analysts and investors were therefore concerned that mining was driving NVIDIA's revenue growth. 3-ER-342-43 ¶¶62, 64. In response to repeated investor and analyst requests for information concerning NVIDIA's reliance on mining, Defendants repeatedly downplayed the impact of cryptocurrency mining on NVIDIA's astonishing revenue growth. *Id.* Initially, Defendants downplayed NVIDIA's reliance on cryptocurrency-related revenues by falsely attributing NVIDIA's growth in revenues to gaming. 3-ER-342-46 ¶¶63-75. After NVIDIA launched Crypto SKU, Defendants repeatedly informed investors that (i) Gaming Segment revenue surges were the result of demand from gaming, not mining, (ii)

cryptocurrency-related demand for NVIDIA's GPUs was being largely satisfied by its newly launched Crypto SKU, and (iii) those revenues were being reported in NVIDIA's OEM Segment, not the Gaming Segment. 3-ER-325-26 ¶¶6-8; 3-ER-342 ¶62. This allowed Defendants to both understate NVIDIA's cryptocurrency-related revenues, and to tell investors—falsely—that its cryptocurrency-related revenues were cabined in the relatively minor OEM Segment. 3-ER-325-26 ¶¶6-8; 3-ER-345 ¶72.

NVIDIA continued to report massive revenues in its Gaming Segment each quarter for the next year, including on May 10, 2018, when it reported $1.723 billion in Gaming Segment revenues—a 68% year-over-year increase and approximately 2.5 times the revenues from two years before. 3-ER-342-43 ¶63. However, although NVIDIA was reporting this spectacular growth in its Gaming Segment, the growth was not from ***gamers*** buying more GeForce GPUs to play videogames—it resulted from ***miners*** buying them, often in thousand-unit lots, to capitalize on the surging value of Ether.

Had NVIDIA reported cryptocurrency-related revenues as a standalone segment, it would have been one of NVIDIA's largest each quarter. 3-ER-387 ¶197; 3-ER-389-91 ¶¶208, 211, 214. Post-Class Period studies conducted by securities analysts concluded that from February 2017 to July 2018, NVIDIA generated $1.95 billion in total crypto-related revenues. 3-ER-368 ¶140. The

Prysm Group—an economic consulting firm, retained by Plaintiffs, specializing in cryptocurrency markets—similarly found that, from May 2017 to July 2018, ***NVIDIA took in mining-related revenues of $1.728 billion—with $1.126 billion of that falsely reported as gaming revenue***. 3-ER-368-75 ¶¶143-54.

### F. Multiple Sources of Information Alerted Defendants to Cryptocurrency-Related GeForce GPU Demand

Before and during the Class Period, Defendants had multiple sources of internal information (i) quantifying the massive growth in revenues resulting from Geforce GPU sales to miners, and (ii) documenting increasing demand for GeForce GPUs from miners.

#### 1. Centralized Sales Database Tracked Miners' Demand for GeForce GPUs

The Individual Defendants had access to a centralized sales database ("**Centralized Sales Database**" or "**Channel Support System**") that quantified GPU sales to miners. 3-ER-347-49 ¶¶78, 82, 84. According to FE-1, NVIDIA kept meticulous track of those buying its GeForce GPUs—not only firms buying GeForce GPUs directly from NVIDIA, but also others further down the distribution channel. 3-ER-348 ¶80.

FE-1 explained that NVIDIA started tracking the mining trend in late 2016 or early 2017, pulling cryptocurrency-related sales data from customer order sheets that earmarked sales to miners, who were buying GeForce GPUs in thousand-unit lots. 3-ER-347-49 ¶¶78-81, 83. The Centralized Sales Database showed that

throughout 2017, mining-related sales accounted for 60-70% of NVIDIA's GeForce GPU revenues in China—the geographic market generating more than half of NVIDIA's total revenues, and 40-50% of NVIDIA's GeForce revenues. 3-ER-347 ¶79 & n.5; 3-ER-350 ¶86. Accordingly, even before factoring in revenues from the non-China markets, 25% to 35% of NVIDIA's global GeForce GPU revenues were from miners. 3-ER-350 ¶86.

FE-5 corroborated FE-1's account of NVIDIA's data collection processes, describing how sales reports from customers allowed NVIDIA to identify sales to miners. 3-ER-348-49 ¶82. According to FE-5, NVIDIA tracked "sell-in/sell-out" data, which allowed it to record sales throughout its distribution chain. *Id.* NVIDIA incentivized its partners (those purchasing directly from NVIDIA) to report their own detailed sales information by paying them "Marketing Development Funds." *Id.* Account managers processed this transaction-level data and posted it to NVIDIA's regional operations centers, which forwarded it to the California headquarters, where it was entered into the Centralized Sales Database. 3-ER-348-49 ¶¶81-83.

Multiple sources confirmed that Defendants had direct access to the Centralized Sales Database. FE-1 reported that Huang, Kress, and Fisher all had access to the database and that NVIDIA executives were "obsessed" with this data. 3-ER-349-50 ¶¶84, 86. FE-2 corroborated FE-1's account, recalling a video

presented at a 2017 meeting that showed Huang personally accessing the database. 3-ER-349-50 ¶85.

### 2. Defendants Received GeForce Experience Data Showing that the Majority of GeForce GPU Sales Were to Miners

GeForce GPUs came with embedded software called GeForce Experience, which was used by more than 90% of GeForce users and allowed NVIDIA to track how GeForce GPUs were being used. 3-ER-354 ¶¶99-102. GeForce Experience's usage data showed that crypto-related demand had skyrocketed, with over 60% of GeForce GPU sales during the Class Period to miners. 3-ER-355 ¶¶104-06. NVIDIA stored GeForce Experience data in a central database, and FE-5 explained that regional managers compiled monthly reports from the data. 3-ER-355 ¶106. FE-5 also reported that, during the Quarterly Business Review meetings he attended, he was informed by his superiors that Huang personally reviewed the GeForce Experience data for each region. *Id.*

### 3. Defendants Received Detailed Accounts Quantifying Crypto-Related GeForce GPU Sales in China

According to FE-3, a Senior Director for Consumer Marketing based in the Santa Clara headquarters, everyone at NVIDIA was engaged, to some degree, in discussion about mining's impact on NVIDIA's sales. 3-ER-347 ¶77. Fisher and other executives received regular reports of crypto-driven GeForce GPU demand in China. FE-1 explained that, throughout 2017, the China sales team sent Fisher

sales reports and quarterly spreadsheets quantifying GeForce GPU sales to crypto-miners in China. 3-ER-356-57 ¶¶111-13. According to FE-1, NVIDIA's sales team included crypto-related GeForce GPU sales in developing sales projections for important markets. 3-ER-357 ¶114. FE-1 stated that NVIDIA was internally forecasting that, in 2018, GeForce GPU sales would rise 60% over 2017 levels due to mining demand. *Id.* FE-1 and his team specifically discussed mining demand as driving these increased sales projections in calls, emails, and weekly reports with Fisher and others. *Id.*

In March 2017, FE-1 gave a presentation to executives—including Fisher—in which FE-1 emphasized the explosion of crypto-related GeForce GPU sales in China and reported that mining demand had caused GeForce sales to almost double in a short period. 3-ER-357-58 ¶115. During that presentation, FE-1 cautioned that NVIDIA had to "take care" given its growing reliance on crypto-miners, a trend that Fisher called "dangerous." *Id.*

Later in 2017, Fisher asked the China team to prepare in an internal study on crypto-mining's effect on GeForce sales. 3-ER-359 ¶119. That study, which was sent to U.S. executives in September 2017, contained detailed internal sales data showing, among other things, that (i) NVIDIA had captured 70% of the cryptocurrency-related GPU market in China, (ii) between January and September 2017, at a minimum, $225 million of NVIDIA's revenues came from sales of

GeForce GPUs to miners in China, and (iii) between May and July 2017, a minimum of $120 million in NVIDIA's revenues came from sales of GeForce GPUs to miners in China. 3-ER-359-61 ¶¶119-22. The study reflected NVIDIA's ability to track mining-related GeForce GPU sales, which were quantified monthly and used to generate monthly sales forecasts. 3-ER-360 ¶121. The study highlighted that "[t]he cryptocurrency market [came] with high risk and severe fluctuation," while simultaneously outlining NVIDIA's "New Business Model" intended to target the top 10-20 miners in China. 3-ER-361-62 ¶¶122-25.

#### 4. Defendants Reviewed Crypto-Related GeForce GPU Sales Data at Meetings

Defendants—including Huang and Fisher—attended quarterly management meetings where managers presented data quantifying crypto-related sales. 3-ER-350-52 ¶¶87-92. FE-1 reported that his managers told him that crypto-specific sales data was presented directly to Huang, Fisher, and other top executives at NVIDIA's quarterly meetings in 2017. 3-ER-350 ¶¶87-88. In those meetings, Huang discussed ways to profit from the cryptocurrency trend by selling directly to miners, including Genesis Mining, a well-known European mining firm. *Id.* A 2017 study commissioned by Fisher corroborated this account, identifying Genesis Mining as one of ten large mining enterprises NVIDIA would target directly. 3-ER-363 ¶126.

FE-2—one direct-report removed from Huang—confirmed that Huang reviewed GeForce sales data at quarterly meetings that FE-2 attended. 3-ER-335 ¶34; 3-ER-351-52 ¶¶92-93. FE-2 recounted that Huang specifically discussed miners' preference for GeForce GPUs in at least two meetings in 2017, where Huang acknowledged that miners were not interested in buying NVIDIA's more expensive professional GPUs because miners were interested in "cranking out algorithms [for mining] at the lowest cost." 3-ER-352 ¶93.

FE-5 confirmed that Huang received this crypto-specific sales data, explaining that NVIDIA's regional leaders compiled the sales and forecasting information and sent it to Huang on a quarterly basis. 3-ER-351 ¶90.

#### 5. Huang Received Weekly Top 5 Emails Highlighting the Impact of Crypto-Related Demand on Global GeForce GPU Sales

In 2014 or 2015, Huang created an internal reporting system, the Top 5 Emails, in which senior sales and marketing personnel provided weekly updates to executives, including Huang, on developments in NVIDIA's various markets. 3-ER-352-54 ¶¶94-98. FE-2 and FE-5 both received the Top 5 Emails. *Id.* FE-5 stated that Huang reviewed them on Sundays, often responding directly and requesting follow-up information the following day. 3-ER-352-53 ¶¶94-96. FE-5 stated that, during 2017 and 2018, virtually every Top 5 report addressed miners' demand for GeForce GPUs. 3-ER-353 ¶97. These emails included sales data reflecting the growth in GeForce GPU demand and updates from NVIDIA's

partners, resellers, and distributors on demand from miners. *Id.* FE-5 stated that the weekly emails also addressed sales of GeForce GPUs to miners in "bunches"—i.e., in hundred- or thousand-unit lots—and how these bulk orders took off during the Class Period. *Id.* FE-5 further stated that the Top 5 Emails regularly discussed shortages in GeForce GPU inventory across regions caused by heightened crypto-related demand. 3-ER-353-54 ¶98; 3-ER-366 ¶133.

### G. Defendants Inform Investors NVIDIA Was Monitoring Sales to Miners

The Individual Defendants assuaged investor concerns by reporting that NVIDIA had the ability to track, and was tracking, sales to miners. In November 2016, Kress stated that NVIDIA's GeForce Experience software allowed NVIDIA to monitor how end-users used their GeForce GPUs. 3-ER-355 ¶107; 2-ER-296. On March 1, 2017, Kress reiterated that NVIDIA's GeForce Experience software provided NVIDIA with the "ability to actually look to say, 'Yes, the intended use of those overall gaming platforms are actually being used for gaming.'" 3-ER-356 ¶108; 2-ER-308.

Similarly, during an August 10, 2017 earnings call—in response to a question about how NVIDIA thought about managing the "volatility" of the cryptocurrency market—Huang stated, "our strategy is to stay very, very close to the market. We understand its dynamics really well. … We know its every single move and we know its dynamics." 3-ER-343 ¶66; 2-ER-81.

