**21-15604**

IN THE

# United States Court of Appeals

**FOR THE NINTH CIRCUIT**

E. OHMAN J:OR FONDER AB;
STICHTING PENSIOENFONDS PGB, Lead Plaintiffs,

*Plaintiffs-Appellants,*

—and—

IRON WORKERS LOCAL 580 JOINT FUNDS,

*Plaintiff,*

—v.—

NVIDIA CORPORATION; JENSEN HUANG;
COLETTE KRESS; JEFF FISHER,

*Defendants-Appellees,*

—and—

OAKLAND COUNTY EMPLOYEES' RETIREMENT SYSTEM; OAKLAND COUNTY VOLUNTARY EMPLOYEES' BENEFIT ASSOCIATION TRUST; OAKLAND COUNTY EMPLOYEES' RETIREMENT SYSTEM TRUST,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES


KATHLEEN R. HARTNETT
JULIE M. VEROFF
COOLEY, LLP
3 Embarcadero Center, 20th Floor
San Francisco, California 94111
(415) 693-2000

JOHN DWYER
PATRICK E. GIBBS
SAMANTHA KIRBY
JOSHUA WALDEN
COOLEY, LLP
3175 Hanover Street
Palo Alto, California 94304
(650) 843-5000

SARAH M. LIGHTDALE
PATRICK HAYDEN
COOLEY, LLP
55 Hudson Yards
New York, New York 10001
(212) 479-6000

*Attorneys for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendant-Appellee NVIDIA Corporation hereby state that NVIDIA Corporation has no parent corporations, and no publicly held company owns ten percent or more of NVIDIA Corporation. Defendants-Appellees Jensen Huang, Colette Kress, and Jeff Fisher are individuals.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 4

STATEMENT OF ISSUES TO BE DECIDED ........ 4

STATEMENT OF THE CASE ........ 5

I. Statement of Facts ........ 5

A. NVIDIA's GPU Business ........ 5

B. Cryptocurrency "Mining," NVIDIA's GPUs, and the Challenged Statements ........ 7

C. The FAC's Allegations ........ 18

II. Procedural History ........ 20

SUMMARY OF ARGUMENT ........ 22

ARGUMENT ........ 24

I. Standard of Review ........ 24

II. Plaintiffs Do Not Allege Specific Facts Supporting a Strong Inference of Scienter ........ 24

A. Under a Holistic Review, the Non-Culpable Explanation Is Far More Plausible, Precluding Scienter Under the PSLRA ........ 26

B. The FEs Lack the Indicia of Reliability and Personal Knowledge Required by the PSLRA ........ 31

C. The FAC Fails to Allege Particularized Facts Regarding Any Data to Show That Any Statement Was Knowingly False When Made ........ 33

1. Internal Sales Database ........ 35

2. GeForce Experience ("GFE") Data ........ 38

3. Report from China, "Top 5" Emails, and Quarterly Meetings ........ 39

4. Plaintiffs' Authorities Do Not Undermine the District Court's Analysis ........ 42

D. The District Court Correctly Determined that Plaintiffs Failed to Allege Deliberate Recklessness ........ 44

**TABLE OF CONTENTS**
**(CONTINUED)**

**Page**


E. The Core Operations Theory Does Not Apply ........................46

III. Plaintiffs Fail to Plead Falsity ..........................................................50

A. The FAC Does Not Allege an Actionable Misstatement ........50

B. Plaintiffs' "Expert" Allegations Cannot Be Credited..............58

IV. The Section 20(a) Control Person Claim Was Properly Dismissed ...........................................................................................60

CONCLUSION ...........................................................................................60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alphabet, Inc. Securities Litigation*,
1 F.4th 687 (9th Cir. 2021) ....................................................................49

*In re Am. Apparel, Inc. S'holder Litig.*,
855 F. Supp. 2d 1043 (C.D. Cal. 2012) ...........................................................48

*Applestein v. Medivation, Inc.*,
561 F. App'x 598 (9th Cir. 2014) ....................................................................60

*Berson v. Applied Signal Technology, Inc.*,
527 F.3d 982 (9th Cir. 2008) ....................................................................49

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ....................................................................58

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ....................................................................*passim*

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) ....................................................................30

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ....................................................................55

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ....................................................................39, 47

*ESG Capital Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ....................................................................28

*Freedom from Religion Found., Inc. v. Chino Valley Unif. Sch. Dist.*,
896 F.3d 1132 (9th Cir. 2018) ....................................................................32

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
843 F.3d 1257 (11th Cir. 2016) ....................................................................35

*Gingery v. City of Glendale*,
831 F.3d 1222 (9th Cir. 2016) ....................................................................50

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**


*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ....................................................................46

*Inst. Inv'r Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) .......................................................................46

*Jackson v. Loews Hotels, Inc.*,
2019 WL 6721637 (C.D. Cal. July 24, 2019)...................................................9

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ...............................................................3, 34

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ....................................................................50

*Martin v. Quartermain*,
732 F. App'x 37 (2d Cir. 2018) ...................................................................55

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ...................................................................*passim*

*Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,
2016 WL 7475555 (N.D. Cal. Dec. 29, 2016)..................................................39

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ..............................................................42, 43

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ..........................................................44, 48, 50

*Old Person v. Cooney*,
230 F.3d 1113 (9th Cir. 2000) ....................................................................44

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ......................................................................45

*Par Inv. Partners, L.P. v. Aruba Networks, Inc.*,
681 F. App'x 618 (9th Cir. 2017) ..................................................................6

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**


*Pirani v. Slack Techs., Inc.*,
13 F.4th 940 (9th Cir. 2021) ....................................................................6

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ....................................................................*passim*

*Prodanova v. H.C. Wainwright & Co.*,
993 F.3d 1097 (9th Cir. 2021) ....................................................25, 27, 28, 37

*In re Quality Systems, Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ....................................................42, 43, 44

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ....................................................46, 47, 49

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ....................................................................50

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ....................................................................25

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ....................................................................45

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)....................................................................25, 26, 30

*In re Twitter, Inc. Sec. Litig.*,
506 F. Supp. 3d 867 (N.D. Cal. 2020)....................................................41

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
2013 WL 2247394 (C.D. Cal. May 9, 2013)..........................................59

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ....................................................................50

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ....................................................................46

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ....................6

*Webb v. Solarcity Corp.*,
884 F.3d 844 (9th Cir. 2018) ....................28

*Wochos v. Tesla, Inc.*,
2019 WL 1332395 (N.D. Cal. Mar. 25, 2019) ....................6

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ....................40, 55, 56

*Wozniak v. Align Tech., Inc.*,
850 F. Supp. 2d 1029 (N.D. Cal. 2012) ....................42

*Xiaojiao Lu v. Align Tech., Inc.*,
417 F. Supp. 3d 1266 (N.D. Cal. 2019) ....................50

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ....................*passim*

**Statutes**

15 U.S.C.
§ 78u-4(b)(2) ....................24, 35

Private Securities Litigation Reform Act ....................*passim*

**Other Authorities**

Fed. R. App. Proc. 10(a) ....................6

Federal Rule of Civil Procedure
9(b) ....................24
12(b)(6) ....................24

## INTRODUCTION

The District Court's decision dismissing with prejudice Plaintiffs' First Amended Complaint ("FAC") asserting securities fraud claims against Defendant NVIDIA Corporation and three of its executives should be affirmed.

NVIDIA is the world's largest producer of graphic processing units ("GPUs"), computer chips designed and primarily used for gaming. In 2017, as prices of certain cryptocurrencies skyrocketed, a new set of end users — cryptocurrency "miners" — began using NVIDIA's GPUs to earn tokens by solving complex mathematical problems. This presented a challenge for NVIDIA: how to meet this new and highly unpredictable demand while ensuring adequate supplies for its core gaming end users. That challenge was compounded by the fact that NVIDIA does not sell directly to end users, but instead through a complex, multi-layer distribution channel.

NVIDIA responded to the challenge by, first, creating a new GPU — the "Crypto SKU" — designed specifically for mining and without video functions needed by gamers, and, later, by substantially increasing production of gaming GPUs. Even as mining demand dried up, distributors continued to buy record amounts of GPUs from NVIDIA, and NVIDIA expected gamers (who had been priced out of the market) to return to the market as prices normalized. But distributors took longer than expected to adjust their pricing, gamers did not absorb the increased supply, and a build-up of inventory in NVIDIA's channel caused

NVIDIA to temporarily pause sales of certain GPUs. This lawsuit followed.

In the FAC, Plaintiffs assert that NVIDIA violated federal securities laws by concealing the extent to which sales were driven by demand from miners, as opposed to video-game players. Plaintiffs claim NVIDIA *knew* that gamers would not absorb the gaming GPUs that NVIDIA sold to distributors, yet "flooded" its distribution channel with those GPUs anyway. 3-ER-378 (¶162).[1] According to Plaintiffs, Defendants deliberately misled investors about NVIDIA's mining-related GPU sales, despite knowing that its stock price would crater once cryptocurrency prices "inevitabl[y]" declined. *Id.*

The District Court correctly dismissed the FAC with prejudice for failure to plead particularized facts creating a "strong inference" of scienter, as required by the Private Securities Litigation Reform Act ("PSLRA"). Plaintiffs cite several anonymous former employees ("FEs"), who purport to describe various internal data sources with information about mining-related sales. After conducting a "holistic inquiry," the District Court held that the FAC "fail[ed] to raise a strong inference of scienter, largely because Plaintiffs do not adequately tie the specific contents of any of these data sources to particular statements." 1-ER-18.

Plaintiffs' opening brief ("OB") mischaracterizes the District Court's analysis

---

[1] "ER" refers to Appellants' Excerpts of Record. References to "¶" are to paragraph(s) of the FAC. 3-ER-320-406.

and advances the same meritless arguments that the District Court properly rejected. Although Plaintiffs argue that the District Court failed to conduct a "holistic inquiry" or assess "deliberate recklessness," the District Court did both. Moreover, Plaintiffs articulate no plausible rationale for the alleged fraud. Nowhere do Plaintiffs explain why Defendants would intentionally "flood" the distribution channel with GPUs despite knowing, according to Plaintiffs, that the decline of mining demand was "inevitable" and that gaming demand would not materialize in time to absorb supply. Nor do Plaintiffs argue that any Defendant had any plausible motive for the alleged fraud. Viewed holistically, the facts alleged are far more consistent with a company trying to navigate a complex and disruptive business environment, and novel and volatile demand for its products, with no way to reliably predict what would happen in the future.

As the District Court recognized, Plaintiffs have failed to allege that any internal data source put NVIDIA's executives on notice that any of their public statements was false or misleading. Indeed, they do not allege the *contents* of any data sources with specificity and, as such, cannot show that any of those data sources conflicted with any of the challenged statements, much less that any of the speakers were aware of such information when they spoke. Plaintiffs' plea that such a "level of specificity" is not required, OB-47, ignores this Court's precedent, which holds that "negative characterizations of reports relied on by insiders, *without specific*

*reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA*." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (emphasis added).

