## Docket No. 21-15604

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

E. OHMAN J:OR FONDER AB and STICHTING PENSIOENFONDS PGB, Lead Plaintiffs,

*Plaintiffs-Appellants,*

IRON WORKERS LOCAL 580 JOINT FUNDS,

*Plaintiff,*

v.

NVIDIA CORPORATION, JENSEN HUANG, COLETTE KRESS and JEFF FISHER,

*Defendants-Appellees,*

OAKLAND COUNTY EMPLOYEES' RETIREMENT SYSTEM, OAKLAND COUNTY VOLUNTARY EMPLOYEES' BENEFIT ASSOCIATION TRUST and OAKLAND COUNTY EMPLOYEES' RETIREMENT SYSTEM TRUST,

*Defendants.*

---

*Appeal from a Decision of the United States District Court for the Northern District of California,*
*No. 4:18-cv-07669-HSG · Honorable Haywood S. Gilliam, Jr.*

## APPELLANTS' REPLY BRIEF

GREGORY P. JOSEPH, ESQ.
RACHEL M. CHERINGTON, ESQ.
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
(212) 407-1200 Telephone
gjoseph@jhany.com
rcherington@jhany.com

*Attorneys for Appellants,*
*E. Ohman J:or Fonder AB and*
*Stichting Pensioenfonds PGB*

**Additional Counsel Listed Inside Cover**

 COUNSEL PRESS · (213) 680-2300

PRINTED ON RECYCLED PAPER 

ERIC GERARD, ESQ.
MATTHEW L. MUSTOKOFF, ESQ.
ANDREW L. ZIVITZ, ESQ.
KESSLER TOPAZ MELTZER & CHECK,
LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706 Telephone
egerard@ktmc.com
mmustokoff@ktmc.com
azivitz@ktmc.com

JOHN BROWNE, ESQ.
MICHAEL MATHAI, ESQ.
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1251 Avenue of the Americas, 44th Floor
New York, New York 10020
(212) 554-1400 Telephone
johnb@blbglaw.com
michael.mathai@blbglaw.com

JENNIFER L. JOOST, ESQ.
KESSLER TOPAZ MELTZER & CHECK,
LLP
One Sansome Street, Suite 1850
San Francisco, California 94104
(415) 400-3000 Telephone
jjoost@ktmc.com

LAUREN M. CRUZ, ESQ.
JONATHAN D. USLANER, ESQ.
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
2121 Avenue of the Stars, Suite 2575
Los Angeles, California 90067
(310) 819-3470 Telephone
lauren.cruz@blbglaw.com
jonathanu@blbglaw.com

*Attorneys for Appellants E. Ohman J:or Fonder AB and Stichting Pensioenfonds PGB*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..................................................................... iii

PRELIMINARY STATEMENT ................................................................1

ARGUMENT ...........................................................................................4

    I.    PLAINTIFFS ADEQUATELY PLED SCIENTER ...................................4

        A.    Plaintiffs' Theory of Culpability Is As Plausible As Defendants' Explanations of Innocence................................................4

        B.    Defendants Rely Impermissibly on Extrinsic Documents ................8

        C.    Plaintiffs Tied False Statements to Contemporaneous Documents Contradicting Them ................................................9

            1.    CSD Allegations are Reliable and Particular...........................11

            2.    GFE Data Is Reliable and Particular........................................13

            3.    Internal China Reports Are Reliable and Particular ................15

            4.    Allegations Concerning Top 5 Emails Are Reliable and Particular ..........................................................16

            5.    Allegations Concerning Quarterly Meetings Are Reliable and Particular ..........................................................17

        D.    Rejection of Core Operations Doctrine Was Error...........................17

    II.    DISTRICT COURT FAILED TO PROPERLY ASSESS RECKLESSNESS ..............22

    III.    PLAINTIFFS ADEQUATELY PLED FALSITY .....................................24

        A.    Defendants Made Actionable Misrepresentations...........................24

        B.    Defendants' Falsity Defenses Are Meritless ....................................26

C.    Prysm's Analysis Supports Plaintiffs' Falsity Allegations ..............28

1.    Plaintiffs Filled Gaps in CAC's Prysm Allegations .................29

2.    Defendants' Attacks on Peddie Report Are Meritless.............30

IV.  Dismissal of § 20(a) Claims Should Be Reversed.............................32

CONCLUSION ...................................................................................................33

CERTIFICATE OF COMPLIANCE ........................................................................34

CERTIFICATE OF SERVICE ...............................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ...........................................................19, 24, 26

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) .................................................................10 n.3

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
    527 F. Supp. 3d 1151 (N.D. Cal. Mar. 22, 2021) ...........................................6

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
    8 F.4th 592 (7th Cir. 2021) ..............................................................................7

*Cutler v. Kirchner*,
    696 F. App'x 809 (9th Cir. 2017).............................................................27, 28

*Frank v. Dana Corp.*,
    646 F.3d 954 (6th Cir. 2011) .........................................................................23

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) .......................................................................23

*Huey v. Honeywell, Inc.*,
    82 F.3d 327 (9th Cir. 1996) ......................................................................9 n.2

*In re Allied Nev. Gold Corp. Sec. Litig.*,
    743 F. App'x 887 (9th Cir. 2018).................................................................17

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021),
    *petition for cert. filed*, No. 21-594 (U.S. Oct. 25, 2021) ...............6, 10, 15, 16

*In re Apple Inc. Sec. Litig.*,
    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ..................................................7

*In re Atossa Genetics Inc. Sec. Litig.*,
 868 F.3d 784 (9th Cir. 2017) .........................................................................28

*In re Cabletron Sys., Inc.*,
 311 F.3d 11 (1st Cir. 2002).............................................................................13

*In re Daou Sys., Inc.*,
 411 F.3d 1006 (9th Cir. 2005) .......................................................................32

*In re Finisar Corp. Sec. Litig.*,
 646 F. App'x 506 (9th Cir. 2016)...................................................................25

*In re NVIDIA Corp. Sec. Litig.*,
 768 F.3d 1046 (9th Cir. 2014) ..............................................................19 n.9

*In re Quality Sys., Inc. Sec. Litig.*,
 865 F.3d 1130 (9th Cir. 2017) .......................................................10 n.4, 28

*In re Resonant Inc. Sec. Litig.*,
 2016 WL 6571267 (C.D. Cal. July 11, 2016) ..............................................30

*In re STEC Inc. Sec. Litig.*,
 2011 WL 2669217 (C.D. Cal. June 17, 2011)...............................................27

*Institutional Invs. Grp. v. Avaya, Inc.*,
 564 F.3d 242 (3d Cir. 2009) ............................................................ 23 & n.11

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) ......................................................8, 27 n.12, 31

*Lipton v. Pathogenesis Corp.*,
 284 F.3d 1027 (9th Cir. 2002) ...............................................................11 n.5

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
 513 F.3d 702 (7th Cir. 2008) ...........................................................................5