Huang also publicly confirmed that NVIDIA tracked sales through its distribution partners. In 2015, Huang confirmed that NVIDIA monitored its sales throughout its distribution channel, telling investors that "we monitor sellout in the channel literally every day." 3-ER-337 ¶43; *see also* 2-ER-274. And in August 2018, during an earnings call, Huang reaffirmed that NVIDIA monitored sales down its distribution chain, stating that "[w]e are masters at managing our channel, and we understand the channel very well." 3-ER-376 ¶158, 3-ER-398 ¶234; 2-ER-258.

### H. Defendants Mislead the Market About Significance of Mining to NVIDIA's Revenue Growth

With the price of Ether rising and NVIDIA reporting colossal revenues, analysts repeatedly questioned the extent to which cryptocurrency-related demand—which they expected to evaporate when cryptocurrency prices fell—was driving the Gaming Segment's blockbuster revenue growth. 3-ER-383 ¶179; 3-ER-384 ¶183; 3-ER-385 ¶190; 3-ER-386 ¶193; 3-ER-387 ¶196; 3-ER-388 ¶203; 3-ER-389 ¶207; 3-ER-390 ¶¶210, 213. Despite Defendants' access to, and review of, multiple streams of data showing that cryptocurrency was critical to NVIDIA's revenue growth, Defendants repeatedly told investors that cryptocurrency-related sales were inconsequential and cordoned off from its Gaming Segment.

### 1. Defendants Falsely Report Mining Concentrated in OEM Segment

NVIDIA launched its Crypto SKU product in 2017, and then reported revenues from Crypto SKU in its OEM Segment, which accounted for 5% to 10% of NVIDIA's revenues (compared to over 50% reported in the Gaming Segment). 3-ER-325-26 ¶¶6-8; 3-ER-345 ¶72. After the introduction of the Crypto SKU, Huang and Kress repeatedly assured investors and analysts that mining-related revenues came almost entirely from the sales of Crypto SKU recorded in the OEM Segment—not sales of the GeForce GPUs reported in the Gaming Segment. 3-ER-383 ¶179; 3-ER-384 ¶183; 3-ER-386 ¶193; 3-ER-387 ¶196; 3-ER-388 ¶203. Defendants falsely reassured investors that the massive growth in its Gaming Segment was due to demand from gamers—and, therefore, far less likely to be volatile.

***August 2017 Huang Statements.*** On August 10, 2017, when NVIDIA reported "record revenue"—$250 million above guidance—for the second quarter of fiscal year 2018, Huang was asked whether crypto-mining was driving the $250 million upside. Huang replied that NVIDIA recorded just $150 million in Crypto SKU sales in the OEM segment, and represented that NVIDIA "serve[s] the vast -- I would say large majority of the cryptocurrency demand out of that specialized product." 2-ER-81; *see also* 3-ER-345-46 ¶73; 3-ER-383 ¶179.

In an interview published on August 12, 2017, Huang reiterated that all of NVIDIA's sales to miners represented "maybe $150 million or so"—the exact amount NVIDIA had just reported selling in the OEM segment. 3-ER-384 ¶¶183-84; 2-ER-94.

***September 2017 Kress Statement.*** In September 2017, an analyst asked Kress, "What steps has NVIDIA taken to avoid cannibalization of core gaming market from these cards?" 3-ER-385-86 ¶190. Kress responded, "we covered most of cryptocurrency with our cryptocards [Crypto SKU] that we had developed." *Id.*; 2-ER-147.

***November 2017 Huang and Kress Statements.*** During a November 9, 2017 earnings call, analysts asked Huang and Kress to "quantify how much crypto was in [third-quarter fiscal 2018]." 3-ER-386 ¶193; 2-ER-163. Kress responded that NVIDIA's "specific crypto [cards] equated to about $70 million of revenue, which is the comparable to the $150 million that we saw last quarter," but said nothing about sales of GeForce GPUs to miners. 3-ER-386 ¶193; 2-ER-163. In an interview published on November 10, 2017, Huang also represented that NVIDIA's cryptocurrency-related revenue was "[m]aybe $70 million." 3-ER-387 ¶196; 2-ER-173. And at a November 29, 2017 conference, when asked about the impact of cryptocurrency-related demand on NVIDIA's gaming revenues, Kress stressed that while "there probably is some residual amount or some small amount

in terms of" crypto-related sales in the Gaming Segment, "the majority" comes from Crypto SKU. 3-ER-346 ¶74; 3-ER-388 ¶203; 2-ER-228.

In truth, nearly $2 out of every $3 that NVIDIA earned in crypto-related revenues during the Class Period was from sales of GeForce GPUs, amounting to approximately **$1.126 billion** in undisclosed Gaming Segment sales to miners. 3-ER-374-75 ¶154.

#### 2. Defendants Falsely Describe Crypto-mining as an Inconsequential Revenue Source

In addition to falsely representing that mining-related revenues were almost entirely reported in the OEM Segment, Defendants—in response to direct questions from analysts and investors, as well as in its public filings—repeatedly downplayed the impact of crypto-mining on NVIDIA's revenue, falsely touting sales to gamers as the primary driver of the Gaming Segment's growth.

***May 2017 Fisher Statement.*** During a May 2017 investor conference, Fisher—the head of the Gaming who, just two months earlier, commissioned a presentation showing that GeForce GPU sales in China had nearly doubled in a short period due to sales to miners—touted Gaming's strong fundamentals and credited "PC gaming, eSports, competitive gaming, AAA gaming, [and] notebook gaming" as the drivers for NVIDIA's revenue. 3-ER-383 ¶176; 2-ER-41. Fisher said nothing about the impact of cryptocurrency on Gaming revenues. *Id.*

***November 2017 Huang Statements.*** On November 10, 2017, *VentureBeat* asked Huang whether "cryptocurrency is driving all of your success," Huang falsely replied that cryptocurrency's contribution was "small … [i]t's large for somebody else. But it is small for us." 3-ER-387 ¶196; 2-ER-173.

***February 2018 Huang Statement.*** In an interview published February 9, 2018, Huang dismissed analysts' "talk" about the effects of mining on NVIDIA's results, falsely asserting that cryptocurrency-related revenues comprised a "small, overall part" of NVIDIA's business the prior quarter. 3-ER-389 ¶207; 2-ER-232.

***March 2018 Huang Statements.*** On March 26, 2018, in response to direct queries about mining's impact, Huang reassured investors that mining-related revenues were "a small percentage of NVIDIA's overall business." 3-ER-390 ¶210; 2-ER-239. On March 29, 2018, Huang again deceptively downplayed mining's significance, stating that "cryptocurrency just gave [revenues] that extra bit of juice" and that NVIDIA's "core growth drivers" were other parts of the business. 3-ER-390 ¶213; 2-ER-244.

***SEC Filings.*** Defendants made misleading representations in SEC filings keying NVIDIA's stellar performance to GPU demand from gamers. On August 23, 2017, NVIDIA filed its Form 10-Q for 2Q2018, signed by Huang and Kress. 3-ER-385 ¶187; 2-ER-135-36. In that filing, Defendants announced a 59% increase of $701 million in GPU business revenue year-over-year, growth that

Defendants claimed "was due primarily to increased revenue from sales of GeForce GPU products for gaming." 2-ER-124; *see also* 3-ER-385 ¶187. On November 21, 2017, NVIDIA's Form 10-Q for 3Q2018, signed by Huang and Kress, similarly touted a 31% increase of $520 million in GPU revenue year-over-year, which Defendants again attributed "primarily to increased revenue from sales of GeForce GPU products for gaming." 2-ER-201; *see also* 3-ER-388 ¶200.

### I. NVIDIA Stock Plummets When Defendants Reveal the Truth

As intended, these misrepresentations left investors with the false impression that NVIDIA's growth was driven by gamers, not miners, and that any risk from cryptocurrency-related demand was minimal. 3-ER-344 ¶69. In an August 2017 report, JPMorgan stated that cryptocurrency-related sales were "not a significant portion of NVIDIA's business" and that NVIDIA "remain[ed] focused on continued growth drivers in AI, autonomous driving and gaming." *Id.* Similarly, in a November 2017 report, BMO Capital wrote that NVIDIA "continues to believe there is only a small amount of GeForce cards that is used for cryptocurrency mining." *Id.*

In the summer of 2018, demand from miners evaporated when cryptocurrency prices fell. By then, NVIDIA could no longer hide that miners—not gamers—had driven the Gaming Segment's astonishing revenue growth during the Class Period. Investors first started to learn about the extent of NVIDIA's

dependence on cryptocurrency in August 2018, when NVIDIA lowered its revenue guidance 2.2% for the coming quarter because it no longer expected meaningful contributions from cryptocurrency. 3-ER-375 ¶155. Huang conceded that "a great deal" of miners had bought NVIDIA's GeForce GPUs, partially revealing that NVIDIA's cryptocurrency-related exposure was not cabined in the OEM Segment, contrary to Defendants' earlier reassurances. *Id.* NVIDIA's stock price promptly fell by 4.9%. 3-ER-376 ¶156. Yet Huang reassured the market that gamers would absorb excess GeForce GPU inventory, withholding the extent to which the huge inventory buildup was due to expected mining demand that had vanished. 3-ER-376-77 ¶158.

The news soon worsened. 3-ER-377 ¶160. On November 15, 2018, NVIDIA announced a 2% revenue miss for 3Q2019 and that stated that the company was expecting a 7% year-over-year decline for the fourth quarter. *Id.* Defendants attributed the decline to excess inventory in NVIDIA's Gaming Segment—not the OEM Segment—created by a "sharp falloff in crypto demand." 3-ER-377-78 ¶161. This admission shocked investors and directly contradicted Defendants' consistent reassurances that mining-related sales were primarily housed in the OEM Segment, not Gaming Segment, and that they accounted for only a "small" part of NVIDIA's overall revenues. 3-ER-378-80 ¶¶163-70. NVIDIA had flooded its Gaming-Segment channel with GeForce inventory to

meet expected mining demand, leaving NVIDIA with an inventory glut when that demand disappeared. 3-ER-378 ¶162. NVIDIA revealed that it would take at least 12 weeks to burn off its excess inventory, resulting in approximately $600 million in lost revenue. *Id.* In response, NVIDIA's stock price plummeted 28.5% over two trading sessions. 3-ER-380 ¶171.

Analysts and the press recognized the obvious irreconcilability of Defendants' November 2018 announcement with their prior assurances. One analyst observed that "[t]he large shortfall in guidance due to a bloated channel due to cryptocurrency is in sharp contrast to the comments around channel inventory from the company at the last earnings call." 3-ER-379 ¶166. Another journalist commented, "Again, it seemed, in the past, that [crypto] was described as a small part of revenue, and now it's something that can affect one or two quarters' worth of inventory." 3-ER-380 ¶170. In January 2019, RBC issued a report calculating that NVIDIA had understated its mining-related revenues by $1.35 billion, leading press outlets to publish reports with headlines like, "Analyst says Nvidia lied about its cryptocurrency earnings to avoid stock crash: They may have concealed revenue to mask shrinking demand." 3-ER-368 ¶¶140-41.

**J. Procedural Background**

On December 21, 2018, Iron Workers Local 580 Joint Funds filed the first of two securities class action lawsuits targeting NVIDIA's cryptocurrency-related

misrepresentations. 3-ER-597 (ECF 1). On March 4, 2019, the District Court consolidated the two actions under the caption *In re NVIDIA Corporation Securities Litigation* (3-ER-575-82), and later appointed Öhman Fonder and PGB as Lead Plaintiffs (3-ER-568-74). On June 21, 2019, Plaintiffs filed the Consolidated Class Action Complaint ("**CAC**"). 3-ER-494-567.