This Court should affirm the judgment below for the reasons expressed in the District Court's dismissal order. Alternatively, the Court, should it choose to address the issue, should affirm the judgment based on the FAC's failure to adequately allege that any challenged statement was false or misleading.

## STATEMENT OF JURISDICTION

Defendants concur with Plaintiffs' statement of jurisdiction.

## STATEMENT OF ISSUES TO BE DECIDED

(1) Did the District Court correctly determine that the FAC's allegations fail to raise an inference of fraudulent intent that is "strong," "cogent," and at least as "compelling" as the alternative innocent explanation?

(2) Should this Court affirm the District Court's judgment on the alternate ground that the FAC fails to allege with particularity that any statement was false or misleading?

(3) Did the District Court correctly hold that the FAC fails to state a claim under Section 20(a) of the Securities and Exchange Act, given its failure to adequately plead a primary violation of Section 10(b)?

## STATEMENT OF THE CASE

# I. STATEMENT OF FACTS

## A. NVIDIA's GPU Business

NVIDIA, the world's largest producer of GPUs, invented the GPU for rendering computer graphics. 3-ER-333, 336 (¶¶29, 38). Given their powerful processing capability, however, GPUs are increasingly deployed in a wide range of systems for processing large data sets, including, for example, in machine learning and automated driving. *Id.* Defendant Jensen Huang is co-founder and Chief Executive Officer of NVIDIA; Defendant Colette Kress is its Chief Financial Officer; and Defendant Jeff Fisher is its Executive Vice President. 3-ER-333-34 (¶¶30-32).

NVIDIA generally does not sell GPUs directly to end users. 3-ER-337 (¶42). Instead, it sells them to device manufacturers, which incorporate the GPUs into their own products, such as graphics cards or personal computers. *Id.* These manufacturers then sell their products into multi-level distribution channels, which include "wholesalers, retailers, or internet platforms." *Id.* NVIDIA refers to its direct customers, together with their distribution networks, as the "channel," and the volume of NVIDIA products that its customers and their distribution networks have in inventory at any given time as "channel inventory." *See, e.g.*, 2-ER-256, 258.

As NVIDIA has explained to investors, it typically takes months for an NVIDIA GPU to move from the beginning of the channel (when NVIDIA sells into

the channel) to the end (when an end user buys a product that incorporates the GPU). *See, e.g.*, SER-194; SER-27.[2] If end-user demand slows while NVIDIA continues to sell product into the channel, channel inventory can increase to a point at which NVIDIA's distributors might halt their purchases. *See, e.g.*, 3-ER-378 (¶162). Conversely, if end-user sales suddenly accelerate, inventory may tighten — and prices may increase — until NVIDIA increases supply. Further, while NVIDIA suggests a price ("MSRP") for graphics cards containing its GPUs, it does not control pricing in the channel. *See, e.g.*, SER-29. Thus, third parties' independent purchasing and pricing decisions can affect (at times, dramatically) the flow of NVIDIA's products through the channel. *See id.* NVIDIA regularly warned investors: "In estimating demand, we make multiple assumptions, any of which may

[2] While the District Court denied "as moot" Defendants' request for judicial notice of this earnings call transcript (Ex. P, SER-17), *see* 1-ER-13, courts routinely consider such "earnings conference call transcripts" to be "appropriate subjects of judicial notice," *Wochos v. Tesla, Inc.*, 2019 WL 1332395, at *2 (N.D. Cal. Mar. 25, 2019), *aff'd*, 985 F.3d 1180 (9th Cir. 2021). This Court may consider such transcripts — additionally including Exhibit U (SER-47) and Exhibit Z (SER-161) — "to indicate what was in the public realm at [a particular] time." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010). For the same purpose, this Court may consider Exhibit W, a Form 10-K filed with the SEC, *see Pirani v. Slack Techs., Inc.*, 13 F.4th 940, 947 n.5 (9th Cir. 2021) (SEC filings), and two analyst reports — Exhibits K and S, *see Par Inv. Partners, L.P. v. Aruba Networks, Inc.*, 681 F. App'x 618, 620 n.1 (9th Cir. 2017) (analyst report). Each of these documents is already included in the appellate record because they were filed in the district court (2-ER-28-33). *See* Fed. R. App. Proc. 10(a).

prove to be incorrect," and any mistakes in those assumptions could result in excess or insufficient inventory to meet customer demand. SER-75.

NVIDIA's GPU revenue reflects the value of GPUs that NVIDIA sold to its direct customers. NVIDIA reports revenues by market platforms, which reflect the markets towards which NVIDIA's products are branded and marketed. 3-ER-336 (¶39). The two market platforms relevant here are "Gaming" (chips designed for playing video games, comprised primarily of the "GeForce" or "GTX" product line of GPUs) and "Original Equipment Manufacturer & IP" (or "OEM") (a catch-all category that includes GPUs sold for embedded devices and personal computers). *Id.*

### B. Cryptocurrency "Mining," NVIDIA's GPUs, and the Challenged Statements

GPUs can also be used to mine cryptocurrencies. *See* 3-ER-337-41 (¶¶44-54). As the price of a cryptocurrency goes up, miners have incentives to invest in more processing power. 3-ER-338-41 (¶¶49-54). "Because cryptocurrency prices have swung wildly over their short history . . . the demand for mining hardware — including GPUs — has proven extremely volatile." 3-ER-341 (¶55). NVIDIA's primary competitor, Advanced Micro Devices, Inc. ("AMD"), experienced this volatility in 2013, when the price of Bitcoin increased 14-fold over six months. 3-ER-341 (¶¶56-58). This caused both demand and prices for AMD's GPUs, then favored by Bitcoin miners, to "skyrocket[]." 3-ER-341 (¶57). When

Bitcoin prices plummeted, that demand collapsed, "a problem compounded by those miners dumping AMD GPUs on the secondary market at steep discounts." 3-ER-341 (¶58).

**<u>Ether's "Meteoric Climb" in Spring 2017</u>**: In the spring of 2017, the price of a cryptocurrency called Ether began a "meteoric climb" from around $23 in March to over $400 in June. 3-ER-342 (¶60); SER-201; SER-203. The chart below reflects Ether prices from January to August 2017:




*See* SER-201-04.

Initially, Ether miners "preferred" AMD's GPUs, but they turned to

NVIDIA's GPUs when AMD's became hard to find. 3-ER-513-14 (CAC ¶¶62, 65).[3] This new market presented a challenge for NVIDIA: addressing this new demand while ensuring an adequate supply of GPUs for gamers. *See, e.g.*, 2-ER-228. NVIDIA did not want to "fall prey to the boom-and-bust cycle" that AMD had experienced. 3-ER-324-25 (¶5).

In May 2017, NVIDIA launched a GPU specifically designed for mining (the "Crypto SKU"). 3-ER-325, 345 (¶¶6, 72). The Crypto SKU was designed to satisfy mining demand while preserving the supply of gaming GPUs for gamers: it had all the computing power miners needed, but without display ports and other functions critical to gaming. 3-ER-500 (CAC ¶12).[4] Because the Crypto SKUs could not be used for gaming, they would not be dumped on the market should Ether prices decline. *Id.* Analysts cheered the Crypto SKU launch, "congratulat[ing] [NVIDIA] on the very good execution and capitalizing on the crypto opportunity." 2-ER-84. Because the Crypto SKU could not be used for gaming and in order to increase transparency, revenue from the Crypto SKU was reported in the OEM segment. 3-

[3] Plaintiffs included this admission in their Consolidated Amended Complaint ("CAC") but removed it, without explanation, from the FAC. Plaintiffs cannot "simply erase these allegations," which "are more appropriately characterized as judicial admissions that Plaintiff[s] ha[ve] not cured." *Jackson v. Loews Hotels, Inc.*, 2019 WL 6721637, at *3 (C.D. Cal. July 24, 2019).

[4] Plaintiffs included these factual admissions related to the Crypto SKU in the CAC. *See supra* note 3.

ER-325, 345 (¶¶6, 72).

The Class Period begins on May 10, 2017, just before the price of Ether spiked that summer. It begins with the single challenged statement made by Fisher at NVIDIA's Annual Investor Day, where he offered his "perspective" on "some of the fundamentals behind PC gaming." 3-ER-383 (¶176); 2-ER-41. Fisher opined, "The fundamentals of PC gaming, as I'll talk about today, are also strong. What's driving PC gaming, eSports, competitive gaming, AAA gaming, notebook gaming, all those fundamentals remain strong." 2-ER-41. He did not discuss mining.

On August 10, 2017, on the first earnings call after the Crypto SKU launch, NVIDIA reported financial results for the second quarter of its 2018 fiscal year, including Gaming revenue of $1.19 billion and $150 million in sales of the new Crypto SKU.[5] 3-ER-345-346 (¶73); 2-ER-77-78, 81. Kress made clear that miners were buying both GeForce chips and the Crypto SKU: "GPU sales were lifted by demand from increasing[] mining activity, or Ethereum. We served a large portion of this specialized market with a dedicated board, as seen in our OEM sales, and some with GeForce GTX boards." 2-ER-78. Huang expressed the belief that NVIDIA satisfied "the large majority of the cryptocurrency demand out of [the

[5] NVIDIA's fiscal year ends the last Sunday in January, such that its fiscal year 2018 was the 12-month period ending January 28, 2018. 2-ER-103. Accordingly, its fiscal quarters run as follows: first quarter, February to April; second quarter, May to July; third quarter, August to October; and fourth quarter, November to January.

Crypto SKU],” and that miners “probably also increased the demand of” GeForce GPUs. 2-ER-81; *see also* 3-ER-345-46 (¶73). He also stated there were gamers “whose needs and demands were not filled last quarter.” 2-ER-81. Two days later, *VentureBeat* magazine published an article containing an “edited transcript” of an interview with Huang. 3-ER-384 (¶183); 2-ER-94. The magazine asked Huang: “Did you say a hallelujah for cryptocurrency?” Huang is quoted as responding: “No? Cryptocurrency is around. But it represented only a couple hundred million dollars, maybe $150 million or so. There’s still crypto mining to go to, currency mining.” *Id.* At a conference in early September 2017, an analyst asked Kress about mining demand. 3-ER-385-86 (¶190); 2-ER-146-47. Kress responded:

> [T]here was very, very strong demand for mining as the overall price of Ethereum, one of the most popular cryptocurrencies, was very, very high. And so what you had seen in some of those shortages is there was a possibility in terms of some of the gaming cards that they might have bought as well. But we covered most of cryptocurrency with our cryptocards that we had developed and that was probably about $150 million in our quarter.

2-ER-146-47.