*Martin v. Walt Disney Internet Grp.*,
 2010 WL 2634695 (S.D. Cal. June 30, 2010) ..........................................9 n.2

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..........................................................................................25

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...............................................................11, 17

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ............................................................7, 11 n.5

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ............................................................................7

*Norfolk Cnty. Ret. Sys. v. Solazyne, Inc.*,
    2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) .......................................15 n.7

*Nursing Home Pension Fund v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ......................................................10, 29 n.13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)........................................................................................27

*Petrie v. Elec. Card Game, Inc.*,
    761 F.3d 959 (9th Cir. 2014) ........................................................................24

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ............................................ 11 n.5, 20-21 n.10

*Prodanova v. H.C. Wainwright & Co.*,
    993 F.3d 1097 (9th Cir. 2021) ........................................................................7

*Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014),
    *overruled on other grounds by*
    *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.*
    *Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) .........................17, 22, 25, 28

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ....................................................................6, 24

*SEC v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) ......................................................................26

*S. Ferry LP, No. 2 v. Killinger*,
　　542 F.3d 776 (9th Cir. 2008) ...................................................18, 20

*Sierra Pac. Res. v. El Paso Corp.*,
　　50 F. App'x 776 (9th Cir. 2007) ....................................................24

*Siracusano v. Matrixx Initiatives, Inc.*,
　　585 F.3d 1167 (9th Cir. 2009),
　　*aff'd*, 563 U.S. 27 (2011) ...............................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　　551 U.S. 308 (2007) ...................................................................1, 13

*Wochos v. Tesla, Inc.*,
　　985 F.3d 1180 (9th Cir. 2021) ...............................................16 n.8

*Zaghian v. Farrell*,
　　675 F. App'x 718 (9th Cir. 2017) ..................................................28

*Zucco Partners, LLC v. Digimarc Corp.*,
　　552 F.3d 981 (9th Cir. 2009) .......................................... 12, 18-19

## Rules & Statutes

15 U.S.C. § 78t(a) .................................................................................32

15 U.S.C. § 78u-5(c)(1)(A)(i) ...............................................................28

### PRELIMINARY STATEMENT[1]

Pleading scienter is not intended to be impossible. A plaintiff need not prove its case in its complaint. Nor must a viable complaint plead "irrefutable," "smoking-gun" evidence. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). What is required is that, "[w]hen the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. Viewed collectively, the allegations in the FAC provide a cogent theory of culpability supported by particularized allegations establishing Defendants had access to multiple internal data sources demonstrating the falsity of their public statements.

Plaintiffs allege that, throughout the Class Period, Defendants (i) tracked mining-related GeForce GPU sales; (ii) knew crypto-mining demand was driving the massive increase in GeForce GPU sales; (iii) sought to capitalize on those sales, including by promoting NVIDIA's crypto-specific GPU (Crypto SKU); and (iv) were aware that sales into the cryptocurrency market were likely to be highly volatile, *and* that investors were wary of such volatility. Cognizant of investors' concerns, but unwilling to relinquish mining-related sales, Defendants publicly minimized NVIDIA's reliance on such sales. First, Defendants falsely told

---

[1]  Emphasis is added to, and internal citations, quotation marks, and brackets are omitted from, quoted material, unless otherwise indicated. "**DB**" refers to Defendants' opposition brief. All other capitalized terms used but not defined have the meanings given in Plaintiffs' opening brief ("**OB**") and DB.

investors that NVIDIA's Crypto SKU satisfied nearly all mining-related demand, with only "residual" mining-related sales of GeForce GPUs, misleading investors about the extent of NVIDIA's reliance on mining. Second, Defendants affirmatively denied NVIDIA's true reliance on mining-related revenues.

Defendants concede they tried to satisfy crypto demand (DB-1), but contend they were operating in a complex market, had difficulty quantifying mining-related sales, had no reason to believe NVIDIA's internal data undermined their statements, and guessed wrong about "the pace at which GPUs would sell through the channel" (DB-23). The problem with this narrative is that it is factual and at odds with well-pled allegations of the FAC, making it ripe for litigation, not dismissal.

The FAC identifies multiple internal data sources quantifying the sales NVIDIA now claims were incalculable, including: (i) the Centralized Sales Database ("**CSD**"), available to Huang, showing that, in China (NVIDIA's largest market), 60% of GeForce GPU sales in 2017 were for crypto-mining; (ii) GFE usage data, monitored by Huang and discussed by Kress and Fisher, revealing that 60% of GeForce GPU sales were to miners; and (iii) an internal Fisher-commissioned study showing that in China in 2Q2018—the same quarter in which NVIDIA claimed its $150 million in Crypto SKU revenues accounted for the "vast" majority of its mining-related sales—NVIDIA sold an estimated 800,000

2

GeForce GPUs to miners for at least another $120 million. Defendants discount the reliability of these sources, and argue that more specificity is required, but Plaintiffs are not required to plead evidence and the FAC's allegations contain numerous details about these sources.

Defendants contend they had no reason to believe NVIDIA had internal data contradicting their public statements, but contemporaneously admitted they were "masters" of their distribution channel and understood the "[cryptocurrency market's] every single move." 3-ER-391 ¶216; 3-ER-398 ¶233. FEs confirmed NVIDIA was closely monitoring mining-related sales of GeForce GPUs, including in weekly emails to Fisher, weekly Top 5 Emails to Huang, and quarterly meetings with Huang. As one FE explained, everyone at NVIDIA was engaged in discussions "about cryptocurrency mining's impact on the Company's sales." 3-ER-347 ¶77. Given NVIDIA's—and investors'—intense focus on crypto-mining demand, Defendants' denials at most raise a question of fact unresolvable on a 12(b)(6) motion.

The District Court's dismissal for failure to plead scienter should be reversed. Further, if this Court does not reject Defendants' request that it review, in the first instance, whether falsity was adequately pled, it should hold that Plaintiffs adequately pled actionable misrepresentations by Defendants.

## **ARGUMENT**

### I. **PLAINTIFFS ADEQUATELY PLED SCIENTER**

Plaintiffs allege that, throughout the Class Period, Defendants (i) tracked GeForce GPU sales to cryptominers, (ii) knew crypto-mining demand was driving surging GeForce GPU sales, (iii) sought to capitalize on those sales, and (iv) knew investors were wary of crypto-mining demand's volatility. 3-ER-324-25 ¶¶2, 4-6; 3-ER-326-29 ¶¶8-14.

Accordingly, Defendants embarked on a strategy that allowed NVIDIA to profit from skyrocketing crypto demand for its GeForce GPUs, while assuaging investor concerns by minimizing NVIDIA's reliance on mining and averring that NVIDIA understood the cryptocurrency market and NVIDIA's distribution channels. 3-ER-324-25 ¶¶5-6; 2-ER-81.