Defendants moved to dismiss the CAC, and on March 16, 2020, the District Court granted in part and denied in part Defendants' motion, concluding that Plaintiffs adequately pleaded loss causation but not falsity or scienter. 3-ER-468-493. With respect to falsity, the District Court found that Plaintiffs needed to allege additional details regarding the assumptions underlying the Prysm Group's analysis of GPU mining-related sales. 3-ER-479-82. With respect to scienter, the District Court concluded that (i) allegations based on FE accounts failed to establish a link between Defendants and NVIDIA's crypto-related GeForce sales data, (ii) allegations about sales patterns in China might not reflect sales patterns in other markets, (iii) Plaintiffs failed to adequately allege the "core operations" theory of scienter, and (iv) Huang's stock sales did not support scienter. 3-ER-483-89. The District Court dismissed Plaintiffs' § 10(b) and § 20(a) control person claims, granting leave to amend. 3-ER-492-93.

On May 13, 2020, Plaintiffs filed the FAC. 3-ER-320-467. The FAC added a host of new allegations, including: (i) explanations of the assumptions underlying

Prysm's analysis; (ii) detailed descriptions, backed by accounts from multiple FEs, of NVIDIA's processes for gathering, assessing and accessing crypto-specific sales data; (iii) allegations identifying meetings where Huang explicitly acknowledged miners' preferences for GeForce GPUs; (iv) accounts from FEs copied on the weekly Top 5 Emails reporting enormous mining demand; (v) FE accounts reporting that the GeForce Experience data sent to Huang showed that over 60% of GeForce sales during the Class Period was to miners; and (vi) excerpts from the 2017 Fisher-commissioned study showing that NVIDIA earned hundreds of millions of dollars in revenues from unreported GeForce GPU sales to miners in China alone. 3-ER-347-50 ¶¶78-86; 3-ER-352-356 ¶¶93-108; 3-ER-359-64 ¶¶119-26; 3-ER-369-74 ¶¶147-52. The FAC also added a chart requested by the District Court identifying (i) each false statement, (ii) reasons the statement was false, and (iii) facts giving rise to a strong inference of scienter. 3-ER-413-67.

On June 29, 2020, Defendants moved to dismiss the FAC, and on March 2, 2021, the District Court granted that motion. 1-ER-4-25. The District Court ruled that Plaintiffs failed to establish a strong inference of scienter. 1-ER-17-24. The District Court held that, although the FAC contained accounts from former NVIDIA employees stating that Defendants had access to data showing a spike in cryptocurrency-related sales during the Class Period, the FAC did not "adequately tie the specific contents of any of these data sources to particular statements so as

to plausibly show that the Defendant who made each specific statement knowingly or recklessly spoke falsely." 1-ER-16. The District Court also ruled that the core operations doctrine did not support scienter. 1-ER-23-24. The District Court dismissed the FAC with prejudice and entered judgment for Defendants. 1-ER-25; 1-ER-3.

Plaintiffs appeal from the judgment below and from the March 2, 2021 Order granting Defendants' motion to dismiss the FAC without leave to amend (1-ER-4-25).

## SUMMARY OF THE ARGUMENT

*First*, the District Court erred by failing to appropriately consider the allegations in the FAC holistically. Plaintiffs' scienter allegations relied on reports from multiple former employees, as well as written evidence identified by those witnesses, that not only directly contradicted Defendants' public statements, but also corroborated Plaintiffs' allegations that Defendants (i) were closely monitoring sales to miners, (ii) knew that sales to miners were driving growth of NVIDIA's flagship GeForce GPU product, and (iii) knew that mining-related demand for that product did not dissipate when NVIDIA launched its Crypto SKU product. Taken collectively, those allegations sufficiently alleged scienter.

*Second,* the District Court erred in concluding that the core operations theory was inapplicable. GeForce GPUs were NVIDIA's flagship product, and

Defendants touted their knowledge of the downstream market's use of NVIDIA's products. In these circumstances, Defendants' contention they were simply unaware what was driving skyrocketing sales of NVIDIA's flagship product is incredible—"absurd," in the words of the core-operations precedent. At a minimum, given the Individual Defendants' high-level roles at NVIDIA, as well as their admitted access to multiple sources of information contradicting their public statements, the "actual access" test of the core operations doctrine was met.

*Third*, the District Court erred in focusing only on whether Defendants actually knew about information contradicting their public statements. They unquestionably did know about it. But given Defendants' ready access to such information, it was at a minimum culpably reckless for them to fail to first ascertain the veracity of their public statements.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's dismissal of a complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), accepting plaintiffs' allegations as true and construing them in the light most favorable to plaintiffs. Dismissal is improper unless the complaint fails to state a claim that is plausible on its face. *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011). In reviewing the claims, this Court considers the complaint in its

entirety, materials incorporated by reference, and matters about which it can take judicial notice. *Id.*; *see also Tellabs*, 551 U.S. at 322.

**ARGUMENT**

"To establish liability under § 10(b)(5) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). "A complaint can plead scienter by raising a strong inference that the defendant possessed actual knowledge or acted with deliberate recklessness." *N.M. State Inv. Council*, 641 F.3d at 1095.

To plead scienter, a complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs*, 551 U.S. at 323 ("strong" means "powerful or cogent"); *In re Silicon Graphics Inc.*, 183 F.3d 970, 974 (9th Cir. 1999) (must plead "facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct"), *superseded on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008). Under controlling Ninth Circuit law, the "most direct way to show both that a statement was false when made and that the party making the statement knew it was false is through allegations of contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund v. Oracle Corp.*, 380 F.3d

1226, 1230 (9th Cir. 2004); *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (scienter established where defendants repeatedly told public that they had "access to, and knowledge of, sales information").

Where, as here, a complaint relies on confidential witnesses, those witnesses "must be described with sufficient particularity to establish their reliability and personal knowledge," and the statements reported "must themselves be indicative of scienter." *Quality Systems*, 865 F.3d at 1144-45. To make this determination, this Court will "look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).

While a "strong inference" of scienter is an exacting standard, it is not intended to be "insurmountable." *ESG Capital*, 828 F.3d at 1035. Neither "irrefutable" nor "smoking-gun" evidence is required. *Tellabs*, 551 U.S. at 324. Nor is a plaintiff required to "prove its case at the outset." *ESG Capital*, 828 F.3d at 1035. What *is* required is that the Plaintiffs "provide a narrative of fraud—facts which, if true, substantiate an explanation <u>at least as plausible as a nonfraudulent alternative</u>." *Id.*; *see also Tellabs*, 551 U.S. at 323-324 (analysis is inherently comparative).

In assessing whether a plaintiff has met its burden of pleading a plausible narrative of fraud, courts must consider the allegations holistically. *Id.*; *see also Matrixx*, 563 U.S. at 49 (although no allegation that defendants understood report was statistically significant, viewed collectively allegations sufficient to establish scienter); *S. Ferry LP*, 542 F.3d at 784 (contrary to Ninth Circuit's prior decisions, a "series of less precise allegations," including vague or ambiguous allegations, can be read together to establish scienter). Although this Court allows judges to undertake a "dual analysis"—first reviewing the allegations individually, then holistically—it cautions "[t]he risk, of course, is that a piecemeal analysis will obscure a holistic view." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 703 (9th Cir. 2012); *see also Zucco Partners*, 552 F.3d at 991-92 (methodology that "relies exclusively on a segmented analysis of scienter" impermissible under *Tellabs*").

## I. VIEWED HOLISTICALLY, PLAINTIFFS' ALLEGATIONS PROVIDED A POWERFUL NARRATIVE OF FRAUD

The inquiry required "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. Here, Plaintiffs provided a compelling narrative of fraud supported by specifics from internal reports and multiple, corroborating reports from former employees. The FAC identified five sources of internal data and reports—each described with

sufficient detail to establish its reliability—that controverted Defendants' public statements. Plaintiffs buttressed these allegations with accounts from five former employees, who all described NVIDIA and the Individual Defendants as hyper-focused on cryptocurrency-related growth in sales of NVIDIA's flagship product. Taken collectively, these allegations are more than sufficient to give rise to a strong inference that Defendants knew—contrary to their assurances to investors—that crypto-mining was the source of NVIDIA's soaring revenue growth during the Class Period.

### A. Plaintiffs Provide a Compelling Narrative of Fraud

Viewed holistically, Plaintiffs' allegations provided a compelling narrative that Defendants knew—or were deliberately reckless in not knowing—that their statements downplaying NVIDIA's reliance on cryptocurrency-related sales were untrue.

*First*, Plaintiffs provided multiple, corroborating accounts from FEs describing Defendants as fully cognizant of, and even "obsessed" with, the growth from mining-related sales of GeForce GPUs. By no later than early 2017, Defendants understood that rising cryptocurrency prices had led to increased demand for NVIDIA's flagship GeForce GPUs. According to a report from FE-1, which was corroborated by FE-5, by late 2016 or early 2017, NVIDIA started tracking crypto-related sales of its GeForce GPUs in its Centralized Sales Database

(*supra* pp. 14-16). FE-1 and FE-2 both described quarterly meetings during which mining-related sales data was presented to Huang, and Huang discussed large sales deals with miners. (3-ER-350-52 ¶¶87-93). FE-5 confirmed these accounts, reporting that, at quarterly meetings, managers quantified the sales of GeForce GPUs to miners. *Id.*

After NVIDIA's China-based sales team began discussing growing demand for GeForce GPUs in weekly emails to U.S. executives (3-ER-356-57 ¶¶109-111), FE-1 gave a presentation to Fisher that showed that, by March 2017, sales of GeForce GPUs had doubled in a short period due to cryptocurrency demand (3-ER-357-58 ¶115).

That report, combined with the China sales team's weekly reports on burgeoning mining-related sales, piqued Fisher's interest, and he commissioned a more comprehensive report on mining-related sales (3-ER-359-64 ¶¶119-126). The resulting September 2017 presentation showed that between January and September 2017, NVIDIA obtained, at a minimum, $225 million in revenues from sales of GeForce GPUs to miners <u>in China alone</u>, and between May and July 2017 **(**2Q2018)**,** NVIDIA obtained a minimum of $120 million in revenues from sales of GeForce GPUs to miners <u>in China alone</u>. 3-ER-359-61 ¶¶119-22.

Further, FE-2 and F-5 reported that the weekly Top 5 Emails sent to Huang reported on mining-related sales growth, mining-related shortages in inventory,

bulk orders for GeForce GPUs from miners, and updates from throughout the distribution channel on mining-related demand for GeForce GPUs. 3-ER-352-54 ¶¶94-98.

*Second,* the FAC alleges that Defendants understood that this mining demand was likely to be enormously volatile, which was a concern for investors. 3-ER-343 ¶¶64-65; *supra* pp. 12-13, 20-21. Throughout the Class Period, analysts repeatedly sought assurances—willingly provided by Fisher, Huang, and Kress—that NVIDIA's surging revenues were not due to mining. *See, e.g.*, 3-ER-383 ¶179; 3-ER-384 ¶183; 3-ER-385-86 ¶¶190, 193; 3-ER-387 ¶196; 3-ER-388 ¶203; 3-ER-389 ¶207; 3-ER-390 ¶¶210, 213.

In May 2017, in response to what it understood was increasing crypto-related demand for its flagship GeForce GPUs, NVIDIA introduced its Crypto SKU product, designed specifically for mining. 3-ER-325-36 ¶¶6-8; *supra* pp. 22. Promptly thereafter, Huang and Kress reported that nearly the entirety of NVIDIA's cryptocurrency-related sales had shifted—essentially immediately—from the GeForce GPUs miners had previously been buying to the brand-new Crypto SKU. 3-ER-325-36 ¶¶6-8, 3-ER-345 ¶72; *supra* pp. 22-24. In August 2017, Huang reported that NVIDIA had approximately $150 million in mining-related sales—which corresponded to the amount of Crypto SKU sales reported in NVIDIA's OEM Segment—and stated that the "vast … majority" of mining-

related sales were contained in that segment. *Supra* pp. 22-24. Kress and Huang continued to make similar statements through November 2017, and throughout the Class Period Defendants consistently downplayed the impact of mining-related sales on NVIDIA's revenue growth. *Supra* pp. 22-26.

*Third*, the FAC establishes that Defendants had access to, and did access, multiple sources of information establishing the patent falsity of these claims. NVIDIA's skyrocketing sales of GeForce GPUs were driven by mining, not gaming, and NVIDIA's Crypto SKU product was not satisfying the vast majority of mining demand.