Ether prices levels off in late summer and early fall of 2017. SER-204-06. NVIDIA reported the results for the third quarter of fiscal 2018 on November 9, 2017. *See* 3-ER-386 (¶193); 2-ER-155, 163. During an earnings call that day, Kress stated: “GPU sales also benefited from continued cryptocurrency mining. We met some of this demand with a dedicated board in our OEM business and a portion with

GeForce GTX boards, though it's difficult to quantify." 2-ER-156. In response to a request to "quantify" the impact of mining on Gaming revenue, Kress stated, in part, that "there probably is some residual amount or some small amount" that NVIDIA could not "visibly count" but "[w]e do believe the majority does reside in terms of our overall crypto card." 3-ER-388 (¶203); 2-ER-228.

In response to a question about the "*longer term*" impact of mining "*in the future*," Huang opined: "I believe that crypto will be around for some time, kind of like today. There will be new currencies emerging. Existing currencies will grow in value. . . . [S]o I think for some time, we're going to see that crypto will be a small but not zero . . . part of our business." 2-ER-163 (emphasis added). He explained that the impact of crypto had to be considered "in the context of our company overall" ("the largest GPU computing company in the world"), and that NVIDIA's "really sizable" GPU business had multiple "large and growing" segments. *Id.* Further, he stated that "the reason why I say that . . . crypto usage of GPUs will be small but not zero for some time . . . [is] because when it gets big, somebody will go and build a custom ASIC [a custom chip]. But if somebody builds a custom ASIC, there will be a new emerging cryptocurrency, so ebbs and flows." 2-ER-164. Huang repeated a similar message in a November 10 *VentureBeat*

interview.[6] 3-ER-387 (¶196); 2-ER-172-73 ("As you know, crypto is going to ebb and flow. It is small but not zero. For us it is small because our overall GPU business is so large. . . . It's going to remain small for us."). Shortly after the call, analysts recognized that NVIDIA was meeting miner demand with both the Crypto SKUs and GeForce GPUs. *See, e.g.*, SER-3 ("we estimate that crypto also benefited Gaming revs by ~$100-150m").

**Ether's Second Spike in Late 2017 and Early 2018**: The challenges presented by mining demand increased substantially in late 2017 and early 2018, as Ether prices reached unprecedented levels, dwarfing the spike in early 2017. The price of a single Ether coin skyrocketed from $276 in November 2017 to $1,422 just two months later:




[6] Plaintiffs challenge the *VentureBeat* statement, but not the substantively identical statement on the earnings call. 3-ER-387 (¶196).

SER-204-08.

On February 8, 2018, NVIDIA reported financial results for the quarter ended January 28, 2018. SER-20. During that earnings call, Kress addressed the impact the increase in Ether prices was having on NVIDIA's business:

> Strong demand in the cryptocurrency market exceeded our expectations. We met some of this demand with a dedicated board in our OEM business, and some was met with our gaming GPUs. This contributed to lower than historical channel inventory levels of our gaming GPUs throughout the quarter. While the overall contribution of cryptocurrency to our business remains difficult to quantify, we believe it was a higher percentage of revenue than the prior quarter. That said, our main focus remains on our core gaming market as cryptocurrency trends will likely remain volatile.

SER-21. After the call, analysts estimated as much as $400 million in GeForce revenue attributable to demand from miners. *See, e.g.*, SER-35 ("we believe the vast majority of Gaming upside came from Ethereum-related GPU sales (we note $400M of these sales in 4Q17)"). A few days later, Kress reiterated that some miners were buying GeForce GPUs, but that it was "extremely tough to gauge." SER-56.

In a *Barron*'s article on February 9, 2018 (the day after the quarterly earnings call), Huang is quoted as saying that "crypto was a real part of our business this past quarter, though "small, overall" in light of, for example, the rise in data centers, gaming, and self-driving cars. 2-ER-232; *see* 3-ER-389 (¶207). On March 26, a *TechCrunc*h article noted, without quotation, that Huang "still attributes crypto's demands as a small percentage of Nvidia's overall business." 3-ER-390 (¶210); 2-

ER-239. And on March 29, in an interview with *Mad Money*, Huang reiterated his expectation that cryptocurrency would remain part of NVIDIA's future business, but would be a relatively small driver of growth long term as compared with the Company's "core growth drivers" (again naming NVIDIA's primary market platforms of "Gaming, Professional Visualization, Datacenter, and Automotive"). 3-ER-390 (¶213); 2-ER-244.

During the February earnings call, NVIDIA management also discussed the impact Ether prices were having on channel inventory, the high prices being charged by channel participants, and the resulting inability of gamers to purchase GeForce GPUs at reasonable prices. *See* SER-21; SER-24; SER-29-30. Huang noted that, because of these dynamics, he believed there was "a fairly sizable pent-up demand [for GeForce GPUs] going into this quarter," meaning that the higher prices had caused some gamers to wait until those prices returned to more normal levels. SER-24; SER-29-30. After noting that channel inventory for GeForce cards was "relatively lean," Huang stated, "We're working really hard to get GPUs down to the marketplace for the gamers." SER-27. NVIDIA would "have to keep working on increasing supply." SER-29.

**<u>The Decline of Ether Prices and the "Flooding" of Channel Inventory in 2018</u>**: By the end of March 2018, the price of Ether had dropped below $370. *See* SER-209. On May 10, 2018, NVIDIA announced its financial results for the first

quarter of its fiscal year 2019, including Gaming revenue of $1.72 billion. SER-165. During the earnings call, Kress addressed the impact of falling Ether prices:

> While supply was tight earlier in the quarter, the situation is now easing. As a result, we are pleased to see that channel prices for our GPUs are beginning to normalize, allowing gamers who had been priced out of the market last quarter to get their hands on the new GeForce GTX at a reasonable price. Cryptocurrency demand was again stronger than expected, but we were able to fulfill most of it with crypto-specific GPUs, which are included in our OEM business, at $289 million. As a result, we could protect the vast majority of our limited gaming GPU supply for use by gamers. Looking into Q2, we expect crypto-specific revenue to be about 1/3 of its Q1 level.

SER-166. Huang added that "miners bought a lot of our GPUs during the quarter, and it drove prices up," such that many gamers were not able to purchase GeForce GPUs. SER-169. He opined "my sense is that there's a fair amount of pent-up demand still." *Id.* Huang emphasized the Company would "work as hard as we can to get supply out into the marketplace." *Id.*; *see also* SER-178.

On August 16, NVIDIA announced financial results for the second quarter. 2-ER-251. The Company reported OEM revenue attributable to the Crypto SKU of just $18 million. *Id.* Kress explained that, whereas NVIDIA "had previously anticipated cryptocurrency to be meaningful for the year, [it was] now projecting no contributions going forward." 3-ER-375 (¶155). As a result, the Company lowered its third-quarter revenue guidance by 2.2% to $3.25 billion, *id.*, which reflected "no contribution from crypto," 2-ER-254.

In response to a question asking the Company to "look[] backwards" and

"size" the GeForce business that had been driven by crypto, Huang again acknowledged both the existence of Gaming revenue from mining and the difficulty estimating it:

> [I]t's ambiguous and hard to predict anyway. It's hard to estimate no matter what . . . . And for . . . how much of GeForce could have been used for crypto, a lot of gamers at night, they could—while they're sleeping, they could do some mining. And so whether they buy it for mining or do they buy it for gaming, it's kind of hard to say. And some miners were unable to buy our OEM products, and so they jumped onto the market to buy it from retail. And that probably happened a great deal[.]

2-ER-259; 3-ER-375 (¶155). Asked whether NVIDIA's guidance assumed a drawdown of inventory levels, Huang stated: "We're expecting the channel inventory to work itself out. We are masters at managing our channel, and we understand the channel very well." 3-ER-376 (¶158); 2-ER-258.

On November 15, 2018, the Company disclosed third-quarter financial results that missed the Company's prior guidance. SER-185. Gaming revenue fell short because "channel inventory took longer than expected to sell through [as] [g]aming card prices, which were elevated following the sharp crypto falloff, took longer than expected to normalize." *Id.*; 3-ER-377–78 (¶161). For the first time in this period, the Company projected a decline in quarterly revenue. 3-ER-377 (¶160). Kress explained that this reflected the Company's expectation that it would not ship any mid-range gaming GPUs as it worked through high channel inventory that quarter. *See* SER-185; 3-ER-378 (¶162).

Huang provided his opinion about what had happened: "[W]e came into Q3 with excess channel inventory post the crypto hangover. We expected the pricing in the marketplace to decline. It declined slower than we expected . . . and the volume increase took longer than we expected." 3-ER-378 (¶163); SER-191. Huang stated that NVIDIA did not realize the magnitude of the issue until late in the quarter, and that channel dynamics were further complicated by the difficulty in estimating how much inventory "other brands" (*i.e.*, AMD) had in the channel. 3-ER-378-79 (¶165); SER-192-94. The Company projected it would take about one quarter to work through the excess channel inventory. SER-192-94. After the call, the price of NVIDIA's stock dropped. 3-ER-380 (¶171). This lawsuit ensued.

### C. The FAC's Allegations

In the FAC, Plaintiffs claim Defendants knew, but concealed, the extent to which GeForce GPUs were purchased by miner end-users during the Class Period. Plaintiffs specifically challenge thirteen statements — one by Fisher, seven by Huang, three by Kress, and two in quarterly filings — from May 10, 2017 to November 14, 2018. 3-ER-382-91 (¶¶174-217).

Every one of the thirteen challenged statements is alleged to be false on the basis of an "expert opinion" of a third-party "economic consulting firm," Prysm Group ("Prysm"), that Plaintiffs hired for this litigation. 3-ER-368-75 (¶¶143-54). Prysm did not formulate its opinions on the basis of information provided by any of

NVIDIA's current or former employees with relevant information. *See id.* Rather, Prysm allegedly relied on *other* third parties to estimate, in hindsight, the amount of NVIDIA's quarterly Gaming revenue driven by mining during the Class Period. 3-ER-368-69 (¶¶143, 147).

Plaintiffs could not possibly allege that any Individual Defendant was aware of Prysm's *post hoc* analysis. Rather, in an effort to plead what the Defendants knew or should have known during the relevant time period, Plaintiffs turn to the five anonymous FEs. As described below, *see infra* pp. 31-33, these range from an account manager in China who was at least three levels removed from any Individual Defendant to a social media manager in Russia who never allegedly interacted with any Individual Defendant.

Collectively, the FEs purport to describe five data sources which Plaintiffs claim put the Individual Defendants on notice that their statements about mining-related sales were false or misleading:

- ***"Top 5" Emails***. The FAC alleges that Huang received "Top 5" weekly emails discussing "the effect of cryptocurrency mining on demand for GeForce GPUs" and "crypto-related GeForce sales." 3-ER-352-54 (¶¶94-98). Plaintiffs do not allege the contents of any Top 5 email on any date.
- ***Quarterly Meetings***. According to FE-1 and FE-5, mining-related sales were discussed at quarterly meetings during the Class Period. 3-ER-350-51 (¶¶87-90). FE-5 is alleged to have attended one such meeting with Huang; FE-2 attended "some" before leaving NVIDIA at the start of the Class Period. 3-ER-351-52 (¶¶91-93). The FAC does not allege the content of any data conveyed to any Individual Defendant during any such meeting.