#### A. Plaintiffs' Theory of Culpability Is As Plausible As Defendants' Explanations of Innocence

Defendants characterize Plaintiffs' theory as implausible because it purportedly requires an inference that NVIDIA deliberately flooded "its channel knowing that its stock price would 'inevitabl[y]' fall," DB-22, with its channel-stuffing "com[ing] to light within a quarter or two," DB-27. But the quotation marks are deceptive. Plaintiffs neither alleged that NVIDIA's *stock price* would "inevitabl[y]" fall, nor that NVIDIA's scheme would "come to light within a quarter or two." Rather, Plaintiffs alleged that it was "inevitable" that the

*cryptocurrency market* would tumble and so too would mining-related sales of GeForce GPUs.  3-ER-325 ¶6; 3-ER-378 ¶162.  What was unknown was *when* the cryptocurrency market would fall—it took six quarters, not "a quarter or two"— and whether NVIDIA's overall GeForce GPU sales would fall or whether expected innovations in the gaming market (DB-30) would generate sufficient demand to counter any decline in crypto-mining demand.

That a positive outcome was conceivable, however, does not negate scienter. As Judge Posner explained in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008) (following remand from the Supreme Court), scienter is at least as plausible as the innocent explanation:

> [D]efendants argue that they could have had no motive to paint the prospects for [their products] in rosy hues because within months they acknowledged their mistakes and disclosed the true situation of the two products . . . .  <u>The argument confuses expected with realized benefits.  [Defendant] may have thought that there was a chance that the situation regarding the two key products would right itself.  If so, the benefits of concealment might exceed the costs.  Investors do not like to think they're riding a roller coaster.</u>  Prompt disclosure of the truth would have caused Tellabs's stock price to plummet, as it did when the truth came out a couple of months later.  Suppose the situation had corrected itself.  <u>Still, investors would have discovered that the stock was more volatile than they thought, and risk-averse investors (who predominate) do not like volatility</u> . . . .

*Id.* at 710.

Here, in response to analysts' repeated queries about reliance on mining-related revenues, Defendants minimized the connection between the steep rise in

GeForce GPU sales and crypto-mining. Is it conceivable that Defendants knew GeForce GPU demand was skyrocketing but did not know why? Perhaps. But with the magnitude of GeForce GPU sales, multiple FEs reporting that NVIDIA was tracking mining-related GeForce GPU sales (3-ER-346-366 ¶¶76-133), internal presentations quantifying the very sales NVIDIA claims were unquantifiable (3-ER-359-61 ¶¶120-21), and FEs' reports that NVIDIA focused intensely on such sales (*e.g.* 3-ER-347 ¶77), it is at least as plausible that Defendants falsely downplayed NVIDIA's reliance on mining-related sales to assuage investors' volatility concerns.

This Court routinely finds scienter adequately pled in similar circumstances. *See, e.g.*, *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 709 (9th Cir. 2016) (company may have had a positive explanation for study, but investors were entitled to know company and FDA disagreed); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021) (concealment of negative report "calculated to buy time to avoid putting Google in the spotlight"), *petition for cert. filed*, No. 21-594 (U.S. Oct. 25, 2021); *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1185 (N.D. Cal. Mar. 22, 2021) ("Defendants attempted to buy . . . time to improve their flagging cloud products by deploying coercive sales practices and obfuscating that these practices" were driving growth).

Defendants' reliance on *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020) (DB-26-27) is misplaced. In *Nguyen*, which addressed forward-looking statements, no scienter was found because "defendants failed to plead sufficient facts to show the intractable issues would lead the FDA to withhold approval." *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *13 (N.D. Cal. Nov. 4, 2020); *see also id.* at *12 ("*Nguyen* presents an unusual case because both the Supreme Court and the Ninth Circuit have found scienter on fairly similar allegations."). In *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1107 (9th Cir. 2021) (DB-27-28), this Court found no scienter because, unlike here, there was no causal connection between fraud and the alleged outcome. And *City of Taylor Police & Fire Retirement System v. Zebra Technologies Corp.*, 8 F.4th 592, 596 (7th Cir. 2021) (DB-30) supports Plaintiffs' theory of culpability, noting that "[t]ypically, an executive will be privy to good historical information about the inner workings of her own corporation."

Neither the absence of stock sales by Defendants nor NVIDIA's stock repurchase is dispositive. *See No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); *Apple*, 2020 WL 6482014, at *13.

### B. **Defendants Rely Impermissibly on Extrinsic Documents**

Defendants' theory relies nearly exclusively on factual claims in extrinsic documents omitted from, or disputed by, the FAC. DB-30-31. Because the "unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims," consideration of extrinsic documents is strictly limited. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Courts may judicially notice documents to determine what was disclosed to the market, but not "disputed facts" therein. *Id.* at 999. Further, while courts can assume the truth of documents incorporated by reference, they cannot do so "to dispute facts stated in a well-pleaded complaint." *Id.* at 1003.

Defendants impermissibly rely on the truth of disputed facts in extrinsic documents, including that (i) it takes months for NVIDIA's GPUs to work through NVIDIA's channel (DB-5-6, citing 2/8/18 earnings call not referenced in FAC and 11/15/18 earnings call judicially noticed below to determine what was disclosed to the market (1-ER-12)); (ii) NVIDIA expected prices would normalize when it increased the supply of GPUs (DB-30-31, citing 2/8/18 earnings call not referenced in FAC); and (iii) sellers took longer than expected to lower their prices (DB-29-30, citing 3-ER-378 ¶163 (not supporting assertion) and 11/15/18 earnings

call transcript judicially noticed below to determine what was disclosed to the market (1-ER-12)).

Defendants' request for judicial notice (DB-6 n.2) should be denied. If not denied, this Court should disregard Defendants' claims improperly premised on the truth of facts in judicially noticed documents,[2] and decline to accept the truth of statements unsourced or contradicted by the FAC. *E.g.*, DB-9 (to "increase transparency," Crypto SKU revenue reported in OEM Segment), DB-30 (it appeared Crypto SKU's launch "successfully addressed" crypto market).

### C. Plaintiffs Tied False Statements to Contemporaneous Documents Contradicting Them

Contrary to the District Court's conclusion (1-ER-18), Plaintiffs directly tied false statements to contemporaneous documents contradicting those statements. OB-41-52.