For example, the Fisher-commissioned September 2017 presentation, which revealed $120 million in cryptocurrency-related sales of GeForce GPUs between May and July 2017 (2Q2018) (reported in its Gaming Segment) just in China—without accounting for the other regions that made up roughly half of NVIDIA's Gaming revenues—is irreconcilable with Defendants' claims that NVIDIA's mining-related revenues amounted to only "maybe $150 million or so"—the amount of Crypto SKU sales NVIDIA reported in its OEM Segment. 3-ER-359-60 ¶¶120-21; 3-ER-384 ¶¶183-84; *supra* pp. 16-18.

Similarly, throughout 2017, while Defendants insisted there were only "residual" sales of its GeForce GPU product to miners, the Centralized Sales Database (available to Huang, Kress, and Fisher) revealed that mining-related sales

accounted for 60-70% of NVIDIA's GeForce GPU revenues in China, which translated to 25-35% of NVIDIA's overall GeForce GPU sales being to miners in China. 3-ER-350 ¶86; *supra* pp. 14-16.

Additionally, GeForce Experience data, which Huang reviewed and Kress touted, revealed that over 60% of GeForce GPU sales during the Class Period were to miners—directly refuting Defendants' claims that mining-related sales during the Class Period were inconsequential. 3-ER-355 ¶¶104-106; *supra* p. 16.

This is precisely the kind of narrative of fraud that this Court has held satisfies the PSLRA's pleading standards for scienter. *See, e.g.*, *Nursing Home*, 380 F.3d at 1231 (scienter pled where plaintiffs included hard numbers and specific allegations concerning sales data, as well as "specific statements" from employees testifying to a slowdown in sales); *Okla. Police Pension & Ret. Sys. v. Lifelock, Inc.*, 780 F. App'x 480, 484-85 (9th Cir. 2019) (inference of scienter at least as compelling as nonfraudulent explanation where defendants received reports of problems, admitted they were working to fix problems, and entered into consent decree requiring it to stop exaggerating capabilities); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) (scienter compelling where allegations that CEO received weekly reports about operations, was "vitally concerned with … operations," and direct report received information concerning problems).

### B. The District Court Erred in Failing to Conduct a Holistic Review

The District Court stated that it reviewed the FAC's allegations of scienter "as a whole" (1-ER-18; 1-ER-22). But the District Court's opinion demonstrates that it performed the type of "segmented analysis" prohibited by *Tellabs*. *See Zucco Partners*, 552 F.3d at 991-92; *see also VeriFone*, 704 F.3d at 703 (although brief statement that court reviewed allegations holistically technically sufficient to meet demands of *Matrixx*, courts not permitted to "unduly focus on the weakness of individual allegations to the exclusion of the whole picture").

#### 1. Plaintiffs Directly Tied False Statements to Contemporaneous Data Contradicting Those Statements

The District Court erred in holding that—notwithstanding Plaintiffs' identification of multiple data sources to which Defendants had access and that contradicted their public statements—*Nursing Home* was distinguishable because "the plaintiffs there directly tied the statements at issue … to specific, identifiable underlying information known to the defendants." 1-ER-21.

*First*, the District Court improperly characterized the challenged statements as "more generalized statements about cryptocurrency" than those at issue in *Nursing Home*. 1-ER-22. Putting aside that even "more generalized" statements may suffice,[2] the District Court ignored multiple, specific statements by Huang and

---

[2] Even "impressionistic" statements can violate securities laws if they are false or misleading. *See, e.g.*, *Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017)

Kress falsely *quantifying* revenues attributed to cryptocurrency-related sales—including, for example, that mining-related revenue represented "$150 million or so" in 2Q2018 and "$70 million or so" in 3Q2018 (*supra* pp. 22-24). Further, Plaintiffs identified statements by Huang and Kress falsely asserting that Crypto SKU made up the "large majority" of cryptocurrency-related sales in 2Q and 3Q2018, so such sales were contained within the OEM Segment (*supra* pp. 22-24). *See Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) ("[T]he inference that [defendant] did not have access to the [relevant] data is directly contradicted by the fact that she specifically addressed it in her statement."), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

Even those statements characterized as too generalized by the District Court—for example, that sales to miners were "small"—were directly comparable to those found actionable in *Nursing Home* and its progeny. *See, e.g.*, *Nursing Home*, 380 F.3d at 1230 ("declining U.S. economy was not hurting [defendants'] business"); *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 933 (9th Cir. 2003) (false statements included that defendants were not "anticipating any major increase in maintenance costs");

---

(general language describing product's performance not immaterial as a matter of law).

*Quality Systems*, 865 F.3d at 1137 ("[O]ur pipeline current and our pipeline future are very robust.").

*Second*, the District Court wrongly distinguished *Nursing Home* on the grounds that plaintiffs there "tied the statements at issue … to specific, identifiable underlying information known to the defendants that suggested knowledge that their statements were untrue when made." 1-ER-21. Here, as in *Nursing Home*, Plaintiffs directly tied Defendants' statements to multiple sources of identifiable underlying information that suggested knowledge of their statements' falsity.

#### a. Centralized Sales Database Contradicted Defendants' Statements

The Centralized Sales Database showed that throughout 2017, sales to miners accounted for 60-70% of NVIDIA's GeForce GPU revenues in China, which translated to a total of 25-35% of NVIDIA's total GeForce GPU revenues coming from miners, even before including sales in other regions. 3-ER-350 ¶86. This directly contradicted several of Defendants' public statements—including that in 2Q and 3Q2018, Crypto SKUs—not GeForce GPUs—constituted the "vast … majority" of mining-related sales, with only "residual" sales in GeForce GPUs. 3-ER-384 ¶¶183-84; 3-ER-388 ¶¶203-04

The District Court discounted the relevance of this allegation, concluding that (i) Plaintiffs' allegation that Huang had access to the database rested primarily on the account of FE-2, who left in May 2017 and thus his allegations are not

"sufficiently reliable as to any alleged misstatements beyond that date," and (ii) because FE-1's Centralized Sales Database allegations concerned only China, Plaintiffs did not allege Huang had "contradictory information … concerning global sales." 1-ER-19. Neither of these grounds supports dismissal.

*First*, there is no basis to conclude that the conduct FE-2 observed before departing in May 2017 ended with his departure. FE-2 alleged that Huang had access to and did access the Centralized Sales Database. 3-ER-349-50 ¶85. There is no basis to infer that access ended with FE-2's unrelated departure. The most plausible inference from FE-2's statement is that Huang—the CEO and a micromanager alleged to be obsessed with sales data—would have continued to access the Centralized Sales Database throughout the Class Period.[3]

In any case, and as addressed *infra* (§II.B), Huang's access to the Centralized Sales Database—which tracked sales through NVIDIA's distribution pipeline (*supra* pp. 14-16)—can be reasonably inferred because Huang repeatedly touted the ability NVIDIA has and uses to track sales through its distribution pipeline. *Supra* pp. 20-21. In response to direct questions from analysts, Huang repeatedly asserted that "we" closely monitored NVIDIA's channel and

---

[3] *See Quality Systems*, 865 F.3d at 1145 (although confidential witness not at company during class period he "had personal knowledge of executive-level management's real-time access" to sales database).

"sellout"—precisely the information included in the Centralized Sales Database. *Supra* pp. 20-21. As this Court has held, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that [defendant] had access to information [defendant] discussed publicly." *Reese*, 747 F.3d at 572; *see also S. Ferry LP*, 542 F.3d at 785 ("specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements" were sufficient); *Nursing Home*, 380 F.3d at 1231 (scienter established where defendant admitted knowing "exactly how much we have sold in the last hour").

*Second*, the District Court's characterization of the information in the Centralized Sales Database as pertaining solely to China was inaccurate. The FAC provides detailed information from FE-1 concerning the process by which information was added to, and consolidated in, the database (3-ER-347-48 ¶¶79-81)), and includes allegations from FE-5 that not only corroborate FE-1's allegations (3-ER-348-49 ¶82), but also establish that the "process of obtaining granular sales data from the distribution channel occurred in other regions." *Id.* The only plausible inference from these allegations is that the Centralized Sales Database included worldwide sales information.

*Third*, even if the Centralized Sales Database had included only China-specific sales data, it was still sufficient to establish that Defendants understood the falsity of their statements. The FAC alleges that, throughout 2017, the Centralized

Sales Database showed that 60-70% of sales of GeForce GPUs in China were to miners, not gamers, which—given the size of the China market—translated into a minimum of 25-35% of worldwide sales of GeForce GPUs being to miners. That is irreconcilable with Defendants' multiple statements that Crypto SKUs accounted for nearly all NVIDIA's cryptocurrency-related revenues.

*Fourth*, the District Court concluded that there was little establishing that either Fisher or Kress had access to the Centralized Sales Database (1-ER-23), but, given their roles within NVIDIA and the critical importance of the information the Database contained, the most compelling inference is that they did. *Infra* §II.A-B.

**b. GeForce Experience Data Contradicted Defendants' False Statements**

Defendants also had access to NVIDIA's GeForce Experience data—which showed that 60% of GeForce GPU sales during the Class Period were to miners, refuting Defendants' claims that mining was not driving the growth in GeForce GPU sales and that, after the introduction of Crypto SKU, nearly all mining-related sales had migrated to that product.

The District Court rejected Plaintiffs' reliance on GeForce Experience data, holding that FAC failed to specify "whether theparticular 60% statistic was presented in a particular report or was an average calculated from reports 'during the Class Period'" (1-ER-20). This was error.

This Court expects that a complaint relying "on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability." *Nursing Home*, 380 F.3d at 1230-31. However, consistent with this Court's precedent establishing that scienter allegations be neither irrefutable nor proven, this Circuit requires only "some specifics" from such reports be included. Accordingly, this Court has held that a complaint relying on internal reports should "state facts relating to the internal reports, including their contents, who prepared them, which officers reviewed them and from whom [the plaintiff] obtained the information." *Silicon Graphics*, 183 F.3d at 984.

This Court does not require the level of specificity demanded by the District Court. For example, in *Quality Systems*, this Court concluded scienter was pled even though the only specifics about information allegedly included in a sales database defendants relied on was one confidential witness's claim that he could "see … that the market was going to a recurring revenue model." 865 F.3d at 1138. The remainder of the allegations were less detailed than those in the FAC—including that the database included "real-time information concerning QSI revenues and income" and "business performance and sales pipeline," and "QSI management knew on a monthly basis how QSI was doing." *Id.* at 1138-39; *see also Nursing Home*, 380 F.3d at 1231 (sales database tells defendants how much

has been sold within the past hour); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1137 (N.D. Cal. 2017) (that plaintiff cannot specify precisely when ratio declined just means issue not appropriate to decide on a motion to dismiss).[4]

The FAC included the information suggested in *Silicon Graphics* with respect to GeForce Experience data, including (i) specifics about what it showed (60% of GeForce GPU sales during Class Period were to miners), (ii) who prepared the information (regional managers), (iii) when the information was prepared (monthly), and (iv) which officers received it (Huang and Kress). *Supra* p. 16; ER-354-56 ¶¶99-108.[5]

---

[4] The District Court's conclusion that *Quality Systems* differed because here Plaintiffs fail to "tie the challenged statements to comparably specific underlying information known to the defendants" (1-ER-22 n.5) is, at best, perplexing. Huang and Kress made statements quantifying mining sales—including that NVIDIA's sales to miners were $150 million in 2Q2018 and $70 million in 3Q2018, and that nearly all such sales were from Crypto SKU—that were directly contradicted by the GeForce Experience data and the Centralized Sales Database. Further, the District Court distinguished *Quality Systems* because one defendant there had sold large quantities of stock, but this Court has consistently held that such sales are not necessary for scienter. *See Alphabet*, 1 F.4th at 707 (allegations regarding stock sales not a sine qua non for scienter); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1182 (9th Cir. 2009) (same), *aff'd*, 563 U.S. 27 (2011).