- ***"Internal Study" from China***. The FAC includes screenshots of an internal presentation dated September 2017, which includes a footnote stating: "China 1H 1500Ku+ GPU sold to mining estimated NVIDIA Share > 70% est." 3-ER-359-64 (¶¶119-26). Plaintiffs do not allege that Huang or Kress was aware of this presentation. While Plaintiffs claim Fisher "commissioned" the presentation, 3-ER-359, they do not allege that he ever saw it. Further, Fisher's lone challenged statement was made in May 2017, months before the presentation allegedly existed.

- ***Internal Sales Database***. According to FE-1 alone, data in an internal database "reflected" that, "throughout 2017," "60% to 70% of NVIDIA's GeForce revenue" in China came from "sales to crypto-miners." 3-ER-350 (¶86). FE-1 does not say whether that database or any report actually reflected the "60% to 70%" figure at any specific point in time, or whether any Individual Defendant saw or could have seen that figure. *See id.*

- ***GeForce Experience ("GFE") Data***. NVIDIA'S GFE software is used to "optimize graphics settings" and to "check[] for and install[] updated driver software." 3-ER-354 (¶100). According to FE-5, "data" contained in GFE software reports "showed that over 60% of GeForce GPU sales during the Class Period were to miners." 3-ER-355 (¶106). Plaintiffs do not explain how GFE data could "show" sales to miners. They also again do not allege that any report ever contained this "over 60%" figure, nor when such a report was prepared and whether any Individual Defendant could or did receive it.

Critically, the FAC fails to allege that any Individual Defendant personally received any specific information that conflicted with a challenged statement at the time it was made.

## II. PROCEDURAL HISTORY

The District Court dismissed Plaintiffs' claims twice, the first time with leave to amend, the second time with prejudice.

In the first order, the District Court found that the CAC failed to adequately plead both falsity and scienter. The Court held that Plaintiffs' falsity allegations,

which "rel[ied] entirely on an expert opinion by Prysm," lacked the "particularity" the PSLRA requires. 3-ER-480-83. The Court explained that Plaintiffs did not sufficiently describe Prysm's "assumptions," did not allege "any sort of interaction between Prysm and former or current NVIDIA employees or review of its financial data," and undermined Prysm's analysis through Plaintiffs' "own allegations about miners' preferences" for AMD's products. 3-ER-481-82.

As to scienter, the District Court analyzed Plaintiffs' allegations attributed to FEs, and held that none were sufficient. 3-ER-484. Further, "[t]aking all the allegations provided by the confidential witnesses together," they "fail[ed] to plausibly establish that any particular statement by any Individual Defendant was knowingly or recklessly false or misleading when made." 3-ER-486.

On May 13, 2020, Plaintiffs filed the FAC, which Defendants moved to dismiss for failure to plead falsity and scienter. On March 2, 2021, the District Court granted Defendants' motion for failure to plead scienter and dismissed the FAC with prejudice. 1-ER-25. The District Court did not reach falsity, explaining that it "need not consider" the issue given its holding "that Plaintiffs failed to adequately plead scienter." *Id.*

With respect to scienter, the District Court observed that the FAC's scienter allegations were "largely based on accounts of the same [FEs]" as the CAC. 1-ER-18. "[A]fter a holistic inquiry," the District Court determined that "Plaintiffs'

allegations again fail to raise a strong inference of scienter, largely because Plaintiffs do not adequately tie the specific contents of any . . . data sources to particular statements." *Id.* As such, the Court concluded that Plaintiffs had not even "plausibly show[n] that the Defendant who made each specified statement knowingly or recklessly spoke falsely." *Id.* The Court also held that Plaintiffs failed to meet the "heavy burden" of pleading scienter under the core operations theory. 1-ER-23-24. This appeal followed. 3-ER-583.

## SUMMARY OF ARGUMENT

The judgment below should be affirmed because Plaintiffs have failed to allege particularized facts raising a "strong inference" of scienter.

***First***, the FAC fails to provide — as it must — any plausible theory of fraud, much less one that is more "cogent" or "compelling" than the nonculpable explanations for Defendants' actions. Indeed, Plaintiffs do not articulate *any* motive for why Defendants would have made misleading statements about the mix of end-users purchasing their products. Plaintiffs do not claim that any Individual Defendant benefitted from the alleged fraud. Ultimately, Plaintiffs ask this Court to infer that NVIDIA deliberately chose to "flood" its channel knowing that its stock price would "inevitabl[y]" fall, just as AMD's had. That theory is implausible and fails to meet Plaintiffs' burden for pleading scienter under the PSLRA.

By contrast, the far more compelling inference is that NVIDIA's executives were doing their best to manage a novel and challenging business environment. When cryptocurrency prices suddenly spiked in 2017 and 2018, a new set of end-users sought out GPUs for mining. Amid that uncertain and rapidly evolving situation, NVIDIA tried to satisfy the growing demand for its products by selling more GeForce GPUs into its distribution channel and by developing the Crypto SKU specifically for miners. Along the way, executives told NVIDIA investors what they knew and believed: miners were continuing to buy GeForce GPUs — exactly how many, they did not know — and the Crypto SKU would help absorb mining demand while preserving the Company's gamer base. Eventually, NVIDIA's executives overestimated the pace at which GPUs would sell through the channel once crypto demand subsided. But a failure to accurately predict the future is not fraud.

***Second***, the District Court correctly rejected Plaintiffs' attempt to establish scienter through the FEs' allegations about internal data sources. These allegations lack the required indicia of reliability, and so fail altogether. Moreover, even if credited, the FEs' generalized allegations are insufficient to support a "strong inference" of scienter. What is required — and what the FEs' allegations lack — are particularized allegations regarding the *content* of such internal sources and a *conflict* with any public statement. Plaintiffs' rare attempts at alleging any "specific" data in any internal report or database fall well short.

***Third***, the "core operations" theory of scienter does not apply. The FAC nowhere pleads that the Individual Defendants had — much less admitted — detailed involvement with data quantifying the amount of GeForce GPUs bought by miners. Indeed, the FAC fails to adequately allege that such information existed at any time. To this day, the number of GeForce GPUs purchased from NVIDIA that were ultimately deployed to mine cryptocurrencies is pure conjecture.

Although Plaintiffs' failure to allege scienter is dispositive, the judgment below may also be affirmed on the alternative basis that the FAC fails to adequately allege that any challenged statement was materially false or misleading.

# ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews the District Court's dismissal of the FAC pursuant to Rule 12(b)(6) *de novo*. OB-32. The FAC is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

## II. PLAINTIFFS DO NOT ALLEGE SPECIFIC FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

The PSLRA requires plaintiffs to plead with particularity facts supporting a "strong inference" that each defendant made false or misleading statements "either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991; *see* 15 U.S.C.

§ 78u-4(b)(2). This requirement "has teeth," *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quotation marks omitted), and "presents no small hurdle for the securities fraud plaintiff," *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1106 (9th Cir. 2021) (alteration and citation omitted). "The complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (quotation marks omitted). In determining whether a complaint raises a "strong inference" of scienter, courts must take into account "plausible, nonculpable explanations for the defendant's conduct," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007), and a complaint may only survive "if the malicious inference is at least as compelling as any opposing innocent inference," *Zucco*, 552 F.3d at 991.

In dismissing the FAC, the District Court carefully examined Plaintiffs' allegations individually and holistically, properly applied the pleading standards, and correctly determined that the FAC fails to plead specific facts supporting a strong inference that any Defendant acted with scienter. Plaintiffs' opening brief does not challenge critical aspects of the District Court's ruling, misstates others, and otherwise advances the same arguments that the District Court properly rejected.

### A. Under a Holistic Review, the Non-Culpable Explanation Is Far More Plausible, Precluding Scienter Under the PSLRA

A "strong inference" of scienter must be "more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. But here, Plaintiffs' scienter arguments suffer from "an immediate first-level problem": the FAC's scienter "theory does not make a whole lot of sense." *Nguyen*, 962 F.3d at 415. Plaintiffs do not allege any plausible rationale — and no motive at all — for what they describe as a 19-month fraud, where NVIDIA's executives knew but intentionally concealed the precise mix of end-users purchasing their products from the distribution channel, despite their awareness that the truth would "inevitabl[y]" and promptly come to light. 3-ER-378 (¶162). Worse, under Plaintiffs' theory, NVIDIA's executives deliberately flooded the channel with products, despite knowing there was not enough gaming demand to absorb it. That theory is neither "cogent" nor "compelling," and for this reason alone, the FAC fails to plead scienter. *Tellabs*, 551 U.S. at 314.

This Court's recent precedents are instructive. In *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020), plaintiff claimed defendants made misleading statements about the likelihood of FDA approval for a drug, even though they "knew the FDA would eventually figure out that [the drug] could not be approved." *Id.* at 415. With "common experience" in mind, this Court rejected such an "improbable"

theory. *Id.* Similarly, in *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097 (9th Cir. 2021), this Court affirmed dismissal of a complaint that challenged an investment bank's actions in connection with a company's stock offering — issuing a report valuing the company at less than the bank had priced the company's stock offering earlier that day — but failed to "articulate[] with particularity or plausibility the bank's motive for doing so." *Id.* at 1103. Ultimately, this Court may not "check [its] disbelief at the door" in assessing allegations of scienter under the PSLRA. *Nguyen*, 962 F.3d at 415.

Plaintiffs' theory makes no more sense than those this Court has rejected. Much like the *Nguyen* plaintiff's claim that executives "knew [FDA approval] would not materialize" and chose to "face the inevitable fallout," 962 F.3d at 415, Plaintiffs here claim Defendants knew that cryptocurrency demand would "inevitabl[y] bust" and "crash," 3-ER-325 (¶6), and that "pent-up" gaming demand would not absorb the supply of products NVIDIA sold to distributors, 3-ER-378 (¶¶162-65). Thus, Plaintiffs' theory posits that NVIDIA and its top executives (including Huang, NVIDIA's largest single shareholder) deliberately created a massive build-up of inventory in the distribution channel, knowing that it would come to light within a quarter or two. On top of that, NVIDIA allegedly did so after watching AMD — its "main competitor in the GPU market" — venture into a volatile crypto market and "enjoy[] supercharged revenues" for a short time "only to see its revenues and share

price crater." OB-11.

To say the least, the theory that Defendants committed a fraud that they *knew* would "inevitabl[y]" surface and cause the value of their own shares to plummet, 3-ER-325 (¶6); 3-ER-378 (¶162), is "improbable." It "depends on the supposition that [D]efendants would rather keep the stock price high for a time and then face the inevitable fallout" once the unconcealable truth was revealed. *Nguyen*, 962 F.3d at 415. This Court previously has rejected such theories as implausible, and it should do so again here.