Defendants misstate the scienter requirements when they suggest (DB-34-35) that the FAC must allege each Defendant "actually saw" contradictory

---

[2]    Defendants' reliance on the CAC's allegations (DB-9, 29, 58) is improper. Allegations included in the *CAC* but omitted from the FAC are not binding judicial admissions and cannot be considered in deciding a motion to dismiss the *FAC*. *See Martin v. Walt Disney Internet Grp.*, 2010 WL 2634695, at *5 (S.D. Cal. June 30, 2010) (differences between complaints may be considered on summary judgment, but on motion to dismiss court accepts as true allegations in current complaint); *Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996) (superseded portion of amended or withdrawn pleading "ceases to be" conclusive judicial admission" but is "evidence of the facts" that is "controvertible[] like any other extrajudicial admission").

information.  Defendants all had access to information contradicting their public

statements, which is sufficient.  *See Nursing Home Pension Fund v. Oracle Corp.*,

380 F.3d 1226, 1230 (9th Cir. 2004) ("most direct way" to show a statement was

false and that party making the statement knew it was false "is via

contemporaneous reports or data, <u>available to the party</u>" contradicting the

statement); *Alphabet*, 1 F.4th at 706 (executive's role and "access to the

information" relevant in inferring that defendant knew about issue).[3]

Defendants maintain *Nursing Home* is distinguishable because NVIDIA

purportedly warned investors that mining-related sales were "tough to gauge" (DB-

43)—but these "warnings" were nine months and more than a year into the Class

Period, and are contradicted by Defendants' earlier characterizations of such sales

as "small" and by the multiple internal data sources that *did* "gauge" such sales.[4]

Defendants argue that Plaintiffs' descriptions of internal data are just

"negative characterizations of internal reports."  DB-34.  Not so, and the FAC

---

[3]     *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) (DB-34) is off point.  There, it could not be inferred that executives "personally accessed" third-party documents uploaded to a dataroom.  *Id.* at 620.  Here, Plaintiffs identify multiple *internal* NVIDIA data sources available to Defendants.

[4]     Although Defendants contend *Quality Systems* is distinguishable (DB-43-44) because "internal sales reports showing declining sales were automatically delivered" to defendants (DB-43), those reports are not specifically alleged to show "declining sales" (*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1139, 1145 (9th Cir. 2017)) and the level of detail in *Quality System's* internal reports is consistent with the details concerning the Top 5 Emails and GFE data.  OB-47-48.

contains more detail about NVIDIA's internal data than other cases in which courts have found allegations sufficient to state scienter. OB-47-48; *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13 (2d Cir. 2011) (sufficient detail where confidential witnesses reported meetings "concerned levels of obsolete inventory, problems affecting sales, profit and loss margins, customer satisfaction, and on-time deliveries").[5]

## 1. CSD Allegations are Reliable and Particular

The CSD showed that 60% of GeForce GPU revenues in China throughout 2017 were from sales to cryptominers (3-ER-349-50 ¶¶85-86), contradicting Huang's representations that the "vast" majority of mining demand was satisfied by Crypto SKU. FE-1, FE-2, and FE-5 described the database, and FE-1 and FE-5 offered detailed information about the processes by which data—including "sell-in/sell-out" data identifying sales "down the distribution chain"—was collected and input into the database. 3-ER-348-49 ¶¶80, 82.

---

[5] Defendants' other cases are factually inapt. Here, Plaintiffs identified multiple internal data sources, with specifics from each (3-ER-346-366 ¶¶76-133)—*i.e.*, what was lacking in Defendants' cases. *Compare id.*, *with Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002) (DB-34) (conclusory allegations that defendants had access to internal data demonstrating sales decline without alleging specifics), *and Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (DB-33-34) (witness statements failed to detail "actual contents" of reports showing sales decline), *and Nguyen*, 962 F.3d at 416 (DB-34) (witness used "alarming adjectives" but omitted details about study).

NVIDIA's attacks (DB-35-37) on these consistent, corroborative statements fail. *First*, Defendants' claim that FE-1 lacks "reliability and personal knowledge" (DB-35) overstates the District Court's holding—which was that FE-1 lacked personal knowledge of "NVIDIA's operations internationally" (1-ER-19 n.3). Defendants do not argue that FE-1's statements about *China* lacked reliability or personal knowledge. While Defendants contend that FE-1 is not alleged to have "responsibilities or knowledge of the *Taiwan* market" (DB-36), the FAC alleges FE-1 was one of four account managers in the China market (including Taiwan) and had relationships with Taiwanese partners. 3-ER-347-48 ¶79; 3-ER-358 ¶116.[6]

*Second*, NVIDIA's argument that FE-5 is not alleged to have personally entered data into the CSD (DB-37) misses the point. It can reasonably be inferred that the Head of Consumer Marketing for South Asia (3-ER-335 ¶37), who reported the database contained sell-in/sell-out data gathered from NVIDIA's partners (3-ER-348-49 ¶82), was aware of its contents. FE-5's allegations are detailed and consistent with those of FE-1 and FE-2. *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (reliability assessment should consider level of detail provided and "corroborative nature of the other facts

---

[6]     Defendants wrongly aver that FE-1 had "one link" with Fisher (DB-31).  In addition to the March 2017 presentation, FE-1 prepared the September 2017 Fisher-commissioned presentation, and drafted weekly emails for Fisher quantifying mining-related GeForce sales (3-ER-356-58 ¶¶110-112, 115).

alleged (including from other sources)"); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 31 (1st Cir. 2002) (amount of detail significant, particularly with multiple sources).

*Third*, though Defendants claim the CSD allegations were insufficiently detailed (DB-36), FE-1 reported that throughout 2017 the database showed 60-70% of GeForce revenues in China came from cryptominers (3-ER-350 ¶86). Courts decline to require additional specificity at the pleadings stage. *See Tellabs*, 551 U.S. at 324 (inference of scienter "need not be irrefutable"); *Cabletron*, 311 F.3d at 32-33 ("precise dates" and "exact dollar amounts" of transactions not required; consistent details from different sources "reinforce each other," suggesting reliability).

*Fourth*, contrary to Defendants' argument that the FAC does not allege Defendants actually reviewed the CSD's data (DB-32-33; DB-35-36), "sell in/sell out" data was included in monthly reports to Huang (3-ER-351 ¶89), and FE-2 reported that Huang had access to the database (3-ER-349-50 ¶85). NVIDIA argues that FE-2's statements are unreliable given the timing of his departure (DB-37), but FE-2's May 2017 departure does not render unreliable statements that Huang could and did access the CSD. OB-44.

### 2. GFE Data Is Reliable and Particular

FE-5 alleges that GFE data showed 60% of GeForce GPU sales globally during the Class Period were to cryptominers (3-ER-354-56 ¶¶99-108), directly

contradicting Defendants' assertions that gaming was "driving" demand for GeForce, with only "residual" mining-related GeForce GPU sales.

Defendants challenge the reliability and particularity of this data (DB-38-39), but Plaintiffs provided the information needed to establish reliability (OB-48). Defendants argue that Plaintiffs should have explained how GFE data could track sales to cryptominers (DB-38), but FE-1 reported that NVIDIA executives explained how this was done (3-ER-355 ¶104). Defendants identify no authority requiring additional specifics where FEs consistently reported that NVIDIA did use GFE data in this manner (3-ER-355 ¶¶104-06). Defendants claim that the FAC omits allegations explaining FE-5 knew how "GFE data was collected or what it means" (DB-33), but the FAC alleges that FE-5—Head of Consumer Marketing for South Asia—"explained that [GFE data]," used for marketing, "captures information regarding the use of the PC on which it is installed," and had access to the same monthly reports containing this data as Huang. 3-ER-355 ¶¶105-06.