[5] The District Court's reliance on *Norfolk County Retirement System v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) (1-ER-20) was misplaced. There, the allegedly false statement was that an "attempted substitution of oil … was rejected by Unilever because it was not actually produced at the Moema facility," but failed to identify when the attempted rejection *actually* occurred. *Norfolk Cnty.*, 2016 WL 7475555, at *3. In other words, the complaint failed to allege when a *specific* event occurred. Here, Plaintiffs allege that *throughout* the

The District Court also erred in failing even to *address* whether Kress or Fisher had access to GeForce Experience data (1-ER-22-23). *First*, because Kress repeatedly touted the importance of and utility of the GeForce Experience data to determining whether the "intended use of those overall gaming platforms are actually being used for gaming" (3-ER-356 ¶108; 3-ER-355 ¶107; *supra* pp. 20-21), it is reasonable to conclude that she—a senior officer—had access to such data. *See infra* §II.B. *Second*, Fisher was the head of the GeForce Business Unit. It is highly likely that Fisher had access to, and did access, the GeForce Experience data—particularly given Fisher's focus on cryptocurrency-related sales (*supra* p. 7). *See infra* §II.B; *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) (reasonable inference that managers with direct responsibility for company's day-to-day operations have access to information critical to business).

The District Court also erred in holding that the FAC omitted facts showing that "Huang actually received" GeForce Experience data. 1-ER-20. To the contrary, the FAC alleges that Huang "actually reviewed" GeForce Experience data. FE-5 reported that his superior, who was in a position to know, had informed

Class Period, sales to miners were higher than reported—and the GeForce Experience data *throughout* the Class Period corroborated that allegation.

him that Huang did so. 3-ER-355 ¶106.[6] Additionally, given that Huang was both CEO and a micromanager who constantly sought sales-related information, it is highly likely that Huang accessed GeForce Experience data. *Infra* §II.B.

### 2. The District Court Discounted or Ignored Allegations Contributing to the Powerful Narrative of Fraud

In addition to improperly discounting the allegations concerning the Centralized Sales Database and GeForce Experience data, the District Court erred in not crediting the significance of other allegations directly contradicting Defendants' statements.

*First*, the District Court failed even to reference the September 2017 presentation requested by Fisher and prepared by FE-1 in which one slide showed that from May 2017 through July 2017—NVIDIA's 2Q2018 reporting period—sales of GeForce GPUs to miners in China translated into $120 million in sales. 3-ER-360 ¶121; *supra* pp. 17-18. At a minimum, this presentation reveals that, in addition to the $150 million in Crypto SKU sales NVIDIA disclosed in its OEM Segment, NVIDIA had—at least—another $120 million undisclosed crypto-related

---

6 The Ninth Circuit permits reliance on hearsay in complaints where the hearsay is sufficiently reliable. *See, e.g.*, *Lifelock*, 780 F. App'x at 484 n.5 (reliance on hearsay reported by confidential witnesses permissible if report is "sufficiently reliable, plausible, or coherent"). Here, it is entirely plausible that FE-5's superiors—who attended quarterly meetings with FE-5 and then reported information from those meetings to Huang (3-ER-351 ¶¶89-90)—were in a position to know that Huang reviewed the GeForce Experience data.

GPU purchases, rendering false Huang's and Kress's fall 2017 assertions that "vast" majority of NVIDIA's cryptocurrency-related revenues were reported in the OEM Segment.

*Second*, the District Court erred in rejecting the significance of the Top 5 Emails on the ground that the FAC failed to include "facts about what any Top 5 email said on any given date, much less facts to show that any Top 5 email was inconsistent with any of the challenged statements." 1-ER-20. Although this Court rejects an inference of scienter where plaintiffs make only "a general assertion about what they think" internal reports show (*Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002)), the FAC provides the details about the Top 5 Emails required by *Silicon Graphics*, including (i) the identities of the senders and recipients of the Top 5 Emails, (ii) when the Top 5 Emails were sent, (iii) that Huang initiated the use of Top 5 Emails to ensure that he had timely information about sales, and (iv) specifics about the contents of the Top 5 Emails, including "that virtually every salesperson on the distribution chain talked about crypto-related GeForce sales," and that the Top 5 Emails included "accounts of conversations with resellers, partners, and distributors who reported demand" from miners, and discussions of shortages of GeForce GPU inventory due to increasing mining demand. 3-ER-353-54 ¶¶97-98; *supra* pp. 19-20.

Further, even if the FAC did not directly identify an inconsistency between a particular Top 5 Email and a particular false statement, the Top 5 Emails establish that Defendants were closely tracking mining-related sales of GeForce GPUs and were aware that mining-related sales were leading to inventory shortages. That is precisely the type of corroborating information this Court has previously relied on when reviewing a complaint holistically. *See, e.g.*, *Quality Systems*, 865 F.3d at 1145 ("Taken collectively," allegations executives "had access to and used reports documenting in real time the decline in sales" sufficient to plead scienter).

## II. REJECTION OF CORE OPERATIONS THEORY WAS ERROR

The core operations doctrine allows courts to "impute scienter based on the inference that key officers have knowledge of the 'core operations' of the company." *Reese*, 747 F.3d at 575. Core operations allegations satisfy the PSLRA's scienter standard if: (1) "they are particular and suggest that defendants had actual access to the disputed information," or (2) "the nature of the relevant [information] is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry*, 542 F.3d at 785-86; *see also, e.g.*, *Reese*, 747 F.3d at 575-76. The FAC supports a strong inference of scienter under both tests.

### A. Core Operations' "Absurdity" Test Satisfied

It would be wildly unreasonable, in light of the allegations in the FAC, to infer that Kress (CFO), Fisher (Head of Gaming "responsible for the positioning and go-to-market strategy of GeForce GPUs"), and Huang (CEO and "micromanage[r]," "very hands on," and "the most intimately involved CEO … ever experienced")[7] did not know that mining was driving NVIDIA's blockbuster revenues during the Class Period.

In *Applied Signal*, the seminal core operations case in this Circuit, plaintiffs alleged that executives misled investors about the existence of stop-work orders that halted several million dollars' worth of business for key clients. 527 F.3d at 987-88. The complaint omitted any allegation that executives actually knew about the stop-work orders, but this Court held that it was "hard to believe" executives "directly responsible for" the company's "day-to-day operations" would have been unaware of stop-work orders that allegedly "halted tens of millions dollars of the company's work." *Id.* at 987-89. Similarly, in *Alphabet*, this Court held that, although the complaint lacked any allegation that the defendant actually reviewed the information at issue, it was implausible that an executive reporting directly to

---

7 3-ER-333-34 ¶¶30-32; 3-ER-336-37 ¶41; 3-ER-349-50 ¶85; 3-ER-351-52 ¶¶91-92; 3-ER-352-53 ¶95.

the defendant would have "concealed the largest data-security vulnerability" in the company's history. 1 F.4th at 706.

The facts alleged in the FAC parallel, or exceed, those in *Applied Signal* and *Alphabet*. Defendants sat atop NVIDIA, were intimately involved in its operations and finances, and were responsible for investor and analyst communications. *E.g.*, 3-ER-333-34 ¶¶30-32. The Gaming Segment was NVIDIA's largest, accounting for over 50% of NVIDIA's annual revenues (3-ER-324 ¶2; 3-ER-325 ¶6; 3-ER-336 ¶40). During the Class Period, revenues skyrocketed due to sales of GeForce GPUs reported in the Gaming Segment—reaching $1.02 billion in 1Q2018 (a 49% year-over-year increase and 52.8% of total revenues) and $1.723 billion in 1Q2019 (a 68% year-over-year increase and approximately 2.5 times the Gaming Segment's revenues in 1Q2017). 3-ER-342 ¶63; *see also* 3-ER-345-46 ¶73. During the Class Period, mining-related sales accounted for 83% of NVIDIA's total GPU business growth and at least $1.7 billion in revenues. 3-ER-400 ¶238; *see also* 3-ER-368 ¶140. Former employees said that, during this period, "everyone at NVIDIA was engaged, to some degree, in talks about cryptocurrency mining's impact on the Company's sales" (3-ER-347 ¶77), and NVIDIA was aggressively monitoring and working to capitalize on sales to miners (*e.g.*, 3-ER-326-27 ¶10, 3-ER-347-66 ¶¶78-133). Mining's impact on NVIDIA was not just an "obsess[ion]" within the company (3-ER-326-27 ¶10), but a matter of acute

interest in the investing community, as well, with analysts repeatedly questioning Defendants about the impact of mining on NVIDIA's success. 3-ER-343-44 ¶¶64-68; *supra* pp. 12-13. Even if the FAC did not contain a single particularized allegation that Defendants were aware of the magnitude of NVIDIA's GeForce GPU sales to miners—and, as explained above, the FAC has pages of such allegations—it would be absurd to suggest they were in the dark that mining was driving billions of dollars in revenue growth in NVIDIA's core business segment. *See Applied Signal*, 527 F.3d at 987-88 & n.5 (absurd to suggest management was unaware of stop-work orders worth roughly $20 million); *America West*, 320 F.3d at 943 & n.21 (absurd to suggest management did not discuss investigations by a regulator that "was considering penalties of up to $11 million").

In finding the absurdity test unsatisfied, the District Court took an unduly narrow view of the relevant allegations. It expressly considered only three alleged facts: (i) the Gaming Segment was NVIDIA's core business; (ii) China was NVIDIA's most important market; and (iii) analysts questioned the role of mining in NVIDIA's business. 1-ER-24. Plaintiffs' allegations are not so limited. The FAC pleads that NVIDIA's most important segment experienced historic, billion-dollar growth from sales of its flagship product, and that NVIDIA actively generated (and studied) data, which showed that miners—not gamers—were driving the sales boom. The FAC alleges that this was openly discussed within the

company and was the subject of repeated queries from analysts. Together, these facts establish that the massive mining-generated revenues were a matter of such prominence that Defendants could not possibly have been unaware of them. *S. Ferry*, 542 F.3d at 782; *Reese*, 747 F.3d at 576 ("absurd" to think that defendant was unaware of information "core" to business operations).[8]

### B. "Actual Access" Test Satisfied

In addition to showing "absurd[ity]," the FAC establishes scienter under the core operation doctrine's "actual access" standard, which requires "detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry*, 542 F.3d at 785-86. Actual access can be satisfied through (i) admissions by defendants that they had access to the information, or (ii) statements supporting the inference that they had access to that information. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (scienter supported by "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database"); *Reese*,

---

8 *See also Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *13 (C.D. Cal. Feb. 27, 2015) (absurd to suggest defendants were unaware of technology issues in the company's "largest and most profitable division" when the technology was "the focus of intense media scrutiny"); *Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *15 (D. Ariz. Aug. 1, 2017) ("absurd to think [CFO] knew about [the company's] anomalous market dominance but did not know how the company pulled off the feat when he signed on to the company's SEC filings.").

747 F.3d at 576-77 (scienter supported by executive's statements that were "specific" and "strongly suggest[] she had access to the disputed information").

The FAC is replete with allegations establishing Defendants' exposure to information reflecting the magnitude of GeForce GPU sales to miners. These include particularized allegations regarding: (a) crypto-specific GeForce GPU sales data in the Centralized Sales Database that top executives, including Huang, accessed; (b) quarterly meetings at which data concerning mining-related GeForce GPU sales was presented to Huang; (c) weekly Top 5 Emails sent to Huang reporting on surging mining demand for GeForce GPUs; (d) GeForce Experience usage data, sent in monthly reports to Huang and accessed by Kress, confirming that an overwhelming majority of GeForce GPU sales during the Class Period were to miners; (e) weekly reports detailing crypto-related sales sent to Fisher and the GeForce executive team; and (f) an internal study commissioned by Fisher measuring monthly GeForce mining sales to miners. 3-ER-346-366 ¶¶76-133, 3-ER-392-400 ¶¶218-40.

These allegations establish that Defendants had "actual access" for purposes of the core-operations inference. *S. Ferry*, 542 F.3d at 785 ("specific allegations that defendants actually did monitor the data … [are] sufficient under the PSLRA"); *see also Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1026-27 (N.D.

Cal. 2020) (scienter supported by allegations that executives had access to data and "review[ed] the revenue numbers monthly or weekly").