Moreover, Plaintiffs do not articulate *any* "plausible motive for [Defendants'] conduct." *Prodanova*, 993 F.3d at 1107. Plaintiffs do not allege that the Individual Defendants made any suspicious sales of their stock. In fact, under their leadership, the Company approved the repurchase of more than $1 billion of its stock during the Class Period when the price of the stock was allegedly inflated by the fraud. *See* 2-ER-116, 2-ER-79. These "allegations regarding Defendants-Appellees' behavior are not consistent with scienter." *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018); *cf. ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016) (cited at OB-34) ("narrative of fraud" alleged where defendant used alias and bank account while "black listed" from banking).

Plaintiffs' argument that the Company's reporting of Crypto SKU revenues in the OEM platform rather than the Gaming platform evinces fraudulent intent is

absurd. OB-38-39. As Plaintiffs themselves note, the Crypto SKU was "useless for anything but mining," 3-ER-500 (CAC), so why should it be reported in Gaming? Moreover, by reporting those sales separately, the Company provided more, not less, transparency into how it was dealing with these unique circumstances.

The far more plausible and compelling inference here is precisely what NVIDIA explained to investors in November 2018 — namely, NVIDIA sold large quantities of GeForce GPUs into the channel with the honest, but ultimately mistaken, "expect[ation]" that third-party distributors would respond by lowering prices, thereby enticing gamers back into the market. 3-ER-378 (¶163); SER-191. Plaintiffs do not claim that explanation was false, and it plainly reflects no fraudulent intent.

Indeed, for the vast majority of the Class Period, NVIDIA was dealing with overwhelming demand for its GPU products, which it struggled to meet. The second crypto boom in late 2017 and early 2018 sharply exacerbated that supply strain, and after telling investors that it intended to address the issue by increasing supply into the channel as quickly as possible, NVIDIA proceeded to do just that. SER-24, 27, 29. As it did so, NVIDIA's channel partners — who make their own purchasing decisions and have no reason to buy products that they do not expect to be able to sell — continued buying massive quantities of NVIDIA's GPUs. SER-169. Eventually, though, NVIDIA's executives simply guessed wrong about how third

parties in its distribution channel would react to the complex dynamics they faced, as channel participants took longer than expected to lower their prices. 3-ER-378 (¶163); SER-191. Far more compelling than any "malicious" inference Plaintiffs proffer, this "plausible, nonculpable" explanation of Defendants' conduct defeats any claim of scienter under the PSLRA. *Tellabs*, 551 U.S. at 324; *see, e.g.*, *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 596 (7th Cir. 2021) (Easterbrook, J.) (scienter inadequately alleged where "positive statements stemmed not from fraudulent intent but limited knowledge and optimism").

NVIDIA has long warned investors about the difficulties of managing the flow of GPU inventory through the channel, where GPUs typically spend months before reaching end users. *See, e.g.*, SER-27; SER-75; SER-194. In mid-2017, as crypto miners emerged as a new end-user group, it appeared the launch of the Crypto SKU had successfully addressed this new market, and NVIDIA continued to sell record amounts of gaming GPUs. But as Ether prices spiked for the second time in late 2017 and early 2018, channel inventory dropped and prices rose. SER-27, 29. This complex dynamic was further complicated by a "vibrant" gaming industry, spurred in part by the "unprecedented success" of several recently-launched games, and the planned launch in 2018 of a new GPU architecture (called "Turing") with substantial technical improvements for "the gaming community." 2-ER-252. NVIDIA responded by increasing the supply of GPUs into the channel, with the

expectation that prices would normalize, gamers who had been priced out of the market would return, and supply would meet demand. *See, e.g.*, SER-24; SER-27; SER-29. As it turned out, however, channel participants did not react the way that NVIDIA predicted they would. Perhaps hoping for another crypto boom, distributors maintained higher prices, even as inventories built up, and so gamers took longer than expected to absorb the increased supply. 3-ER-378 (¶163); SER-191.

### B. The FEs Lack the Indicia of Reliability and Personal Knowledge Required by the PSLRA

"[C]onfidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco*, 552 F.3d at 995. The District Court correctly determined that the FAC fails to do so, and Plaintiffs' opening brief provides no basis to conclude otherwise.

As the District Court explained, Plaintiffs' allegations regarding **FE-1** fall short of the PSLRA's standard. The FAC describes FE-1 as an employee with "a limited, low-level position in the China market," with hardly any alleged interactions with any Individual Defendant during the Class Period. 1-ER-19 n.3. FE-1 was at least three levels removed from any Individual Defendant and never interacted with Huang or Kress. 3-ER-334-35 (¶33). The one link between FE-1 and Fisher alleged — FE-1 gave one presentation to Fisher about GeForce sales in China, 3-ER-357-

58 (¶115) — did not relate to "Fisher's single alleged misrepresentation," which "did not concern China GeForce sales," 3-ER-484.

Remarkably, despite relying heavily on allegations attributed to FE-1, Plaintiffs' opening brief does not even *address* the District Court's conclusion that, in light of FE-1's position and the "levels of separation" between FE-1 and the Individual Defendants, "Plaintiffs failed to establish the basis for FE-1's reliability and personal knowledge as to statements about NVIDIA's operations internationally." 1-ER-19 n.3 (citations omitted). The District Court first noted this defect in the CAC, 3-ER-484-85, 487; Plaintiffs made no attempt to cure it in the FAC, *see* 3-ER-334-35 (¶33); and now Plaintiffs fail to address the District Court's conclusion in their opening brief. Accordingly, Plaintiffs have waived any argument to the contrary. *See Freedom from Religion Found., Inc. v. Chino Valley Unified Sch. Dist.*, 896 F.3d 1132, 1152 (9th Cir. 2018) (per curiam).

The FAC's allegations about the remaining FEs likewise fail. **FE-2**, a products director in California, left the Company in May 2017, either prior to or at the very beginning of the Class Period. 3-ER-335 (¶34). FE-2's only alleged connection to any Individual Defendant is attending meetings with Huang and Fisher (without alleging the content of any data shared at such a meeting), being on emails along with Huang, and seeing a Company-produced video supposedly showing Huang "looking at sales data in the database" (with no allegations of what that "data"

said, or whether it related to mining). 3-ER-349 (¶85); 3-ER-351-53 (¶¶ 92, 96); 3-ER-365 (¶130). Neither **FE-3** nor **FE-4** is alleged to have *ever* communicated with *any* of the Defendants. 3-ER-486. Finally, **FE-5**, a consumer marketing employee in India, allegedly described what GFE usage data "showed" during the Class Period, 3-ER-355 (¶106), but the FAC does not explain how FE-5 would have any reason to know how GFE data was collected or what it means. FE-5 apparently never interacted with Kress or Fisher. And, while Plaintiffs allege that FE-5 was on an email distribution list with Huang and attended one meeting with him at some point in 2017, during which FE-5 "presented GeForce sales data," 3-ER-335 (¶37), the FAC fails to allege the contents of any common email or of the "data" FE-5 supposedly presented, 3-ER-351 (¶91); 3-ER-352 (¶94).

Because the FAC fails to establish the reliability and personal knowledge of any of the FEs, the allegations attributed to them cannot be credited. *See, e.g.*, *Zucco*, 552 F.3d at 998 (witness must have "reliable personal knowledge of the defendants' mental state"); *accord Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014).

### C. The FAC Fails to Allege Particularized Facts Regarding Any Data to Show That Any Statement Was Knowingly False When Made

Plaintiffs' FE allegations fail, too, because they do not show that any Individual Defendant was aware of contradictory information when he or she made any of the challenged statements. Although Plaintiffs purport to describe several

"data sources" with information about sales of GPUs to crypto miners, the FAC does not place any such information in the hands of Huang, Kress, or Fisher when they made the challenged statements. Further, the FAC fails to adequately allege that the content of these "data sources" actually undermined any of the challenged statements at all.

As the District Court recognized, the PSLRA requires more than "negative characterizations" of internal reports that supposedly contain information inconsistent with challenged statements. 1-ER-18. In *Lipton*, for example, this Court held that allegations that a pharmaceutical company "could regularly track its sales data," which "demonstrate[d] a decline in sales," were insufficient to plead scienter, absent allegations "in any detail, [of] the contents of such report or the purported data." *Lipton*, 284 F.3d at 1035–36. This Court has repeatedly affirmed that principle. *See, e.g.*, *Nguyen*, 962 F.3d at 416-17; *Intuitive Surgical, Inc.*, 759 F.3d at 1063.

In addition, Plaintiffs must allege facts showing that each Defendant "personally accessed" contradictory information when that Defendant made a challenged statement. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017). Finally, because scienter must be alleged "*with respect to each act or omission alleged*" to be false or misleading, any allegations of internal reports or data must be specifically linked to a particular

defendant and a specific challenged statement. 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). Put another way, the plaintiff must allege particularized facts showing that, when each challenged statement was made, the speaker was aware of information that rendered his or her statements false or misleading when made. *See In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1270 (11th Cir. 2016) ("[S]cienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute.").

The FAC falls well short of these standards.

### 1. Internal Sales Database

Plaintiffs' opening brief repeatedly points to the allegations attributed to FE-1 that, "throughout 2017," data in an internal sales database "reflected" that "60% to 70% of NVIDIA's GeForce revenue" in China came from "sales to crypto-miners." OB-43-46; *see* 3-ER-350 (¶86). As noted above, the District Court held that FE-1 lacks the reliability and personal knowledge the PSLRA requires; Plaintiffs have waived any argument to the contrary. *See supra* § II.B.

These allegations fail for numerous other reasons. To start, the FAC does not allege that any Individual Defendant actually saw the "60% to 70%" figure before they made any of the challenged statements, or ever. As such, the reader cannot reasonably infer that, for example, Fisher had this information when he offered his "perspective" on "the fundamentals behind PC gaming" on May 10, 2017, 2-ER-41,

or that Huang did when he opined on November 10, 2017 that "crypto" is "small but not zero," 3-ER-387 (¶196).

Even setting that defect aside, the FAC fails to adequately allege that the database actually undermined any of the challenged statements. It does not explain, for example, why information about GeForce sales to miners "in China" could support a strong inference regarding NVIDIA's global GPU business, the subject of each of the challenged statements. 3-ER-482-83. This is especially problematic given Plaintiffs' own allegations that mining activity was "heavily concentrated" in China, *id.*, and that mining systems purchased in China were "also shipped to overseas," 3-ER-361 (¶123). Indeed, Plaintiffs badly exaggerate any insight FE-1 may have had with regard to global sales by claiming that "the China market" was comprised of China, Taiwan and Hong Kong and thus accounted "for more revenues than the Company's four other regions combined." 3-ER-347 (¶ 79). To the contrary, NVIDIA separately reported revenues for China *and Taiwan* — and Taiwan generated far more revenue than China throughout the Class Period. *See, e.g.*, 2-ER-119; 2-ER-196; SER-133. FE-1 is not alleged to have any responsibilities or knowledge of the *Taiwan* market. *See* 3-ER-334-35 (¶33).