Defendants challenge the reliability of the GFE allegations because Plaintiffs identified no "particular point in time or place" for the assertion that "60% of GeForce GPU sales *during the Class Period* were to miners" (DB-38). But, as

14

with the CSD allegations, this demands pleading of evidence, which is not required at this stage.[7]

Plaintiffs adequately allege that Defendants had access to, or received, GFE data, including through monthly reports to Huang (3-ER-355 ¶106). Notwithstanding Defendants' argument (DB-39), hearsay can be considered when "sufficiently reliable, plausible, or coherent," which FE-5's report was (OB-50 n.6). Defendants argue the FAC omits allegations that "specific GFE data" was provided or "reasonabl[y] available" to Kress and Fisher (DB-39), but given Kress's and Fisher's positions within NVIDIA, and their public statements, it can be reasonably inferred they had access to this data. *See* OB-49; 3-ER-354-56 ¶¶99-108; *Alphabet*, 1 F.4th at 706.

### 3. Internal China Reports Are Reliable and Particular

FE-1's March 2017 presentation to Fisher showed sales of GeForce GPUs had "doubl[ed]" within a short time (3-ER-357-58 ¶¶115-118), and the September 2017 Fisher-requested presentation showed that, in 2Q2018 (May-July 2017), NVIDIA sold cryptominers 800,000 GeForce GPU units for at least $120 million. 3-ER-359-61 ¶¶120-21.

Defendants complain that the September 2017 presentation "estimate[d]" GeForce GPU sales, without explanation of its reliability (DB-40). But with

---

[7]    The non-binding *Norfolk County Retirement System v. Solazyne, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) is distinguishable. OB-48 n.5.

allegations that it was prepared by "senior members" of the China team, underwent multiple revisions, and was edited by more senior executives (3-ER-359 ¶119), Defendants identify no legitimate grounds to discount its reliability. Nor is it necessary to allege that Defendants "shared" the China team's estimates of past sales in China (DB-40).[8] Fisher received the March 2017 presentation before his May 2017 statement (3-ER-357-58 ¶115), and it is reasonable to infer that, given Fisher's close relationship with Huang and NVIDIA's focus on crypto-mining, Fisher informed Huang of the information in both presentations controverting Huang's public statements. *Alphabet*, 1 F.4th at 706.

### 4. Allegations Concerning Top 5 Emails Are Reliable and Particular

Huang received weekly Top 5 Emails containing "sales data reflecting the growth in GeForce demand" and discussing "bulk ordering, and assessments of crypto-related demand" (3-ER-352-54 ¶¶94-98). Defendants reject any tension between the Top 5 Emails and the challenged statements (DB-40)—but as the Top 5 Emails contained "assessments of crypto-related demand," it is a reasonable inference that they included employee estimates of mining sales (*e.g.*, 3-ER-365-66 ¶132). These allegations are sufficiently detailed to support an inference of scienter.

---

[8] *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) (DB-40), is not to the contrary. It did not address scienter (*id.* at 1188) and involved a forward-looking statement.

### 5. Allegations Concerning Quarterly Meetings Are Reliable and Particular

FE-1, FE-2 and FE-5 reported that mining-related sales—including quantification of such sales—were discussed during quarterly meetings with Huang.  3-ER-350-52 ¶¶87-93.  Defendants argue that the FAC does not specify the content of such communications (DB-41)—but it is a reasonable inference that, because these meetings included discussions of mining demand and "sell-in/sell-out" data, they addressed, for example, CSD data showing 60-70% of GeForce sales in China in 2017 were mining-related (3-ER-350-51 ¶¶86, 89-90).  *See In re Allied Nev. Gold Corp. Sec. Litig.*, 743 F. App'x 887, 888 (9th Cir. 2018) (scienter where defendant had daily meetings at which nature and gravity of problems were discussed); *Celestica*, 455 F. App'x at 13 (scienter where operational issues discussed at monthly meetings).

### D. Rejection of Core Operations Doctrine Was Error

Under the core operations doctrine, courts can "impute scienter based on the inference that key officers have knowledge of the core operations of the company." *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014), *overruled on other grounds by Dearborn Heights*, 856 F.3d 605.  Core operations allegations suffice if (i) "they are particular and suggest that defendants had access" to the information, or (ii) the information is so prominent that it would be "absurd" to suggest that management

17

lacked "knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).

***Absurdity Test.*** The FAC meets the absurdity prong, alleging that (i) the Gaming Segment accounted for over 50% of NVIDIA's revenues (3-ER-324-25 ¶¶2, 6; 3-ER-336 ¶40); (ii) revenue growth in Gaming was massive—reaching $1.723 billion in 1Q2019, a 250% increase from two years prior (3-ER-342-43 ¶63); (iii) during the Class Period, mining-related sales accounted for 83% of NVIDIA's total GPU growth and at least $1.7 billion in revenues (3-ER-400 ¶238); (iv) "everyone at NVIDIA was engaged" in discussions about "mining's impact" on sales (*e.g.* 3-ER-347 ¶77), and (v) analysts repeatedly queried Defendants about mining's impact on revenue growth (3-ER-343-44 ¶¶64-68).

Defendants contend the "absurdity" prong is unmet because the FAC lacks allegations that "the *precise proportion* of GeForce GPU sales to miners was so patently obvious that it would have been absurd for management not to know about it," and because Defendants were operating in a "complex market," they had no way of "precisely" understanding, "in real time, the drivers of the company's *growth*" (DB-48-49). Even apart from being factual, this is meritless.

*First,* neither *Zucco* (DB-48) nor any other decision by this Court stands for the proposition that Defendants must know the *precise proportion* of mining-related revenues to invoke the core operations doctrine. The absurdity prong

18

applies when "the falsity is patently obvious—where the facts are *prominent enough* that it would be absurd to suggest that top management was unaware of them." *Zucco*, 552 F.3d at 1001. The FAC alleges that, given the magnitude of mining-related GeForce GPU sales—$1.7 billion in revenues and 83% of NVIDIA's GPU growth (3-ER-400 ¶238)—and the intense internal and investor focus on mining-related sales, it is absurd to suggest Defendants were unaware that crypto-mining was driving revenue growth.[9] *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987, 989-90 (9th Cir. 2008) (executives would have known of stop-work orders that could lead to a 25% revenue drop, despite uncertainty whether such losses would occur).