The FAC also identifies specific admissions by Defendants that they monitored downstream purchasers of NVIDIA's GeForce GPUs. Huang admitted on multiple occasions that Defendants tracked which end-users were purchasing NVIDIA products. *See, e.g.*, 3-ER-337 ¶43 (2015: "[W]e monitor sellout in the channel literally every day. … We don't manage inventory on selling; we manage inventory on sellout."); 3-ER-343 ¶66 (2017: "We stay very close to the [cryptocurrency] market. We know its every single move and we know its dynamics."); 3-ER-376 ¶158 (2018: "We are masters at managing our channel, and we understand the channel very well."). Kress admitted that Defendants used GeForce Experience to monitor how end-users were using GeForce GPUs. 3-ER-356 ¶108 (2017: "[W]e can actually see [users] through our GeForce Experience … So we have an ability to actually look to say, 'Yes, the intended use of those overall gaming platforms are actually being used for gaming."); *see also* 3-ER-355 ¶107. These are exactly the kind of admissions this Court has held support a strong inference of scienter. *See Nursing Home*, 380 F.3d at 1231 (scienter

established when CEO admitted: "All of our information is on one database. We know exactly how much we have sold in the last hour around the world.").[9]

The District Court concluded that the admissions in the FAC were insufficient because (i) some statements were outside the Class Period, (ii) Huang's statements concerning the "channel" referred to data regarding distributors and resellers, and (iii) Huang's statement about staying "close" to the market "reflects more of a review of the general cryptocurrency market." 1-ER-24. This was error for at least three reasons.[10]

*First*, that some admissions fall outside the Class Period does not preclude a finding of scienter—it supports it. This is especially true where, as here, similar statements continued into the Class Period. *See Quality Systems*, 865 F.3d at 1145 (defendant's statement—two months before class period began—that market was saturated established scienter); *Webb v. SolarCity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018) ("Information from before the class period is relevant because it can confirm what a defendant should have known during the class period."); *see*

---

[9] *See also, e.g.*, *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 601-02 (N.D. Cal. 2019) (core operations inference warranted because defendants touted "intimate knowledge of generic drug pricing," including by stating "we have been able to look carefully at the generic purchasing patterns").

[10] The District Court did not examine Defendants' admissions that GeForce Experience data allowed them to monitor usage of GeForce GPUs. *See* 1-ER-23-24. This was also error.

*also In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *4 (C.D. Cal. Mar. 12, 2012) ("[C]ommon sense dictates that facts relevant to scienter ordinarily date from before any alleged misrepresentations … .").

*Second*, Huang admitted that Defendants were monitoring ***sellout*** in the channel—i.e., "sales out of [the] distribution channel" (3-ER-337 ¶43)—and the FAC specifically alleges that sellout data "allowed NVIDIA to determine the percentage of GeForce GPUs sold to crypto-miners." 3-ER-348-49 ¶82; *see also* 3-ER-348 ¶80, 3-ER-360-61 ¶121 & Figure F (NVIDIA slides showing hundreds of thousands of GPU sales to miners in China based on sellout data).

*Third*, the District Court's finding that Huang's "close" to the market comment reflected generalized awareness of cryptocurrency developments, rather than tracking sales to miners, is unwarranted. The FAC contains multiple allegations that Defendants studied and measured who was buying NVIDIA GPUs throughout the Class Period and publicly touted doing so. It is implausible that Huang was speaking generally about the overall cryptocurrency environment.

Further, Defendants' other statements reflected their access to data quantifying mining-related sales. *E.g.*, 3-ER-346 ¶74: (Kress: "the majority [of cryptocurrency-related sales] does reside in terms of our overall crypto card"); 3-ER-345-46 ¶73 (Huang: "we serve the vast … majority of the cryptocurrency demand out of that specialized product [the Crypto SKU];" sales to miners

"represented only a couple hundred million dollars, maybe $150 million or so"); 3-ER-387 ¶196 (Huang: crypto "is small for us"—"[m]aybe $70 million"); 3-ER-344 ¶67 (Huang: crypto is "small, overall"). These specific statements quantifying revenues from cryptocurrency and comparing them to other revenue streams "strongly suggests [Defendants] had access to the disputed information" about the volume of GPU sales to cryptocurrency miners. *Reese*, 747 F.3d at 576-77 ("actual access" analysis supported scienter because defendant's statements comparing conditions in two oil pipelines "reflect her access to the disputed information"); *see also S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1258-60 (W.D. Wash. 2009) (CEO's "statements themselves suggest that he had actual knowledge" of the information).

The FAC establishes the core operations inference in every permutation contemplated by this Court's precedent. The ruling that Plaintiffs failed to allege a strong inference of scienter was incorrect and should be reversed.

Further, even if the core operations allegations did not—as they do—satisfy the "absurdity" or "actual access" tests, those allegations nonetheless reinforce an overall mix of allegations that, viewed holistically, support a finding that scienter is sufficiently pled. *See S. Ferry*, 542 F.3d at 785 (core operations allegations "may be used in any form along with other allegations that, when read together, raise an inference of scienter").

## III. Failure to Assess Recklessness

Notwithstanding the District Court's statement that Plaintiffs failed to plausibly establish that Defendants spoke recklessly (1-ER-18), Plaintiffs respectfully submit that the lower Court did not analyze, or sufficiently analyze, whether Plaintiffs alleged that Defendants were deliberately reckless in denying NVIDIA's reliance on mining-related sales and grossly understating those sales.

This Court defines recklessness as:

> a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Siracusano*, 585 F.3d at 1180.

This Court has cautioned that:

> Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements. Otherwise, the securities laws would be significantly weakened, because corporate officers could stay out of the loop such that, under *Central Bank*, only the SEC could bring suit against them in an individual capacity for their misrepresentations.

*Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1062 (9th Cir. 2000).

In analyzing the sufficiency of Plaintiffs' scienter allegations, the District Court repeatedly concluded only that Plaintiffs had failed to establish that the Individual Defendants *actually* reviewed information contradicting their public

statements. *See* 1-ER-19 (allegations regarding Centralized Database do not "show that Defendant Huang had some contradictory information"); *id.* (quarterly meeting allegations do not show that "Huang actually learned of specific data and then made any statement contradicted by that data"); 1-ER-20 (GeForce Experience data allegations fail to include allegation that Huang "actually received this data"); 1-ER-23 (Centralized Sales Database allegations fail to allege that either Fisher or Kress "actually accessed the database").

This was error. "Deliberate recklessness" does not require that a speaker who spoke recklessly actually obtained information contradicting his or her statement. It requires that the speaker had access to, but failed to obtain, contradictory information despite an ability to do so "without extraordinary effort." *Reese*, 747 F.3d at 569 ("An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have without extraordinary effort."); *see also VeriFone*, 704 F.3d at 708 ("Recklessly turning a blind eye to impropriety is equally culpable conduct under Rule 10b-5.").

This was most palpably an error with respect to Huang's and Kress's false statements concerning Crypto SKU from August through November 2017. *Supra* pp. 22-24. Throughout fall 2017, Defendants were asked repeatedly about the impact of mining on revenues, and were thus on ample notice of analysts' focus on

this issue. Yet, Huang and Kress repeatedly and consistently responded to those queries by (i) quantifying NVIDIA's revenues attributable to Crypto SKU, and (ii) simultaneously averring that those Crypto SKU revenues accounted for the vast majority of NVIDIA's mining-related revenues. *See* 3-ER-383 ¶179; 3-ER-384 ¶183; 3-ER-385-86 ¶190; 3-ER-386 ¶193; 3-ER-387 ¶196; 3-ER-388 ¶203. Even if Huang and Kress had not seen NVIDIA's multiple data sources refuting these claims, it was deliberately reckless for them to repeatedly answer such questions without first obtaining sufficient data to confirm their statements were true. *See Reese*, 747 F.3d at 569; *see also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) ("[The analysts'] focused questions do mark an important distinction between this case and those in which defendants win dismissal on a showing that defendants were most likely simply ignorant of the facts that made their statements false.").

## IV. PLAINTIFFS ADEQUATELY ALLEGED PRIMARY VIOLATIONS UNDERLYING THE SECTION 20(a) CLAIMS

Because the District Court erroneously dismissed the § 10(b) claims, the dismissal of the associated § 20(a) control person claims (1-ER-16) was also error. *See Howard*, 228 F.3d at 1065 (prima facie § 20(a) claim requires proving "a primary violation of federal securities law" and "that the defendant exercised actual power or control over the primary violator"); *America West*, 320 F.3d at 945 (same; reversing dismissal).

## CONCLUSION

"The PSLRA was designed to eliminate frivolous or sham actions, but not actions of substance." *Nursing Home*, 380 F.3d at 1235. Plaintiffs have identified five sources of internal reports or data—all available to, and reviewed by, Defendants and described with particularity—that contradicted Defendants' public statements. Plaintiffs have buttressed their claims with accounts from five confidential witnesses. Reviewed holistically, Plaintiffs have established a compelling narrative of scienter, far stronger than any nonfraudulent alternative. The dismissal of the FAC should be reversed.

Dated: New York, New York
August 11, 2021

By: /s/ *Gregory P. Joseph*

Gregory P. Joseph
Rachel M. Cherington
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
Tel.: (212) 407-1200
gjoseph@jhany.com
rcherington@jhany.com

Eric Gerard, Esq.
Matthew L. Mustokoff
Andrew L. Zivitz
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel.: (610) 667-7706
egerard@ktmc.com
mmustokoff@ktmc.com
azivitz@ktmc.com

Jennifer L. Joost
KESSLER TOPAZ MELTZER & CHECK, LLP
One Sansome Street, Suite 1850
San Francisco, California 94104
Tel.: (415) 400-3000
jjoost@ktmc.com

John Browne
Michael Mathai
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
1251 Avenue of the Americas, 44th Floor
New York, New York 10020
Tel.: (212) 554-1400
johnb@blbglaw.com
michael.mathai@blbglaw.com

Lauren M. Cruz
Jonathan D. Uslaner
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
2121 Avenue of the Stars, Suite 2575
Los Angeles, California 90067
Tel.: (310) 819-3470
lauren.cruz@blbglaw.com
jonathanu@blbglaw.com

*Attorneys for Appellants E. Öhman J:or Fonder AB and Stichting Pensioenfonds PGB*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**
**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)** 21-15604

I am the attorney or self-represented party.