Moreover, the FAC fails to make clear whether or when the "60% to 70%" figure was actually reflected in the database at any particular point in time, or instead represents some sort of extrapolation or average over some period of time. Given

Plaintiffs' own allegations about the wild swings in mining demand for GPUs, *see, e.g.*, 3-ER-324, 329 (¶¶5, 17), it would make no sense to suggest that the "60% to 70%" figure would have appeared consistently in the database throughout the entirety of calendar 2017. Ultimately, Plaintiff's efforts to rely on FE-1's allegation amount to speculation — speculation about what the number means, where it appeared, when it appeared, and whether any of the speakers actually saw the number before making any of the challenged statements. That speculation cannot support a "strong inference" of scienter.

Plaintiffs' other confidential witnesses provide no help. *See* OB-44-46. FE-2 allegedly recalled once seeing a Company-produced video depicting Huang viewing data in the alleged sales database, but Plaintiffs do not allege what that data was, and FE-2 left the Company months before Huang's first challenged statement. 3-ER-335 (¶34), 3-ER-349-50 (¶ 85); *see Prodanova*, 993 F.3d at 1110. FE-5 allegedly described a "process" by which *other* employees entered "sales reports" into "NVIDIA's system." 3-ER-348-49 (¶82); OB-45. However, the FAC does not allege that FE-5 ever accessed the database himself, much less knew what its contents were. 3-ER-348-49 (¶82); OB-45.[7] Finally, Plaintiffs fail to link Fisher

[7] While Plaintiffs' brief attributes to FE-5 one statement that "sell-out" data "allowed NVIDIA to identify sales to miners," OB-15 (citing 3-ER-348-49 (¶82)), the FAC attributes this statement to no source at all, 3-ER-348 (¶82).

and Kress to this database at all. OB-46.

### 2. GeForce Experience ("GFE") Data

The FAC makes only one attempt to quantify any mining-related information available through GFE: according to FE-5 alone, "data" contained in GFE software reports "showed that over 60% of GeForce GPU sales *during the Class Period* were to miners." OB-46 (emphasis added); *see* 3-ER-355 (¶106). As a threshold matter, Plaintiffs never try to explain how GFE — designed to capture information about how GeForce GPUs were being *used* — could "show" real-time *sales* information (especially since products typically take months to sell through NVIDIA's channel). *See* 3-ER-354-56 (¶¶99, 108).

Further, as the District Court noted, the FAC fails to place GFE reports or data at any particular point in time or place "during the Class Period." 1-ER-20. Instead, the FAC leaves all of the context for and meaning of this statistic to the reader's imagination. Did the "over 60%" figure appear in one GFE report "during the [19-month] Class Period"? Or multiple reports? Or is it an average taken from multiple reports during the Class Period, and, if so, which ones? Which Defendants, if any, received any GFE report(s) that contained the "over 60%" figure? And when? Did Fisher have such a report when he offered his "perspective" on the "fundamentals" of "PC Gaming" on May 10, 2017? Did Kress have such a report on September 6, 2017, when she stated that "we covered most of cryptocurrency with our

cryptocards"? 3-ER-386 (¶191). Did Huang have it on August 16, 2018, when he stated that "we understand the channel very well"? 3-ER-391 (¶216). The FAC is silent. *See, e.g.*, *Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) ("Generically asserting in an undifferentiated manner that facts occurred 'during the Class Period' is insufficient.").

None of the FAC's remaining allegations fills in the blanks. Plaintiffs allege that "monthly reports" containing some GFE data were sent to Huang, but they again fail to describe the content of any of these reports. 3-ER-355 (¶106); *see, e.g.*, *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) ("[G]eneral allegations of defendants' . . . receipt of unspecified weekly or monthly reports are insufficient."). And FE-5's recollection that Huang "personally reviewed" GFE data, 3-ER-355 (¶106); *see* OB-49-50, was *not* based upon FE-5's personal knowledge, but hearsay from FE-5's unnamed "superiors," 3-ER-355 (¶106). *See, e.g.*, *Zucco*, 552 F.3d at 997 ("hearsay statements" insufficient to establish scienter). Finally, Plaintiffs assert only that Fisher and Kress were aware of GFE generally, but do not allege that any specific GFE data was ever provided or reasonable available to either of them. OB-49.

### 3. Report from China, "Top 5" Emails, and Quarterly Meetings

Plaintiffs' remaining allegations of "internal sources of data and reports" likewise fail:

***"Internal Study" from China.*** Plaintiffs highlight a September 2017 presentation with an analysis of mining's impact in China, OB-50-51, which allegedly included a "China sales team" *estimate* of NVIDIA's share of *estimated* mining-related GPU sales in China during portions of 2017, 3-ER-359-62 (¶¶120-25). Yet, Plaintiffs fail to allege that either Huang or Kress ever received the presentation or were aware of the "estimates" it contained. While Plaintiffs claim that Fisher "commissioned" the "study," 3-ER-359, they do not allege that he ever received it, and it could not support an inference of his scienter as it did not *exist* at the time of his lone challenged statement four months earlier. 3-ER-383 (¶176). Moreover, Plaintiffs provide zero explanation of how the estimates were arrived at, or of their reliability. 3-ER-359 (¶119). And Plaintiffs fail to allege that any of the Individual Defendants — the Company's most senior executives with global responsibilities — shared the "China sales team['s]" alleged views. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) (allegations that employees informed CEO that production goal was "impossible to achieve" insufficient to infer scienter, as "Plaintiffs failed to plead any facts showing that [the CEO] ever accepted those employees' views").

***"Top 5" Emails.*** The FAC fails to allege any facts about the content of any particular Top 5 email on any given date, much less facts indicating any tension between *any* fact contained in *any* Top 5 email and *any* of the challenged statements.

3-ER-352-54 (¶¶94-98); *see In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 888 (N.D. Cal. 2020) (allegations that officers "received key metrics summary emails" insufficient absent allegations of specific data in emails). Moreover, the FAC's description of high-level discussions of mining-related sales in the Top 5 emails and elsewhere — *e.g.*, "shortages in GeForce GPUs inventory" as a result of "crypto-related demand," 3-ER-353-54 (¶¶ 97-98) — is entirely consistent with Defendants' public statements. *See, e.g.*, 2-ER-81 (miners "probably also increased the demand" of GeForce GPUs, and there were gamers "whose needs and demands were not filled last quarter").

***Quarterly Meetings.*** Finally, FE-1 and FE-5 allegedly described some discussion of mining-related sales at quarterly meetings with Huang during the Class Period. 3-ER-350-52 (¶¶87-93); OB-36-37. But with one exception, neither FE-1 nor FE-5 ever allegedly attended such a meeting with Huang or any other Individual Defendant. *See id.* And despite FE-1's claim that "sales data detailing GeForce sales to crypto-miners" was presented (at meetings FE-1 did *not* personally attend), 3-ER-350 (¶87), the FAC again does not allege the *content* of any "data" communicated to Huang at any such meeting. The allegations attributed to FE-2 about such meetings likewise fall short. 3-ER-351-52 (¶92). Putting aside the fact that FE-2 left NVIDIA in May 2017, Plaintiffs do not allege the content of any "GeForce data" Huang allegedly "closely reviewed" at any meeting. *Id.*; *see, e.g.*,

*Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1043 (N.D. Cal. 2012).[8]

#### 4. Plaintiffs' Authorities Do Not Undermine the District Court's Analysis

Plaintiffs rely heavily on two prior decisions by this Court: *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004), and *In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130 (9th Cir. 2017). *See* OB-33-34, 40-43. The District Court correctly distinguished both. 1-ER-21-22 & n.5.

In *Nursing Home*, plaintiffs claimed that Oracle's revenue and earnings per share guidance were knowingly false, on the theory that defendants knew when the guidance was announced that the company would not meet its guidance. Plaintiffs alleged "hard numbers" and "specific [data] regarding large portions of Oracle's sales data" — *e.g.*, four "large deals [ ] lost or delayed early in the third quarter" totaling at least $186 million, which represented nearly 75% of the subsequent revenue shortfall. 380 F.3d at 1231-32. Critically, Oracle's CEO said he had been "involved in an awful lot of these deals" and had monitored a database containing "our forecast around the world up to the minute at any level of detail that you want to see" and "every deal out there that my reps around the world are working." *Id.* The panel also emphasized other factors supporting a strong

---

[8] FE-1 further recounts a presentation to Fisher in March 2017, *see* OB-37, but that came two months before the Class Period began and, in any event, related only to "sales of GeForce GPUs *in China*," which Fisher's sole alleged misstatement did not concern, 3-ER-357-58 (¶115) (emphasis added).

inference of scienter: "astronomical" stock sales made by the CEO and "very important[]" allegations of "improper revenue accounting records." *Id.* at 1232-33.

Plaintiffs place no comparable "hard numbers" in the hands of any Individual Defendant at the time of any challenged statement here. No Individual Defendant ever said they knew "exactly how much [NVIDIA] sold" to miners "in the last hour around the world," *id.* at 1231, or anything close — exactly to the contrary, the Individual Defendants repeatedly warned NVIDIA investors that sales to miners were "extremely tough to gauge," SER-56 and could not be "visibly count[ed]," 2-ER-228. There are no "astronomical stock sales," *id.* at 1232, alleged in the FAC — indeed, no suspicious sales at all by any Individual Defendant, and instead they authorized a massive stock *repurchase*, 2-ER-79, during the alleged inflation — and no hint of any "improper [ ] accounting," 380 F.3d at 1233.

Similarly, in *Quality Systems*, plaintiffs adequately alleged scienter where internal sales reports showing declining sales were "automatically delivered" to individual defendants, who then "used" those reports and "told investors they had real-time access to, and knowledge of, sales information," even though that information contradicted their claims of a robust sales pipeline. 865 F.3d at 1145-46. The additional scienter allegations in *Quality Systems* were even more compelling: they included allegations that a former company director had stated that the defendants "were aware of real time data that contradicted their public

statements" and had engaged in "securities laws violations," and that the CEO-defendant sold 87 percent of his holdings just before a sharp drop in the stock price. *Id.* at 1138, 1146.

The comparison between the allegations in this case and the two decisions upon which Plaintiffs rely confirms the wisdom of the District Court's decision.

**D. The District Court Correctly Determined that Plaintiffs Failed to Allege Deliberate Recklessness**

Plaintiffs argue the District Court "did not analyze" whether the FAC alleged "deliberate recklessness." OB-62-64. In fact, the District Court cited the correct standard, 1-ER-17, and expressly determined that the FAC's allegations regarding "data sources" did not "plausibly show that the Individual Defendant who made each specified statement knowingly or recklessly spoke falsely," and that, "[v]iewed as a whole, the FAC's factual allegations do not plausibly suggest that Defendants acted with at least deliberate or conscious recklessness." 1-ER-18. The District Court's reference to the lack of any allegation that the Individual Defendants actually reviewed any contrary information does not suggest (as Plaintiffs argue) that it applied the wrong legal standard. *See Old Person v. Cooney*, 230 F.3d 1113, 1131 (9th Cir. 2000) (affirming holding where district court "stated and applied the correct standard" and "correctly applied the relevant law in rejecting [the] claim").