*Second*, this Court should reject Defendants' assertion that mining-related sales were unquantifiable because GeForce GPUs could be used for gaming and mining or because NVIDIA sells "GPUs to third parties" (DB-48). FEs reported that NVIDIA tracked the end users of its GeForce GPUs in multiple ways—including through NVIDIA's GFE data and relationships with partners (*e.g.* 3-ER-

---

[9] Contrary to Defendants' argument (DB-48), Plaintiffs' core operations theory does not rest solely on Gaming being "NVIDIA's largest and most important segment" (OB-55). *In re NVIDIA Corp. Securities Litigation*, 768 F.3d 1046 (9th Cir. 2014) (DB-48-49) is inapposite. There, this Court held the core operations theory inapplicable "[w]ithout factual allegations showing that *at least someone* at NVIDIA had knowledge of the extent of NVIDIA's liability." *NVIDIA*, 768 F.3d at 1064. The FAC alleges multiple NVIDIA employees—including Defendants—knew mining demand for GeForce GPUs was driving NVIDIA's revenue growth.

337 ¶43; 3-ER-348-50 ¶¶80-83, ¶¶85-86; 3-ER-353-54 ¶¶97-98).  Moreover, Defendants knew that the enormous demand for GeForce GPUs was driven not by individual gamers who might "do some mining" while sleeping (DB-17), but by mining centers making bulk purchases, sometimes directly from NVIDIA (3-ER-339-40 ¶52; 3-ER-364-66 ¶¶127-133).

***Actual Access Test***.  The FAC also satisfies the "actual access" prong.

*First*, the "actual access" prong is not only satisfied when a plaintiff identifies "specific admissions by one or more corporate executives of detailed involvement in the relevant minutia of a company's operations" (DB-46).  It is satisfied where allegations are "particular and suggest that defendants had actual access to the disputed information"—which can be shown through confidential witnesses or Defendants' own statements.  *S. Ferry*, 542 F.3d at 786.  Multiple FEs confirm Defendants had access to the disputed information, including through the CSD's sell-in/sell-out data, quarterly meetings with Huang, weekly Top 5 Emails to Huang, GFE data (sent monthly to Huang and available to Fisher and Kress), weekly reports to Fisher, a March 2017 presentation to Fisher, and a September 2017 Fisher-commissioned presentation (3-ER-346-66 ¶¶76-133).[10]

---

[10]    In *Intuitive Surgical* (DB-46), this Court considered confidential witness reports in assessing the core operations theory, but found them insufficient because, unlike here, they contained only "snippets of information, not a view of the company's overall health," witnesses lacked access to the defendants, and their

*Second*, Plaintiffs identified Defendants' "specific admissions" that they monitored sales out of the distribution channel—to end users—and alleged that this data, with other internal sources, allowed NVIDIA to quantify mining-related GeForce GPU sales. OB-58-59. Defendants argue that Huang's 2015 statement was taken "out of context" (DB-47). Not so. In August 2015, an analyst asked, "[H]ow are you making sure there is no build-up of excess inventory given just broad macro conditions seem so volatile right now?" Huang responded, "*We monitor sell-out in the channel literally every day, and so that's how we manage inventory*"—and added that NVIDIA's new platform provided additional "visibility." 2-ER-274.

In March 2017, Kress explained that NVIDIA's GFE data allowed NVIDIA to determine whether its GeForce GPUs were used for gaming (2-ER-308). Defendants characterize Kress's admission as irrelevant because it "does not reference mining" (DB-48)—but multiple FEs reported that GFE data allowed NVIDIA to track crypto-related sales.

Defendants contend that Huang's and Kress's 2017 and 2018 statements "do not establish their 'detailed involvement' in the 'minutia' of NVIDIA's GeForce sales or the ability to monitor such sales in real time" (DB-46-47). But NVIDIA *was* monitoring sales in real time, so it is a reasonable inference that statements

---

statements omitted details of the "actual contents of the reports." 759 F.3d at 1062-63.

like "we are masters at managing our channel" (3-ER-398 ¶¶233-34) referred to NVIDIA's real-time monitoring of its channel.

## II. DISTRICT COURT FAILED TO PROPERLY ASSESS RECKLESSNESS

"Deliberate recklessness" does not require a speaker to have actually obtained information contradicting his/her statement. It requires that the speaker had access to, but failed to obtain, information that could have been obtained "without extraordinary effort." OB-62-63; *Reese*, 747 F.3d at 574.

Defendants contend that the FAC omits "facts suggesting that, when they spoke, Huang or Kress had 'reasonable grounds' to believe that information in any internal data source undermined their statements." DB-45. But the FAC—and Defendants' theory of non-culpability—establishes that Defendants had ample grounds to believe that internal data undermined their statements.

*First*, the FAC shows a company intensely focused on mining-related GeForce GPU sales. There were discussions of such sales in quarterly meetings, Top 5 Emails, weekly emails to Fisher, and monthly reports to Huang (3-ER-346-64 ¶¶76-126). Employees reported mining-related bulk sales worldwide, in 50,000- to 100,000-unit lots (3-ER-364-66 ¶¶127-133). Fisher was so concerned about crypto-mining that he sought an in-depth analysis from his China team. 3-ER-359-64 ¶¶119-126. Beginning in August 2017, analysts repeatedly questioned Defendants about mining's impact on revenues (3-ER-383-88 ¶¶179, 183, 193,

196, 203). In these circumstances, it is implausible that Defendants lacked any reason to believe internal data contradicted their statements. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (optimistic internal report that noted company was "facing a crisis" sufficient to put defendant on notice material facts existed that were omitted or misstated); *see also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1182-83 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011); *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011); *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269-70 (3d Cir. 2009).[11]

*Second*, accepting as true that NVIDIA's GPUs take months to work through NVIDIA's sales channel (DB-1, 5), Huang and Kress had insufficient grounds to believe in the truth of their assertions that Crypto SKU accounted for the "vast majority" of mining-related sales in 2Q2018, with only "residual" mining-related sales of GeForce GPUs. As FE-1's September 2017 presentation demonstrated, their claims were untrue—NVIDIA had at least $120 million in undisclosed revenues attributable to mining-related GeForce GPU sales in 2Q2018 (3-ER-360-61 ¶121), which Defendants concealed throughout fall 2017. 3-ER-383-86 ¶¶179, 183, 190, 193; 3-ER-388 ¶203.

---

[11]    Defendants maintain the defendant in *Avaya* provided "confident, unhedged denials" (DB-46 n.9), but *Avaya* addressed statements comparable to Defendants' statements. *E.g.*, *Avaya*, 564 F.3d at 269 ("Perhaps not in the last 12 months. I mean, clearly from time to time people will want to buy a deal here or there, but the market itself has been fairly stable with just modest declines over the last 12 months.").

### III.   PLAINTIFFS ADEQUATELY PLED FALSITY

Because the District Court did not reach falsity (1-ER-25, n.6), this Court should decline Defendants' request (DB-50-60) to address it now.  *See Sierra Pac. Res. v. El Paso Corp.*, 250 F. App'x 776, 778 (9th Cir. 2007); *Petrie v. Elec. Card Game, Inc.*, 761 F.3d 959, 971 (9th Cir. 2014).  But if the Court reaches the issue, the FAC alleges multiple actionable misrepresentations.