**This brief contains 13,865 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties;
- [ ] a party or parties are filing a single brief in response to multiple briefs; or
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/Gregory P. Joseph* **Date** August 11, 2021

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/18*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

**9th Cir. Case Number(s)** 21-15604

The undersigned attorney or self-represented party states the following:

[ X ] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** *_/s/Gregory P. Joseph_* **Date** August 11, 2021

# STATUTORY ADDENDUM

Code of Federal Regulations
Title 17. Commodity and Securities Exchanges
Chapter II. Securities and Exchange Commission
Part 240. General Rules and Regulations, Securities Exchange Act of 1934 (Refs & Annos)
Subpart A. Rules and Regulations Under the Securities Exchange Act of 1934
Manipulative and Deceptive Devices and Contrivances (Refs & Annos)

17 C.F.R. § 240.10b–5

# § 240.10b–5 Employment of manipulative and deceptive devices.

Currentness

<Notes of Decisions for 17 CFR § 240.10b–5 are displayed in separate documents. Notes of Decisions for subdivisions I to IX are contained in this document. For text of section, and references, see first document for 17 CFR § 240.10b–5. For Notes of Decisions for subdivisions X to end, see documents for 17 CFR § 240.10b–5, post.>

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

(Authority: Sec. 10; 48 Stat. 891; 15 U.S.C. 78j)

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

**Credits**

[13 FR 8183, Dec. 22, 1948, as amended at 16 FR 7928, Aug. 11, 1951]

SOURCE: 50 FR 27946, July 9, 1985; 50 FR 28394, July 12, 1985; 50 FR 37654, Sept. 17, 1985; 50 FR 41870, Oct. 16, 1985; 50 FR 42678, Oct. 22, 1985; 51 FR 8801, March 14, 1986; 51 FR 12127, April 9, 1986; 51 FR 14982, April 22, 1986; 51 FR 18580, May 21, 1986; 51 FR 25882, July 17, 1986; 51 FR 36551, Oct. 14, 1986; 51 FR 44275, Dec. 9, 1986; 52 FR 3000, Jan. 30, 1987; 52 FR 8877, March 20, 1987; 52 FR 9154, March 23, 1987; 52 FR 16838, May 6, 1987; 52 FR 27969, July 24, 1987; 52 FR 42279, Nov. 4, 1987; 53 FR 26394, July 12, 1988; 53 FR 33459, Aug. 31, 1988; 53 FR 37289, Sept. 26, 1988; 54 FR 23976, June 5, 1989; 54 FR 28813, July 10, 1989; 54 FR 30031, July 18, 1989; 54 FR 35481, Aug. 28, 1989; 54 FR 37789, Sept. 13, 1989; 55 FR 23929, June 13, 1990; 55 FR 50320, Dec. 6, 1990; 56 FR 7265, Feb. 21, 1991; 56 FR 9129, March 5, 1991; 56 FR 12118, March 22, 1991; 56 FR 19156, April 25, 1991; 56 FR 28322, June 20, 1991; 56 FR 30067, July 1, 1991; 57 FR 18218, April 29, 1992; 57 FR 32168, July 21, 1992; 57 FR 36501, Aug. 13, 1992; 57 FR 47409, Oct. 16, 1992; 58 FR 14682, March 18, 1993; 59 FR 10985, March 9, 1994; 59 FR 55012, Nov. 2, 1994; 59 FR 66709, Dec. 28, 1994; 61 FR 48328, Sept. 12, 1996; 62 FR 543, Jan. 3, 1997; 62 FR 6071, Feb. 10, 1997; 62 FR 12749, March 18, 1997; 62 FR 35340, July 1, 1997; 63 FR 8102, Feb. 18, 1998; 63 FR 13944, March 23, 1998; 65 FR 76087, Dec. 5, 2000; 66 FR 21659, May 1, 2001; 66 FR 43741, Aug. 20, 2001; 66 FR 55837, 55838, Nov. 2, 2001; 67 FR 247, Jan. 2, 2002; 67 FR 57288, Sept. 9, 2002; 67 FR 58299, Sept. 13, 2002; 68 FR 4355, Jan. 28, 2003; 68 FR 5364, Feb. 3, 2003; 68 FR 18818, April 16, 2003; 68 FR 36665, June 18, 2003; 68 FR 64970, Nov. 17, 2003; 68 FR 67009, Nov. 28, 2003; 68 FR 69221, Dec. 11, 2003; 71 FR 65407, Nov. 8, 2006; 71 FR 74708, Dec. 12, 2006; 71 FR 76596, Dec. 21, 2006; 72 FR 4166, Jan. 29, 2007; 74 FR 68365, Dec. 23, 2009; 75 FR 2794, Jan. 19, 2010; 75 FR 9081, Feb. 26, 2010; 75 FR 54477, Sept. 8, 2010; 75 FR 64653, Oct. 20, 2010; 76 FR 4511, Jan. 26, 2011; 76 FR 6045, Feb. 2, 2011; 76 FR 34363, June 13, 2011; 76 FR 34590, June 14, 2011; 76 FR 41685, July 15, 2011; 76 FR 46620, Aug. 3, 2011; 76 FR 71876, Nov. 21, 2011; 77 FR 30751, May 23, 2012; 77 FR 38454, June 27, 2012; 77 FR 41647, July 13, 2012; 77 FR 48356, Aug. 13, 2012; 77 FR 56362, Sept. 12, 2012; 77 FR 56417, Sept. 12, 2012; 77 FR 66285, Nov. 2, 2012; 77 FR 73305, Dec. 10, 2012; 78 FR 4783, Jan. 23, 2013; 78 FR 42450, July 16, 2013; 78 FR 67633, Nov. 12, 2013; 79 FR 1548, Jan. 8, 2014; 79 FR 39159, July 9, 2014; 79 FR 47369, Aug. 12, 2014; 79 FR 55261, Sept. 15, 2014; 79 FR 57344, Sept. 24, 2014; 80 FR 14550, March 19, 2015; 80 FR 49013, Aug. 14, 2015; 81 FR 8637, Feb. 19, 2016; 81 FR 28705, May 10, 2016; 81 FR 30142, May 13, 2016; 81 FR 70900, Oct. 13, 2016; 82 FR 17555, April 12, 2017; 84 FR 33491, July 12, 2019; 84 FR 33629, July 12, 2019; 84 FR 44041, Aug. 22, 2019; 84 FR 55055, Oct. 15, 2019, unless otherwise noted.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

AUTHORITY: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c–3, 78c–5, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78k, 78k–1, 78*l*, 78m, 78n, 78n–1, 78*o*, 78*o*–4, 78*o*–10, 78p, 78q, 78q–1, 78s, 78u–5, 78w, 78x, 78dd, 78*ll*, 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, and 7201 et seq., and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C. 5221(e)(3); 18 U.S.C. 1350; Pub.L. 111–203, 939A, 124 Stat. 1376 (2010); and Pub.L. 112–106, sec. 503 and 602, 126 Stat. 326 (2012), unless otherwise noted.; Section 240.3a4–1 also issued under secs. 3 and 15, 89 Stat. 97, as amended, 89 Stat. 121 as amended;; Section 240.3a12–8 also issued under 15 U.S.C. 78a et seq., particularly secs. 3(a)(12), 15 U.S.C. 78c(a)(12), and 23(a), 15 U.S.C. 78w(a);; Section 240.3a12–10 also issued under 15 U.S.C. 78b and c;; Section 240.3a12–9 also issued under secs. 3(a)(12), 7(c), 11(d)(1), 15 U.S.C. 78c(a)(12), 78g(c), 78k(d)(1);; Sections 240.3a43–1 and 240.3a44–1 also issued under sec. 3; 15 U.S.C. 78c;; Sections 3a67–1 through 3a67–9 and 3a71–1 and 3a71–2 are also issued under Pub.L. 111–203, §§ 712, 761(b), 124 Stat. 1841 (2010).; Section 240.3a67–10, 240.3a71–3, 240.3a71–4, 240.3a71–5, and 240.3a71–6 are also issued under Pub.L. 111–203, secs. 712, 761(b), 124 Stat. 1754 (2010), and 15 U.S.C. 78dd(c).; Sections 240.3a71–3 and 240.3a71–5 are also issued under Pub.L. 111–203, sec. 761(b), 124 Stat. 1754 (2010), and 15 U.S.C. 78dd(c).; Section 240.3b–6 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.3b–9 also issued under secs. 2, 3 and 15, 89 Stat. 97, as amended, 89 Stat. 121, as amended (15 U.S.C. 78b, 78c, 78*o*);; Section 240.9b–1 is also issued under sec. 2, 7, 10, 19(a), 48 Stat. 74, 78, 81, 85; secs. 201, 205, 209, 120, 48 Stat. 905, 906, 908; secs. 1–4, 8, 68 Stat. 683, 685; sec. 12(a), 73 Stat. 143; sec. 7(a), 74 Stat. 412; sec. 27(a), 84 Stat. 1433; sec. 308(a)(2), 90 Stat. 57; sec. 505, 94 Stat. 2292; secs. 9, 15, 23(a), 48 Stat. 889, 895, 901; sec. 230(a), 49 Stat. 704; secs. 3, 8, 49 Stat. 1377, 1379; sec. 2, 52 Stat. 1075; secs. 6, 10, 78 Stat. 570–574, 580; sec. 11(d), 84 Stat. 121; sec. 18, 89 Stat. 155; sec. 204, 91 Stat. 1500; 15 U.S.C. 77b, 77g, 77j, 77s(a), 78i, 78*o*, 78w(a);; Section 240.10b–10 is also issued under secs. 2, 3, 9, 10, 11, 11A, 15, 17, 23, 48 Stat. 891, 89 Stat. 97, 121, 137, 156, (15 U.S.C. 78b, 78c, 78i, 78j, 78k, 78k–1, 78*o*, 78q).; Section 240.12a–7 also issued under 15 U.S.C. 78a et seq., particularly secs. 3(a)(12), 15 U.S.C. 78c(a)(12), 6, 15 U.S.C. 78(f), 11A, 15 U.S.C. 78k, 12, 15 U.S.C. 78(l), and 23(a)(1), 15 U.S.C. 78(w)(a)(1).; Sections 240.12b–1 to 240.12b–36 also issued under secs. 3, 12, 13, 15, 48 Stat. 892, as amended, 894, 895, as amended; 15 U.S.C. 78c, 78*l*, 78m, 78*o*;; Section 240.12b–15 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.12b–25 is also issued under 15 U.S.C. 80a–8, 80a–24(a), 80a–29, and 80a–37.; Section 240.12g–3 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.12g3–2 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.13a–10 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.13a–11 is also issued under secs. 3(a) and 306(a), Pub.L. 107–204, 116 Stat. 745.; Section 240.13a–14 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.13a–15 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.13d–3 is also issued under Public Law 111–203 § 766, 124 Stat. 1799 (2010).; Sections 240.13e–4, 240.14d–7, 240.14d–10 and 240.14e–1 also issued under secs. 3(b), 9(a)(6), 10(b), 13(e), 14(d) and 14(e), 15 U.S.C. 78c(b), 78i(a)(6), 78j(b), 78m(e), 78n(d) and 78n(e) and sec. 23(c) of the Investment Company Act of 1940, 15 U.S.C. 80a–23(c);; Sections

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

240.13e–4 to 240.13e–101 also issued under secs. 3(b), 9(a)(6), 10(b), 13(e), 14(e), 15(c)(1), 48 Stat. 882, 889, 891, 894, 895, 901, sec. 8, 49 Stat. 1379, sec. 5, 78 Stat. 569, 570, secs. 2, 3, 82 Stat. 454, 455, secs. 1, 2, 3–5, 84 Stat. 1497, secs. 3, 18, 89 Stat. 97, 155; 15 U.S.C. 78c(b), 78i(a)(6), 78j(b), 78m(e), 78n(e), 78*o*(c)