In any event, the District Court's conclusion was correct. The deliberate recklessness standard is "actually much closer to one of intent," *In re NVIDIA Corp.*

*Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014), and "reflects some degree of intentional or conscious misconduct." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.,* 627 F.3d 376, 390 (9th Cir. 2010) (citation omitted).

Plaintiffs cite this standard, but then make an argument that has nothing to do with it: Plaintiffs claim it was "reckless" for Huang and Kress to answer analysts' questions about mining-related sales without obtaining data to support their answers. OB-63-64. But the FAC nowhere alleges that Huang and Kress answered these questions without first obtaining supporting information. More importantly, Plaintiffs do not allege facts suggesting that, when they spoke, Huang or Kress had "reasonable grounds" to believe that information in any internal data source undermined their statements, much less made an "intentional" or "conscious" decision to avoid learning such information. Simply put, Plaintiffs have failed to allege either actual knowledge or reasonable grounds to believe that contradictory information existed and was reasonably accessible to Huang or Kress when they

spoke.[9]

### E. The Core Operations Theory Does Not Apply

The District Court also correctly rejected Plaintiffs' attempt to establish scienter under the often-invoked but seldom-accepted "core operations" theory. 1-ER-23-24. That theory is "not easy" to prove, and is satisfied only: (1) where a plaintiff produces "specific admissions by one or more corporate executives of detailed involvement in the [relevant] minutia of a company's operations," or (2) "[i]n the rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Intuitive Surgical*, 759 F.3d at 1062 (quotation marks omitted).

As the District Court correctly explained, Plaintiffs have not pled particularized facts showing the Individual Defendants had "detailed involvement with . . . secondary data" differentiating between end-user purchasers. 1-ER-23-24. Statements like "[w]e stay very close to the market" and "[w]e are masters at

---

[9] Plaintiffs' deliberate recklessness cases, *see* OB-63-64, do not support a different conclusion. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708-09 (9th Cir. 2012) (executives "received accurate reports at quarter-end indicating that [the company] had not met its financial targets"); *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (inferring, from the totality of facts alleged, that the speaker must have known contradictory information); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1062 (9th Cir. 2000) (addressing question unrelated to scienter); *Inst. Inv'r Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (executive provided "confident, unhedged denials" of accounting practice).

managing our channel," OB-58; 3-ER-398 (¶¶233-34), do not establish their "detailed involvement" in the "minutia" of NVIDIA's GeForce sales or the ability to monitor such sales in real time. 1-ER-24. Just the opposite: the Company repeatedly warned investors crypto-related sales remained "difficult to quantify," 2-ER-156, and "extremely tough to gauge," SER-56.[10]

Plaintiffs' other alleged "admissions" were made well before the Class Period and fail entirely. 3-ER-398 (¶234). The first is a statement that former CFO Marv Burkett — *not* Huang — made *in 2007* about NVIDIA's efforts to "monitor the inventory in the channel continuously." 3-ER-337 (¶43); SER-252; SER-255-56. That statement said nothing about visibility into end consumers, much less how those consumers used NVIDIA's products. The second is from a 2015 earnings call — still years before the Class Period — that "we monitor sellout in the channel literally every day." OB-58; 3-ER-337 (¶43). As the District Court found, Plaintiffs take that statement entirely out of context. 1-ER-24. In response to an analyst asking, "how are you making sure there is no build-up of excess inventory," Huang explained that NVIDIA's new focus on specialized platforms allowed for relatively

[10] *Cf. Reese*, 747 F.3d at 577 (defendant's "own very specific representations of the company's findings" regarding oil pipeline conditions showed access to the disputed information); *Daou*, 411 F.3d at 1022 ("specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database").

"more visibility" as compared to the prior business model. 3-ER-337 (¶43); 2-ER-274. He did not suggest NVIDIA could track the identity of all (or even any) end users. Finally, Kress's pre-Class Period statement about gaming-related use of GFE does not reference mining. 3-ER-356 (¶108) ("[W]e can actually see [users] through our GeForce experience, sign on, download the drivers for games."). These attenuated allegations do not support a core operations theory of scienter. *See In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1082 n.212 (C.D. Cal. 2012).

Plaintiffs also fail to satisfy the "absurdity" prong: the FAC does not allege that the precise proportion of GeForce GPU sales to miners was so "patently obvious" that it would have been "absurd" for management not to know about it. *Zucco*, 552 F.3d at 1001. The Company generally sells GPUs to third parties who incorporate GPUs into their own products and then sell those products to others. 3-ER-337 (¶42). Moreover, as NVIDIA explained, NVIDIA's GeForce GPU could be used for gaming, mining, or both, 2-ER-259 — thus preventing any straightforward quantification of sales driven by mining.

Plaintiffs nonetheless argue that Gaming was NVIDIA's largest and most important segment. OB-54-55. But this Court has previously rejected such an argument, explaining that the core operations theory did not apply simply because "the nature of the problem concerned [NVIDIA's] flagship product." *In re NVIDIA*,

768 F.3d at 1064.

The cases Plaintiffs cite generally involve allegations of catastrophic business developments, whereas this case concerns whether high-level managers overseeing a company operating in a complex market precisely understood, in real time, the drivers of the company's *growth*. *See* OB-53-56 (citing *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 983, 987, 988 n.5 (9th Cir. 2008) ("stop-work orders" had halted millions of dollars in payments and could bring nearly all revenue to an immediate halt), and *Reese*, 747 F.3d 575-77 (oil spill was within the direct jurisdiction of the chemical engineer defendant)).

Also inapposite is *In re Alphabet, Inc. Securities Litigation*, 1 F.4th 687 (9th Cir. 2021), where the defendant (Alphabet's CEO) allegedly had actual access to information from another executive who reported to him (Google's CEO), in alleged contradiction to his statement regarding a massive data vulnerability. *Id.* at 706. Here, Plaintiffs fail to allege that any Individual Defendant had access to such specific information contradicting their statement at the time it was made. *See* OB-55.

Ultimately, Plaintiffs' core operations arguments simply repackage their other failed scienter arguments, and rest on the mistaken assumption that knowledge of financial impact should be presumed when a company's main product is at issue. This Court has already rejected that proposition, and it should do so again here. *See*

*In re NVIDIA Corp.*, 768 F.3d at 1064.

## III. PLAINTIFFS FAIL TO PLEAD FALSITY

In the alternative, this Court may also affirm the judgment below on the alternate ground that the FAC fails to adequately allege that any Defendant made a false or misleading statement. *See Gingery v. City of Glendale*, 831 F.3d 1222, 1226 (9th Cir. 2016).

### A. The FAC Does Not Allege an Actionable Misstatement

Under the PSLRA, a complaint must allege with particularity "each statement alleged to have been misleading, [and] the reason or reasons why." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'" *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084-85 (9th Cir. 2002), *abrogated in part by S. Ferry*, 542 F.3d 776.

In seeking to allege falsity, the FAC ignores all relevant context and often disregards what Defendants actually said. Yet, to allege falsity, Plaintiffs "must account for the entirety of the statements on which they rely, and not simply invoke selective quoting to make their claims." *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276 (N.D. Cal. 2019) (cleaned up); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016).

***Fisher's May 10, 2017 Statement***: Plaintiffs challenge only one statement by Fisher, made on the first day of the Class Period, regarding "the fundamentals of PC gaming" being "strong." 3-ER-383 (¶176); 2-ER-41. Plaintiffs allege that this statement is misleading because Fisher did not state "that 'Gaming' segment revenues actually were being driven significantly by cryptocurrency mining." 3-ER-383 (¶177). This fails. *First*, as the District Court explained in dismissing the CAC, Fisher was describing "the fundamentals of PC gaming . . . as a whole." 3-ER-485. He was not addressing NVIDIA's GeForce revenue or the amount of that revenue being driven by miners. 2-ER-41. *Second*, Plaintiffs again ignore that, when Fisher spoke on May 10, 2017, the "facts" they claim show falsity did not even conceivably exist. *Third*, they ignore that FE-1's allegations about Fisher's knowledge of China GeForce sales are irrelevant as "Fisher's single alleged misrepresentation did not concern China GeForce sales." 3-ER-484. *Finally*, Fisher's "perspective" on what is "fundamental" to "PC gaming" is an opinion, 2-ER-41, which Plaintiffs have failed to allege was actionably false. *Dearborn*, 856 F.3d at 615-16.

***Huang's August 10, 2017 Statement***: Plaintiffs challenge a portion of the following statement made by Huang during the August 10 earnings call: "And I — and we serve the vast — *I would say, the large* majority of the cryptocurrency demand out of that specialized product[] [Crypto SKU]." 3-ER-383 (¶179) (emphasis added); 2-ER-81. The FAC selectively omits the italicized words, which

reflect that Huang was providing a subjective estimate — *an opinion*. Plaintiffs do not even attempt to show that the opinion was not honestly held by Huang or otherwise to meet the standard for alleging an opinion constitutes a material misrepresentation. *Dearborn*, 856 F.3d at 615-16. Indeed, rather than "identify[ing] any particular and material facts going to the basis for [Huang's] opinion" that were omitted at the time, *id.* at 615, Plaintiffs can identify only a post-hoc analysis from an expert who they hired and paid for this litigation, 3-ER-383-84 (¶¶180-81) (citing ¶154). Plaintiffs do not pretend to be able to allege that Huang or anyone else actually knew — then or ever — the precise portion of GeForce GPUs miners had purchased during the second quarter of NVIDIA's 2018 fiscal year. Plaintiffs also conveniently ignore the context in which Huang's statement was made. Immediately after making the challenged statement, Huang explained that miners were buying GeForce chips, which "probably also increased the demand of GeForces." 2-ER-81. And on the same call, Defendants told investors that the quarter had seen an increase in mining activity, miners continued to buy GeForce, there were GeForce "shortages all over the world," and they believed there was unmet demand for GeForce from gamers. 2-ER-78, 81.

***Huang's August 12, 2017 Statements*:** A few days later, Huang was quoted in a *VentureBeat* article as saying that cryptocurrency "represented *only a couple hundred million dollars, maybe* $150 million or so" and that NVIDIA was "not

opposed to [mining]. But our core business is elsewhere." 3-ER-384 (¶183) (emphasis added); 2-ER-94. Plaintiffs' challenge to the first part of this statement fails because they omit language (emphasized above) reflecting that the statement was an estimate or opinion, and ignore the contemporaneous disclosures that mining activity was increasing, miners were purchasing GeForce cards and there were GeForce shortages as a result.[11] 2-ER-78, 84. Further, there is no serious suggestion that NVIDIA's "core business" was not in fact "elsewhere," that is, in Gaming, Datacenter and Professional Visualization. And the latter statement is a quintessential opinion and the sort of vague statement that no reasonable investor would rely upon. *See supra* pp. 51-52.[12]

***Kress's November 9, 2017 Statement*:** On the November 2017 earnings call, an analyst noted that, on the previous earnings call, Kress had "mentioned crypto was $150 million in the OEM line" and asked her to "quantify how much crypto was

---

[11] Plaintiffs also rely on selective quotation to claim Kress's September 6 statement that "we covered most of cryptocurrency with our cryptocards" was false, 3-ER-385-96 (¶190), ignoring that Kress pointed out immediately before that miners bought "some of the gaming cards," 2-ER-147.