### A. Defendants Made Actionable Misrepresentations

"[C]ompanies can control what they have to disclose . . . by controlling what they say to the market," but once they tout positive information, they must "disclos[e] adverse information" cutting "against the positive information." *Schueneman*, 840 F.3d at 705-06.  A statement is misleading if it gives "the impression of a state of affairs that differs" materially from "the one that actually exists." *Berson*, 527 F.3d at 985.  Defendants repeatedly misled investors by hiding or denying NVIDIA's true reliance on mining revenues.

***Misrepresentations Quantifying Crypto SKU.***  Throughout fall 2017, Defendants falsely stated that mining revenues were largely limited to sales of Crypto SKU reported in the OEM segment.  *E.g.*, 3-ER-383 ¶179 ("we serve the vast . . . majority of the cryptocurrency demand out of" Crypto SKU); 3-ER-385-86 ¶190; 3-ER-388 ¶203 (Crypto SKU served "most" and the "majority" of demand, with "residual" amount in Gaming).  In truth, sales of GeForce GPUs

accounted for 57% of mining revenues in 2Q2018 and 77% in 3Q2018—far more than from Crypto SKU (3-ER-383-89 ¶¶179-82, 190-92, 203-06). When asked about NVIDIA's cryptocurrency revenues, Defendants provided the precise amounts booked in the OEM Segment, omitting the greater mining revenues booked in Gaming (3-ER-383-88 ¶¶179-81, 183-85, 193-94, 196, 199, 203). This falsely assured investors that mining was not driving NVIDIA's Gaming revenues and that the OEM Segment contained virtually all mining revenue. *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (falsity where defendants claimed revenues likely to grow despite internal information indicating substantial risk to leading revenue-generating product).

***Misrepresentations Concerning Mining's Importance***. Huang consistently assured investors that cryptocurrency revenues were immaterial. *E.g.*, 3-ER-387 ¶196; 3-ER-389-90 ¶¶207, 210, 213. But mining accounted for hundreds of millions of dollars in quarterly revenues and exposed NVIDIA to substantial risks. 3-ER-374-75 ¶154; 3-ER-389-91 ¶¶207-14; *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) (falsity where defendant denied "inventory build-up," minimized "looming inventory bubble"); *Reese*, 747 F.3d at 570 (stating pipeline had low corrosion rate "objectively misleading" when data showed high rate).

25

***Misrepresentations That Gaming Sales Drove Growth.*** Defendants' SEC filings falsely attributed NVIDIA's increased GPU sales to increased gaming demand. *E.g.*, 3-ER-385 ¶187; 3-ER-388 ¶200. These statements misleadingly concealed that GeForce GPU revenues came primarily from mining. *See SEC v. Todd*, 642 F.3d 1207, 1222 (9th Cir. 2011) (misleading because had defendant "disclosed the true source of the revenue, the investing public would have been alerted to the lesser rate of growth for [the company's] traditional sources of revenue").

***Fisher's May 2017 Misrepresentation.*** Fisher identified the "fundamental" drivers for Gaming revenues as "eSports, competitive gaming, AAA gaming, notebook gaming," omitting mining. 3-ER-383 ¶176; *see also* 3-ER-356-57 ¶¶110-12; 3-ER-383 ¶177. By omitting a material source of Gaming revenues, the statement is actionable. *See Todd*, 642 F.3d at 1222. That the statement did not reference China (DB-51) is irrelevant—China was NVIDIA's largest market and Fisher knew mining-related demand had caused sales in China to double in "a short period."

## B. Defendants' Falsity Defenses Are Meritless

*First*, Defendants contend their statements are innocuous "in context." DB-50, 52, 54, 56. But explanations of "context" at best create ambiguity unresolvable here (*see Todd*, 642 F.3d at 1221-22; *Berson*, 527 F.3d at 986-87) and ring hollow

given that analysts credited them, reporting that mining was insignificant.  *See* 3-ER-344-46 ¶¶69, 71, 75; 3-ER-377-80 ¶159, 163-70; *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) (analysts' statements "underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed.").[12]

*Second*, Defendants incorrectly assert (DB-51, 55, 57) that Huang's and Kress's statements concerning mining's significance, the demand met by Crypto SKU, and estimates of mining-related sales are inactionable estimates or opinions. Many of these statements lacked any reference to subjective attitude, while others expressed certainty.  3-ER-387-90 ¶¶196, 207, 210, 213.  Even if they were opinions, they are actionable because they conflict with what Defendants knew about the magnitude of NVIDIA's mining sales.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015) (opinion misleading if it does not "fairly align[] with the information in the [speaker's] possession"); *Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017) ("I would say on balance things are—the system is performing as we would expect it to" is actionable).

---

[12]     Nor can Defendants rely on the truth of factual allegations not in the FAC to create "context"—particularly where such "context" was provided months into the Class Period (DB-56 (relying on February 2018 earnings call, not referenced in the FAC, for "context").  *Khoja*, 899 F.3d at 1000.

*Third*, Defendants' statements are not immaterial "corporate optimism" (DB-55, 57). Statements like cryptocurrency being "small" for NVIDIA and not a "core growth driver" are "too precise" to be the "vague, optimistic language of puffery that investors know to disregard." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 801 (9th Cir. 2017); *see also Cutler*, 696 F. App'x at 814; OB-41-43 & n.2. That Huang's statements were intended to address analyst concerns about mining's impact on NVIDIA's revenues demonstrates that the issue was material. 3-ER-389-90 ¶¶207, 210, 213; *see also Reese*, 747 F.3d at 570.

*Fourth*, Huang's assertions that crypto was "small" for NVIDIA (*e.g.* 3-ER-387 ¶196; 3-ER-390 ¶213) are not "forward-looking" (DB-55, 57)—they are statements of past and present fact. Even if they are partially forward looking, Plaintiffs can challenge misrepresentations of present facts. *Quality Systems*, 865 F.3d at 1142 (false "statement about current or past facts" mixed with forward-looking statement not protected). Nor do Defendants claim that "meaningful cautionary statements" accompanied their statements. 15 U.S.C. § 78u-5(c)(1)(A)(i). The statements are also unprotected as knowingly false. 3-ER-392-400 ¶¶218-240; *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017).

## C. Prysm's Analysis Supports Plaintiffs' Falsity Allegations

Defendants argue there are purported deficiencies in allegations regarding a study by Prysm Group, the consulting firm Plaintiffs retained to confirm the scale

28

of NVIDIA's undisclosed mining revenues during the Class Period. (DB-58-60); 3-ER-368-75 ¶¶143-154. Prysm's analysis revealed that from May 2017 to July 2018, NVIDIA earned 1.728 billion in mining revenues but understated mining revenues by $1.126 billion—almost two-thirds. 3-ER-374-75 ¶¶153-154. The District Court has not yet evaluated the FAC's Prysm allegations, making the issue unripe—but, if considered, Prysm's conclusions are reliable.