sec. 23(c) of the Investment Company Act of 1940; 54 Stat. 825; 15 U.S.C. 80a–23(c);; Section 240.13f–2(T) also issued under sec. 13(f)(1) (15 U.S.C. 78m(f)(1));; Section 240.13p–1 is also issued under sec. 1502, Pub.L. 111–203, 124 Stat. 1376.; Section 240.13q–1 is also issued under sec. 1504, Pub.L. 111–203, 124 Stat. 2220.; Sections 240.14a–1, 240.14a–3, 240.14a–13, 240.14b–1, 240.14b–2, 240.14c–1, and 240.14c–7 also issued under secs. 12, 15 U.S.C. 781, and 14, Pub.L. 99–222, 99 Stat. 1737,15 U.S.C. 78n;; Sections 240.14a–3, 240.14a–13, 240.14b–1 and 240.14c–7 also issued under secs. 12, 14 and 17, 15 U.S.C. 781, 78n and 78g;; Sections 240.14c–1 to 240.14c–101 also issued under sec. 14, 48 Stat. 895; 15 U.S.C. 78n;; Section 240.14d–1 is also issued under 15 U.S.C. 77g, 77j, 77s(a), 77ttt(a), 80a–37.; Section 240.14e–2 is also issued under 15 U.S.C. 77g, 77h, 77s(a), 77sss, 80a–37(a).; Section 240.14e–4 also issued under the Exchange Act, 15 U.S.C. 78a et seq., and particularly sections 3(b), 10(a), 10(b), 14(e), 15(c), and 23(a) of the Exchange Act (15 U.S.C. 78c(b), 78j(a), 78j(b), 78n(e), 78*o*(c), and 78w(a)).; Section 240.15a–6, also issued under secs. 3, 10, 15, and 17, 15 U.S.C. 78c, 78j, 78*o*, and 78q;; Section 240.15b1–3 also issued under sec. 15, 17; 15 U.S.C. 78*o*78q;; Sections 240.15b1–3 and 240.15b2–1 also issued under 15 U.S.C. 78*o*, 78q;; Section 240.15b2–2 also issued under secs. 3, 15; 15 U.S.C. 78c, 78*o*;; Sections 240.15b10–1 to 240.15b10–9 also issued under secs. 15, 17, 48 Stat. 895, 897, sec. 203, 49 Stat. 704, secs. 4, 8, 49 Stat. 1379, sec. 5, 52 Stat. 1076, sec. 6, 78 Stat. 570; 15 U.S.C. 78*o*, 78q, 12 U.S.C. 241 nt.;; Section 240.15c2–6, also issued under secs. 3, 10, and 15, 15 U.S.C. 78c, 78j, and 78*o*.; Section 240.15c2–11 also issued under 15 U.S.C. 78j(b), 78*o*(c), 78q(a), and 78w(a).; Section 240.15c2–12 also issued under 15 U.S.C. 78b, 78c, 78j, 78*o*, 78*o*–4 and 78q.; Section 240.15c3–1 is also issued under 15 U.S.C. 78*o*(c)(3), 78*o*–10(d), and 78*o*–10(e).; Sections 240.15c3–1a, 240.15c3-1e, 240.15c3-1f, 240.15c3-1g are also issued under Pub. L. 111-203, secs. 939, 939A, 124. Stat. 1376 (2010) (15 U.S.C. 78c, 15 U.S.C. 78*o*-7 note).; Section 240.15c3–3 is also issued under 15 U.S.C. 78c–5, 78*o*(c)(2), 78(c)(3), 78q(a), 78w(a); sec. 6(c), 84 Stat. 1652; 15 U.S.C. 78fff.; Section 240.15c3–3a is also issued under Pub.L. 111–203, §§ 939, 939A, 124. Stat. 1376 (2010) (15 U.S.C. 78c, 15 U.S.C. 78*o*–7 note).; Section 240.15c3–3(o) is also issued under Pub.L. 106–554, 114 Stat. 2763, section 203.; Section 240.15d–5 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.15d–10 is also issued under 15 U.S.C. 80a–20(a) and 80a–37(a), and secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.15d–11 is also issued under secs. 3(a) and 306(a), Pub.L. 107–204, 116 Stat. 745.; Section 240.15d–14 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.15d–15 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.15*l*–1 is also issued under Pub.L. 111–203, sec. 913, 124 Stat. 1376, 1827 (2010).; Sections 240.15Ba1–1 through 240.15Ba1–8 are also issued under sec. 975, Public Law 111–203, 124 Stat. 1376 (2010). ; Section 240.15Bc4–1 is also issued under sec. 975, Public Law 111–

203, 124 Stat. 1376 (2010). ; Sections 240.15Ca1–1, 240.15Ca2–1, 240.15Ca2–2, 240.15Ca2–3, 240.15Ca2–4, 240.15Ca2–5, 240.15Cc1–1 also issued under secs. 3, 15C; 15 U.S.C. 78c, 78o–5;; Sections 240.15Fh–1 through 240.15Fh–6 and 240.15Fk–1 are also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.15Ga–1 is also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.15Ga–2 is also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.16a–1(a) is also issued under Public Law 111–203 § 766, 124 Stat. 1799 (2010).; Section 240.17a–3 also issued under secs. 2, 17, 23a, 48 Stat. 897, as amended; 15 U.S.C. 78d–1, 78d–2, 78q; secs. 12, 14, 17, 23(a), 48 Stat. 892, 895, 897, 901; secs. 1, 4, 8, 49 Stat. 1375, 1379; sec. 203(a), 49 Stat. 704

sec. 5, 52 Stat. 1076; sec. 202, 68 Stat. 686; secs. 3, 5, 10, 78 Stat. 565-568, 569, 570, 580; secs. 1, 3, 82 Stat. 454, 455; secs. 28(c), 3–5, 84 Stat. 1435, 1497; sec. 105(b), 88 Stat. 1503; secs. 8, 9, 14, 18, 89 Stat. 117, 118, 137, 155; 15 U.S.C. 78*l*, 78n, 78q, 78w(a); ; Section 240.17a–4 also issued under secs. 2, 17, 23(a), 48 Stat. 897, as amended; 15 U.S.C. 78a, 78d–1, 78d–2; sec. 14, Pub.L. 94–29, 89 Stat. 137 (15 U.S.C. 78a); sec. 18, Pub.L. 94–29, 89 Stat. 155 (15 U.S.C. 78w);; Section 240.17a–14 is also issued under Public Law 111–203, sec. 913, 124 Stat. 1376 (2010).; Section 240.17a–23 also issued under 15 U.S.C. 78b, 78c, 78*o*, 78q, and 78w(a).; Section 240.17f–1 is also authorized under sections 2, 17 and 17A, 48 Stat. 891, 89 Stat. 137, 141 (15 U.S.C. 78b, 78q, 78q–1);; Section 240.17g–7 is also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.17g–8 is also issued under sec. 938, Pub.L. 111–203, 124 Stat. 1376.; Section 240.17g–9 is also issued under sec. 936, Pub.L. 111–203, 124 Stat. 1376.; Section 240.17h–1T also issued under 15 U.S.C. 78q.; Sections 240.17Ac2–1(c) and 240.17Ac2–2 also issued under secs. 17, 17A and 23(a); 48 Stat. 897, as amended, 89 Stat. 137, 141 and 48 Stat. 901 (15 U.S.C. 78q, 78q–1, 78w(a));; Section 240.17Ad–1 is also issued under secs. 2, 17, 17A and 23(a); 48 Stat. 841 as amended, 48 Stat. 897, as amended, 89 Stat. 137, 141, and 48 Stat. 901 (15 U.S.C. 78b, 78q, 78q–1, 78w);; Sections 240.17Ad–5 and 240.17Ad–10 are also issued under secs. 3 and 17A; 48 Stat. 882, as amended, and 89 Stat. (15 U.S.C. 78c and 78q–1);; Section 240.17Ad–7 also issued under 15 U.S.C. 78b, 78q, and 78q–1.; Section 240.17Ad–17 is also issued under Pub.L. 111–203, section 929W, 124 Stat. 1869 (2010).; Section 240.17Ad–22 is also issued under 12 U.S.C. 5461 et seq.; Sections 240.18a–1, 240.18a–1a, 240.18a–1b, 240.18a–1c, 240.18a–1d, 240.18a–2, 240.18a–3, and 240.18a–10 are also issued under 15 U.S.C. 78*o*–10(d) and 78*o*–10(e).; Section 240.18a–4 is also issued under 15 U.S.C. 78c–5(f).; Section 240.19b–4 is also issued under 12 U.S.C. 5465(e).; Sections 240.19c–4 also issued under secs. 6, 11A, 14, 15A, 19 and 23 of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*–3, and 78s);; Section 240.19c–5 also issued under Sections 6, 11A, and 19 of the Securities Exchange Act of 1934, 48 Stat. 885, as amended, 89 Stat. 111, as amended, and 48 Stat. 898, as amended, 15 U.S.C. 78f, 78k–1, and 78s.; Section 240.21F is also issued under Pub.L. 111–203, § 922(a), 124 Stat. 1841 (2010).; Section 240.31–1 is also issued under sec. 31, 48 Stat. 904, as amended (15 U.S.C. 78ee).

Notes of Decisions (1564)

Current through August 5, 2021; 86 FR 43074.

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
Title 15. Commerce and Trade
Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78j

# § 78j. Manipulative and deceptive devices [Statutory Text & Notes of Decisions subdivisions I to XI]

Currentness

<Notes of Decisions for 15 USCA § 78j are displayed in multiple documents.>

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

**(a)(1)** To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security other than a government security, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(2)** Paragraph (1) of this subsection shall not apply to security futures products.

**(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(c)(1)** To effect, accept, or facilitate a transaction involving the loan or borrowing of securities in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

**(2)** Nothing in paragraph (1) may be construed to limit the authority of the appropriate Federal banking agency (as defined in section 1813(q) of Title 12), the National Credit Union Administration, or any other Federal department or agency having a responsibility under Federal law to prescribe rules or regulations restricting transactions involving the loan or borrowing of securities in order to protect the safety and soundness of a financial institution or to protect the financial system from systemic risk.

Rules promulgated under subsection (b) that prohibit fraud, manipulation, or insider trading (but not rules imposing or specifying reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), and judicial precedents decided under subsection (b) and rules promulgated thereunder that prohibit fraud, manipulation, or insider trading, shall apply to security-based swap agreements to the same extent as they apply to securities. Judicial precedents decided under section 77q(a) of this title and sections 78i, 78***o***, 78p, 78t, and 78u-1 of this title, and judicial precedents decided under applicable rules promulgated under such sections, shall apply to security-based swap agreements to the same extent as they apply to securities.

## CREDIT(S)

(June 6, 1934, c. 404, Title I, § 10, 48 Stat. 891; Pub.L. 106-554, § 1(a)(5) [Title II, § 206(g), Title III, § 303(d)], Dec. 21, 2000, 114 Stat. 2763, 2763A-432, 2763A-454; Pub.L. 111-203, Title VII, § 762(d)(3), Title IX, §§ 929L(2), 984(a), July 21, 2010, 124 Stat. 1761, 1861, 1932.)

Footnotes

1 So in original. Probably should be followed by a comma.

15 U.S.C.A. § 78j, 15 USCA § 78j

Current through PL 117-36 with the exception of PL 116-283, Div. A, Title XVIII, which takes effect January 1, 2022.

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 15. Commerce and Trade
Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78t

# § 78t. Liability of controlling persons and persons who aid and abet violations

Effective: July 16, 2011
Currentness

**(a) Joint and several liability; good faith defense**

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

**(b) Unlawful activity through or by means of any other person**

It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person.

**(c) Hindering, delaying, or obstructing the making or filing of any document, report, or information**

It shall be unlawful for any director or officer of, or any owner of any securities issued by, any issuer required to file any document, report, or information under this chapter or any rule or regulation thereunder without just cause to hinder, delay, or obstruct the making or filing of any such document, report, or information.

**(d) Liability for trading in securities while in possession of material nonpublic information**

Wherever communicating, or purchasing or selling a security while in possession of, material nonpublic information would violate, or result in liability to any purchaser or seller of the security under any provisions of this chapter, or any rule or regulation thereunder, such conduct in connection with a purchase or sale of a put, call, straddle, option, privilege or security-based swap agreement with respect to such security or with respect to a group or index of securities including such security, shall also violate and result in comparable liability to any purchaser or seller of that security under such provision, rule, or regulation.

**(e) Prosecution of persons who aid and abet violations**

For purposes of any action brought by the Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

**(f) Limitation on Commission authority**

The authority of the Commission under this section with respect to security-based swap agreements shall be subject to the restrictions and limitations of section 78c-1(b) of this title.

**CREDIT(S)**

(June 6, 1934, c. 404, Title I, § 20, 48 Stat. 899; May 27, 1936, c. 462, § 6, 49 Stat. 1379; Pub.L. 88-467, § 9, Aug. 20, 1964, 78 Stat. 579; Pub.L. 98-376, § 5, Aug. 10, 1984, 98 Stat. 1265; Pub.L. 104-67, Title I, § 104, Dec. 22, 1995, 109 Stat. 757; Pub.L. 105-353, Title III, § 301(b)(12), Nov. 3, 1998, 112 Stat. 3236; Pub.L. 106-554, § 1(a)(5) [Title II, § 205(a)(3), Title III, § 303(i), (j)], Dec. 21, 2000, 114 Stat. 2763, 2763A-426, 2763A-456; Pub.L. 111-203, Title VII, § 762(d)(6), Title IX, §§ 929O, 929P(c), July 21, 2010, 124 Stat. 1761, 1862, 1865.)

15 U.S.C.A. § 78t, 15 USCA § 78t
Current through PL 117-36 with the exception of PL 116-283, Div. A, Title XVIII, which takes effect January 1, 2022.

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 11, 2021.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: New York, New York
August 11, 2021

*/s/Gregory P. Joseph*____________
Gregory P. Joseph
*Attorney for Plaintiffs-Appellants E. Öhman J:or Fonder AB and Stichting Pensioenfonds PGB*