[12] Plaintiffs also challenge statements in NVIDIA's August 23 and November 21, 2017 10-Qs about "increased revenue from sales of GeForce GPU products for gaming." 3-ER-385, 388 (¶¶187, 200). It is unclear what about those statements Plaintiffs contend was false or misleading. NVIDIA was expressly describing the markets those GPU products were "aimed at." *See* 2-ER-121 ("Our GPU product brands are aimed at specialized markets including GeForce for gamers."); 2-ER-198 (same).

in the October quarter." 3-ER-386 (¶193); 2-ER-163. Kress responded, "in the OEM results, our specific crypto boards equated to about $70 million of revenue, which is the comparable to the $150 million that we saw last quarter." *Id.* (alteration omitted). Plaintiffs claim this somehow left a misleading impression, but ignore that the question Kress was answering referred specifically to OEM revenue, as did her answer. 3-ER-386 (¶194); 2-ER-163. Kress repeatedly made clear during the call that some mining demand was met with GeForce GPUs, though the amount was "difficult to quantify." 2-ER-156.

***Huang's November 10, 2017 Statement*:** Plaintiffs also challenge Huang's comments about cryptocurrency's significance to NVIDIA, as reported in *VentureBeat*. 3-ER-387 (¶196). Again, these comments must be read in context. During the earnings call the day before, as discussed above, Defendants disclosed that mining demand had been met at least in part with GeForce GPUs. And Huang explained during the call why he thought mining demand for GPUs would continue for some time, though that demand would be small "in the context of our company overall." 2-ER-163.[13] In the *VentureBeat* interview, the interviewer apparently observed, "It seemed like [on the earnings call] people had the impression that

[13] Plaintiffs do *not* challenge the veracity of Huang's statements on this earnings call — perhaps because his exhaustive discussion that prior day is less susceptible to mischaracterization than a summary of a subsequent, abbreviated interview (though they contain essentially the same content).

cryptocurrency is driving all of your success." 3-ER-387 (¶196); 2-ER-172-73. Huang's response echoed his prior day's comments; he again explained that crypto was "going to remain small for us" "because our overall GPU business is so large," and because of the development of new ASICs and new cryptocurrencies. *Id.* These comments were plainly expressions of opinion, and Plaintiffs fail to allege any particularized facts showing that he "did not hold the belief [he] professed" or anything else to render them actionable. *Dearborn*, 856 F.3d at 615-16; *Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) ("projections about the future are quintessential opinion statements" (quotation marks omitted)). They are also forward-looking and protected by the PSLRA's safe harbor. *See, e.g.*, *Tesla*, 985 F.3d at 1196; *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

***Kress's November 29, 2017 Statement*:** At a conference, an analyst asked Kress to quantify cryptocurrency-related demand for GeForce GPUs, recognizing that it was "not easy" to do. 2-ER-228. Kress readily acknowledged "probably [] some residual amount or some small amount," but explained that NVIDIA could not "visibly see" or "visibly count" that revenue. *Id.* She then noted, "*We do believe* the majority [of cryptocurrency revenue] does reside in [the Crypto SKU]." 3-ER-388 (¶203) (emphasis added); 2-ER-228. Though Plaintiffs strategically omitted the words "we do believe" from the FAC, Kress was plainly expressing an opinion. Again, Plaintiffs have not adequately pled that her opinion was false or misleading

or not honestly held. *See, e.g.*, *Tesla*, 985 F.3d at 1196.

***Huang's February and March 2018 Statements*:** Plaintiffs challenge three statements Huang made in press interviews in February and March 2018 in which he stated that: (1) while mining was and would be a part of NVIDIA's business, he considered and expected it to be relatively "small," and (2) he believed the Company's long-term "growth drivers" would be its "core" businesses (Gaming, Datacenter, Professional Visualization, and Automotive). 3-ER-389-90 (¶¶207, 210, 213); 2-ER-232, 239, 244. Plaintiffs again ignore the context. The statements were all made shortly after the Company's February 8 earnings call, during which the Company disclosed that "strong demand in the cryptocurrency market" had "exceeded" expectations, that some crypto demand was met with the Crypto SKU and some with GeForce chips, and that, while "the overall contribution of cryptocurrency to our business remains difficult to quantify," "it was a higher percentage of revenue than the prior quarter." SER-21.

The FAC disputes nothing said on that call. Nor does it adequately allege that Huang did not hold the views he expressed. Indeed, the contemporaneous evidence cited in the FAC indicates Huang *did* believe mining would be a small part of its business going forward: only a few months later, in August, NVIDIA announced that it did not expect mining to generate revenues going forward and, as a result, decreased its revenue guidance for the next quarter by just 2.2%. *See* 3-ER-375

(¶155). That is, the Company expected the complete loss of mining demand to result in just a two percent drop in revenues — precisely the "small percentage" Huang had described. 3-ER-390 (¶210).

Further, Huang's view of NVIDIA's mining-related business as "small" and his view of what constitutes the Company's "core" businesses are inactionable statements of opinion and/or corporate optimism. And Huang's statements in the March 29 *Mad Money* interview are protected under the PSLRA's safe harbor. *See, e.g.*, 3-ER-390 (¶213); 2-ER-244 ("I think over the long term, cryptocurrency will still be here, but our four growth drivers [are] what's going to make [NVIDIA] ten times larger than we are today."). Huang was asked a forward-looking question about whether it was possible to "maintain" the cryptocurrency "run rate" and the future value of NVIDIA stock, and his response was phrased accordingly: "*I expect* cryptocurrency *to be* an important driver for GPUs." 2-ER-244 (emphasis added).

***Huang's August 16, 2018 Statement*:** Asked by an analyst if disappointing guidance assumed an inventory drawdown, Huang answered: "We're expecting the channel inventory to work itself out. We are *masters at managing our channel*, and *we understand the channel very well*." 2-ER-258 (emphasis added). This is inactionable corporate optimism. *See, e.g.*, *Intuitive Surgical,* 759 F.3d at 1060 (opportunity "is still very, very large" and company is "in a pretty good position"

not actionable).[14]

### B. Plaintiffs' "Expert" Allegations Cannot Be Credited

Plaintiffs' falsity allegations rest heavily on allegations from their retained "expert" Prysm Group, which allegedly estimated the amount of quarterly gaming revenue that was driven by mining end users versus gamers, for purposes of this litigation. 3-ER-483. In its first dismissal order, the District Court held that Plaintiffs had "fail[ed] to describe Prysm's assumptions and analysis with sufficient particularity to establish a probability that its conclusions are reliable." *Id.* Plaintiffs fare no better with the FAC.

In the CAC, Prysm simply assumed that the Company's share of the gaming market reliably indicated its share of the mining market. In the FAC, Plaintiffs delete all references to that critical admission and allege instead that Prysm relied on a 2018 "Jon Peddie Research" report purporting to analyze the effect of crypto-mining on NVIDIA's add-in board sales. Despite this entirely "new" input data, Prysm's conclusions somehow remain precisely the same — to the dollar. *Compare* 3-ER-531, *with* 3-ER-374 (¶154). Far from curing the problems identified by the District

[14] The FAC also fails to plead a material omission, as Plaintiffs do not sufficiently allege, as they must, that any statement "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Instead, as discussed *supra* § II.C, none of the alleged "facts" from internal reports or data are sufficient to infer that any Individual Defendant was aware that a statement was misleading at the time it was made.

Court, Prysm's after-the-fact "reliance" on yet another third-party's market share estimate — resting on another host of unidentified and unexplained assumptions and inputs — just compounded them.

The FAC nowhere alleges that the Peddie report was based on reliable, personal knowledge — rather, it alleges that the Peddie report used "*proprietary analytic models* to *estimate* NVIDIA's market share." 3-ER-372 (¶152(a)) (emphasis added). But "[c]onclusory allegations and speculation carry no additional weight merely because a plaintiff placed them within the [mouth] of a retained expert." *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2013 WL 2247394, at *13 (C.D. Cal. May 9, 2013) (citation omitted). Further, Peddie's market share estimates were for just two quarters in 2017, and the FAC alleges no facts to support Prysm's assumption that market share throughout the entire Class Period can be reliably extrapolated from that short time. 3-ER-372 (¶152(a)). And finally, the Peddie estimate is built on the unsupported assumption that *any increase* in NVIDIA's sales in a given quarter was *caused entirely by sales to miners*. SER-228. That assumption completely ignores other factors driving demand for GeForce cards for use in gaming, including the release of several new blockbuster games. *See, e.g.*, 2-ER-44; 2-ER-82; 2-ER-272, 2-ER-282. These glaring problems with the Peddie Report preclude Plaintiffs from meeting the heightened pleading requirement for

falsity. *See Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600 (9th Cir. 2014) (unpublished).

At bottom, Plaintiffs fail to show Prysm was "in a position to know" the amount of NVIDIA's revenue driven by mining. 3-ER-480.

## IV. THE SECTION 20(A) CONTROL PERSON CLAIM WAS PROPERLY DISMISSED

Plaintiffs' failure to adequately plead a primary violation of the securities laws means the Section 20(a) "control person" claims should be dismissed as well. *Zucco*, 552 F.3d at 990.

## CONCLUSION

The judgment of the District Court should be affirmed.

Dated: November 10, 2021 COOLEY LLP

By: */s/ John C. Dwyer*
John C. Dwyer
Patrick E. Gibbs
Samantha Kirby
Joshua Walden
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000
dwyerjc@cooley.com
pgibbs@cooley.com
skirby@cooley.com
jwalden@cooley.com

Sarah M. Lightdale
Patrick J. Hayden
55 Hudson Yards
New York, NY 10001
(212) 479-6000
slightdale@cooley.com
phayden@cooley.com

Kathleen H. Hartnett
Julie Veroff
101 California Street, 5th Floor
San Francisco, CA 94111
(415) 693-2000
khartnett@cooley.com
jveroff@cooley.com

*Attorneys for Defendants-Appellees NVIDIA CORPORATION, JENSEN HUANG, COLETTE KRESS, and JEFF FISHER*

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2021, I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ John C. Dwyer*
John C. Dwyer
*Counsel for Defendants-Appellees*
November 10, 2021

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s):** 21-15604

I am the attorney or self-represented party.

**This brief contains 13,980 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [] it is a joint brief submitted by separately represented parties;
  [] a party or parties are filing a single brief in response to multiple briefs; or
  [] a party or parties are filing a single brief in response to a longer joint brief.

[] complies with the length limit designated by court order dated ___________.

[] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ John C. Dwyer **Date** November 10, 2021