### 1. Plaintiffs Filled Gaps in CAC's Prysm Allegations

In dismissing the CAC, the District Court acknowledged that Plaintiffs may support falsity allegations "with facts provided by an expert" but sought "more detail" on the assumptions underlying Prysm's analysis. 3-ER-480-81.[13] The FAC remedies each area the District Court found lacking.

***NVIDIA's Mining Market Share.*** In response to the District Court's direction that Plaintiffs explain the assumptions underlying Prysm's calculation of NVIDIA's share of the GPU mining market (3-ER-481-82), Plaintiffs explained that Prysm assumed a 69% market share and three market analyses—by Jon Peddie Research, Royal Bank of Canada ("**RBC**"), and NVIDIA itself—all concluded NVIDIA's market share was within a few percentage points of Prysm's 69% assumption. 3-ER-372-74 ¶¶152(a)-(c).

---

[13]  *See also Nursing Home*, 380 F.3d at 1233 (relying on expert opinion in reversing order dismissing complaint).

***Differences Between Prysm and RBC Analyses***.  The District Court sought an explanation for the gap between RBC's calculation of NVIDIA's underreported mining revenues ($1.35B) and Prysm's ($1.12B).  3-ER-482.  The FAC explained that RBC's estimate was larger because: (i) RBC analyzed an 18-month period while Prysm considered a 15-month period, (ii) RBC assumed a 75% market share, while Prysm assumed a 69% market share, and (iii) RBC estimated NVIDIA's revenue per mining sale to be $220, while Prysm assumed $150 per sale.  3-ER-374 ¶153 n.15.

***Additional Details Alleged in the FAC.***  The FAC explained Prysm's hashrate and pricing calculations and identified the information sources on which Prysm relied.  3-ER-481; 3-ER-369-72 ¶¶148-51.  As the FAC establishes, Prysm's assumptions were cautious, producing an estimate that likely significantly undercounted NVIDIA's mining revenue.

### 2.  Defendants' Attacks on Peddie Report Are Meritless

Defendants quibble with aspects of Prysm's analysis and its reliance on data from Jon Peddie.  These factual arguments, better suited for a *Daubert* motion, do not support dismissal (*see, e.g.*, *In re Resonant Inc. Sec. Litig.*, 2016 WL 6571267, at *5 (C.D. Cal. July 11, 2016) (accepting as true expert allegations at pleading stage; *Daubert* motion was proper juncture for challenging admissibility)) and are meritless.

*First*, Defendants oddly criticize Prysm's conclusions because they are "the same — to the dollar" as those in CAC. DB-58. The results are the same because Prysm used the same assumptions—the FAC simply provided more explanation. 3-ER-368-75 ¶¶143–54.

*Second*, Defendants contend that the Peddie Report is unreliable (DB-59)— but Defendants have repeatedly identified Peddie as providing reliable industry and market share data. 3-ER-372-73 ¶152(a) n.14.

*Third*, Defendants contend Peddie's "estimates were for just two quarters in 2017" and nothing suggests market share throughout the Class Period "can be reliably extrapolated" from that period. DB-59. But Prysm's market share assumption relied on additional sources—RBC's estimated 75% market share from February 2017 to July 2018 and NVIDIA's internal report pegging it at 70% in China in 2017. 3-ER-373-74 ¶¶152(b)-(c). These three analyses support a 69% market share assumption throughout the Class Period.

*Fourth*, Defendants contend the Peddie Report's estimate assumes quarterly increases in NVIDIA's sales were "caused entirely by sales to miners." DB-59. Nothing in the Peddie Report suggests such an assumption (SER-228). Even if it did, Defendants cannot challenge it by seeking to judicially notice disputed facts. *Khoja*, 899 F.3d at 999. Moreover, even if Peddie assumed these increases were

solely attributable to miners, that would not change the market-share percentages—which is what Prysm used.

Plaintiffs are not required at the pleading stage to allege the precise amount of NVIDIA revenues attributable to mining sales. *Cf. In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) (for "irregularities in revenue recognition," sufficient to allege "the <u>approximate</u> amount" of revenue overstatement). Whatever the exact amount, Prysm's analysis, coupled with the FAC's other allegations, demonstrates that NVIDIA earned hundreds of millions of dollars in undisclosed mining revenues during the Class Period.

## IV. DISMISSAL OF § 20(a) CLAIMS SHOULD BE REVERSED

For the reasons set forth in Plaintiffs' opening brief (OB-64), dismissal of the § 20(a) control person claims was error and should be reversed.

## **CONCLUSION**

Plaintiffs respectfully request that the District Court's dismissal be reversed.

Dated:     New York, New York
           January 3, 2022

                              By:  ___/s/ *Gregory P. Joseph*___
                                   Gregory P. Joseph
                                   Rachel M. Cherington
                                   JOSEPH HAGE AARONSON LLC
                                   485 Lexington Avenue, 30th Floor
                                   New York, New York 10017
                                   Tel.: (212) 407-1200
                                   gjoseph@jhany.com
                                   rcherington@jhany.com

Eric Gerard                        John Browne
Matthew L. Mustokoff               Michael Mathai
Andrew L. Zivitz                   BERNSTEIN LITOWITZ
KESSLER TOPAZ MELTZER &            BERGER &
CHECK, LLP                         GROSSMANN LLP
280 King of Prussia Road           1251 Avenue of the Americas,
Radnor, Pennsylvania 19087         44th Floor
Tel.: (610) 667-7706               New York, New York 10020
egerard@ktmc.com                   Tel.: (212) 554-1400
mmustokoff@ktmc.com                johnb@blbglaw.com
azivitz@ktmc.com                   michael.mathai@blbglaw.com

Jennifer L. Joost                  Lauren M. Cruz
KESSLER TOPAZ MELTZER &            Jonathan D. Uslaner
CHECK, LLP                         BERNSTEIN LITOWITZ
One Sansome Street, Suite 1850     BERGER &
San Francisco, California 94104    GROSSMANN LLP
Tel.: (415) 400-3000               2121 Avenue of the Stars,
jjoost@ktmc.com                    Suite 2575
                                   Los Angeles, California 90067
                                   Tel.: (310) 819-3470
                                   lauren.cruz@blbglaw.com
                                   jonathanu@blbglaw.com

*Attorneys for Appellants E. Öhman J:or Fonder AB and*
*Stichting Pensioenfonds PGB*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** __21-15604_____

      I am the attorney or self-represented party.

      **This brief contains  6,998  words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

      I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**_____*/s/Gregory P. Joseph*_____ **Date** January 3, 2022
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                   *Rev. 12/01/18*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 3, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:   New York, New York
        January 3, 2022

*/s/Gregory P. Joseph*_____
Gregory P. Joseph
*Attorney for Plaintiffs-Appellants E.*
*Öhman J:or Fonder AB and Stichting*
*Pensioenfonds PGB*

35