JOSEPH HAGE AARONSON LLC

800 THIRD AVENUE
NEW YORK, NEW YORK 10022
(212) 407-1200
WWW.JHANY.COM

GREGORY P. JOSEPH
DIRECT DIAL: (212) 407-1210
DIRECT FAX: (212) 407-1280
EMAIL: gjoseph@jhany.com

March 22, 2023

**By ECF**
Molly C. Dwyer, Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

Re:   *E. Öhman J:Or Fonder AB, et al. v. NVIDIA Corp., et al.*,
      **No. 21-15604 (Wallace, Fletcher, Sanchez)**

Dear Ms. Dwyer:

We represent Plaintiffs/Appellants and write to bring the Court's attention to a case decided after oral argument. *See* Fed. R. App. P. 28(j); Ninth Cir. R. 28-6.

In *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, No. 21-16876 (9th Cir. Mar. 16, 2023) (Ex. 1 hereto), this Court held that plaintiffs pled scienter where they alleged that the individual defendants were involved in a company-wide pressure campaign to mischaracterize deals and bolstered those allegations with allegations that individual defendants had access to information concerning the sales pipeline. Ex. 1 at 40-43.

In the present case, Plaintiffs alleged that Defendants must have known crypto was driving sales — they tracked it internally, introduced a crypto-specific product to sell to the crypto market, and were conscious of investor focus on the issue (*e.g.*, Reply Br. at 1; 3-ER-324-25 ¶¶2, 4-6; 3-ER-326-29 ¶¶8-14). Plaintiffs identified five data sources — more than in *Glazer* — containing sales information contradicting Defendants' public statements. *See* 3-ER-347-64 ¶¶78-126. The sources included weekly email reports, which two confidential witnesses reported

**JOSEPH HAGE AARONSON LLC**

Molly C. Dwyer, Clerk of Court
March 22, 2023
Page 2

contained crypto-related sales data, including descriptions of "bulk ordering[] and assessments of crypto-related demand," and were sent to Huang (3-ER-352-54 ¶¶94-98) — similar to the weekly reports described by a single confidential witness in *Glazer* (Ex. 1 at 41-42). Similarly, two confidential witnesses confirmed that NVIDIA's GeForce Experience usage data, sent monthly to Huang and publicly touted by Kress, showed that 60% of GeForce sales during the class period were to cryptominers (3-ER-354-56 ¶¶99-108). Kress's public statements about the GeForce usage data (3-ER-355-56 ¶¶107-08) are comparable to those at issue in *Glazer* (*compare* 3-ER-355-56 ¶¶107-08, *with* Ex. 1 at 42), and Plaintiffs alleged more detail about the contents of the GeForce usage data than *Glazer* held sufficient (*compare* 3-ER-355 ¶106, *with* Ex. 1 at 43). *Glazer* warns that "[r]equiring more detail[s] than those presently alleged would transform the PSLRA's formidable pleading requirement into an impossible one." (Ex. 1 at 34). The same is true here.

We respectfully request that you distribute this letter to the merits panel.

Very truly yours,

*/s/ Gregory P. Joseph*

Gregory P. Joseph

907625

# Exhibit 1

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GLAZER CAPITAL MANAGEMENT, L.P.; GLAZER ENHANCED FUND L.P.; GLAZER ENHANCED OFFSHORE FUND, LTD.; GLAZER OFFSHORE FUND, LTD.; HIGHMARK LIMITED; MEITAV TACHLIT MUTUAL FUNDS LTD., | No. 21-16876 <br><br> D.C. No. 3:20-cv-00076-SI |
| *Plaintiffs-Appellants*, | |
| v. | OPINION |
| FORESCOUT TECHNOLOGIES, INC.; MICHAEL DECESARE; CHRISTOPHER HARMS, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted October 20, 2022
San Francisco, California

Filed March 16, 2023

Before: Michael Daly Hawkins, Carlos T. Bea, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Bea;
Partial Concurrence and Partial Dissent by Judge Hawkins

## SUMMARY[*]

### Securities Fraud

The panel affirmed in part and reversed in part the
district court's dismissal of a securities fraud class action
under §§ 10(b) and 20(a) of the Securities and Exchange Act
and Rule 10b-5 against Forescout Technologies, Inc., a
cybersecurity company that provides network security for
large computer networks, and two of Forescout's officers.

Plaintiffs alleged that during the class period, defendants
made false or misleading statements about Forescout's past
financial performance, presently confirmed sales, and
prospects for future sales. They alleged that defendants
misled investors with respect to (1) the strength of
Forescout's sales pipeline, meaning its presently booked
sales and prospects for future sales; (2) the experience of
Forescout's sales force; (3) the business Forescout lost with
certain business partners, or "channel partners," when it
announced a merger with Advent International, Inc.; and (4)
the likelihood that the merger would close.  The district court

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

dismissed on the grounds that plaintiffs failed adequately to plead that any of defendants' statements were false or misleading or that defendants made such statements with the requisite scienter.

The panel held that plaintiffs adequately pleaded both falsity and scienter as to some of the challenged statements and that the Private Securities Litigation Reform Act's safe harbor for forward-looking statements did not preclude liability as to some of these statements. The panel affirmed the district court's dismissal as to certain statements, and it reversed and remanded for further proceedings as to other challenged statements regarding the sales pipeline and the Advent acquisition.

Concurring in part and dissenting in part, Judge Hawkins wrote that he agreed in the majority opinion except as to Part IV.a., which concluded that plaintiffs successfully alleged falsity and scienter with respect to four sales pipeline statements that were not forward-looking and protected by the PSLRA's safe harbor. Judge Hawkins wrote that he would affirm the dismissal as to these statements because they reflected business judgments about the timing of deals and the underlying causes of missing quarterly forecasts and were not verifiably false. Further, as to these four statements, plaintiffs did not adequately plead scienter, which requires an intent to mislead or a deliberate recklessness to an obvious danger of misleading investors.

## COUNSEL

Omar Jafri (argued), Patrick M. Dahlstrom, and Brian O'Connell, Pomerantz LLP, Chicago, Illinois; Jeffrey S. Abraham (argued) and Michael J. Klein, Abraham Fruchter & Twersky LLP, New York, New York; Jennifer Pafiti, Pomerantz LLP, Los Angeles, California; Jeremy A. Lieberman, Pomerantz LLP, New York, New York; for Plaintiffs-Appellants.

Amy Jane Longo (argued) and Anna Johnson Palmer, Ropes & Gray LLP, San Francisco, California; Diane Marie Walters (argued), Ignacio E. Salceda, and Rebecca Epstein, Wilson Sonsini Goodrich & Rosati, Palo Alto, California; Peter L. Welsh and C. Thomas Brown, Ropes & Gray LLP, Boston, Massachusetts; Charles D. Zagnoli, Ropes & Gray LLP, Chicago, Illinois; for Defendants-Appellees.

## OPINION

BEA, Circuit Judge:

Lead Plaintiffs appeal the district court's dismissal of this securities fraud class action on behalf of all investors who purchased common stock of Forescout Technologies, Inc. between March 4, 2019, and May 15, 2020 (the "Class Period").[1] Plaintiffs alleged that during the Class Period, defendant Forescout and two of its officers ("Defendants") made false or misleading statements about Forescout's past financial performance, presently confirmed sales, and prospects for future performance. Individual defendants are Michael DeCesare, Forescout's Chief Executive Officer ("CEO") and President at all relevant times, and Christopher Harms, Forescout's Chief Financial Officer ("CFO") at all relevant times (collectively, "Individual Defendants").

Throughout 2019, Forescout struggled to meet its revenue goals. In statements to investors, Forescout repeatedly blamed its reduced revenues on deals having "slipped," which caused the closing payments to be made at a later date in 2019. In other words, Forescout told investors that the company already had binding deals with clients and that it expected these deals to close within the year, but that closing payments on the deals had "slipped"—that is, had become delayed. Forescout assured its investors that it was still on track to meet its annual revenue goals based on the

---

[1] The Class Period in the Second Consolidated Amended Complaint ("SCAC") ran from February 7, 2019, to May 15, 2020. The district court dismissed all claims as to the statements made between February 7, 2019, and March 4, 2019, and Plaintiffs do not challenge dismissal of those claims.

strength of its "sales pipeline," i.e., its presently booked sales and prospects for future sales. In early 2020, Forescout announced a pending merger with Advent International, Inc. ("Advent"), a private equity firm. Plaintiffs alleged Forescout lost several major clients because of the merger announcement. In May 2020, Forescout announced that Advent terminated the merger agreement. Forescout then sued Advent in Delaware court for specific performance of the merger, and the parties settled with Advent acquiring Forescout at a price lower than first offered.

Plaintiffs alleged that Defendants misled investors with respect to four items: (1) the strength of Forescout's sales pipeline, (2) the experience of Forescout's sales force, (3) the business Forescout lost with certain business partners ("channel partners") when it announced the merger, and (4) the likelihood that the merger with Advent would close. The district court dismissed Plaintiffs' complaint with prejudice, finding that Plaintiffs failed adequately to plead that any of Defendants' statements were false or misleading or that Defendants made such statements with the requisite scienter.

## I.  FACTUAL BACKGROUND[2]

Forescout Technologies, Inc. is a cybersecurity company that provides network security for large computer networks. Forescout became publicly traded through an initial public offering in October 2017 and subsequently saw steady revenue increases, reporting a 32% increase in revenues for 2018. But Forescout began to encounter some problems in 2019. The cybersecurity market was shifting increasingly towards cloud-based solutions and remote working, and

---

[2] These facts come from the SCAC and are accepted as true for this appeal. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020).

Forescout's products were not as well-suited to these trends as those of its competitors.

In February 2019, Forescout predicted revenue growth of 24% in 2019. In May 2019, Forescout preannounced a lowered guidance range for the second quarter of 2019. Forescout assured investors that it still expected to meet its revenue projections for 2019. The company claimed that the revenue miss was due to "slipped" deals—in other words, firm contracts that were meant to close with payments to Forescout in the second quarter were now expected to close at a later point in the year. Forescout told investors that the company already had the "tech wins" in these deals—i.e., that there were firm commitments to close the deals. Forescout claimed that the sales pipeline continued to grow and touted the experience level of its sales employees.

However, the statements of Plaintiffs' confidential witnesses ("CWs") tell a quite different story. According to the CWs, Forescout did not have "tech wins" in some of these deals. Employees struggled to meet their sales goals, and Forescout began conducting waves of layoffs. The CWs also related that executives pressured employees to categorize deals as "committed"—i.e., certain to close— before Forescout had received firm commitments from clients.

In October 2019, Forescout preannounced poor financial results for the third quarter of 2019. Nonetheless, the company again assured investors that the sales pipeline was continuing to grow. It blamed the missed revenue on deals having slipped because of extended approval cycles due to poor economic conditions in Europe, the Middle East, and Africa (the "EMEA region").

On February 6, 2020, Forescout announced that it had entered into a merger agreement with Advent International, Inc., a private equity firm. Per the agreement, Advent would acquire Forescout for $33 per share. Forescout's shareholders voted to approve the merger agreement. Forescout lost business with three major "channel partners"—third-party organizations that marketed and sold products on behalf of Forescout[3]—at some point after February 6, and later blamed the loss on the February 6 announcement of the merger. According to Forescout itself, the channel partner losses resulted in the loss of tens of millions of dollars of potential profits to Forescout.

Advent began to reconsider the merger. On May 8, 2020, an Advent representative informed Forescout's CEO during a phone call that Advent was considering not closing the merger. Despite having received this word of Advent's hesitation, Forescout issued a press release on May 11, 2020, stating "[w]e look forward to completing our pending transaction with Advent." Forescout made no mention of the May 8 call with Advent in that press release or otherwise. On May 15, 2020, Advent sent Forescout a termination letter explaining that it no longer planned to proceed with the merger.

Forescout then sued Advent in the Delaware Court of Chancery. On May 19, 2020, it filed a complaint (the "Delaware Complaint") seeking specific performance of the merger agreement. Forescout and Advent settled the Delaware litigation in July 2020, with Advent agreeing to acquire Forescout for $29 per share through a tender offer.

---

[3] *Channel Partner*, TECHOPEDIA, https://www.techopedia.com/definitio n/560/channel-partner (last visited Dec. 21, 2022).

Presently before the court is Plaintiffs' Second
Consolidated Amended Complaint ("SCAC") for violations
of the securities laws. Plaintiffs alleged violations of Section
10(b) and Rule 10b-5 of the Securities and Exchange Act
("Exchange Act"), as well as Section 20(a) of the Exchange
Act. The district court dismissed the SCAC with prejudice
for failing to state a claim.

## II. THE STATEMENTS

Plaintiffs alleged that Forescout made actionable
misstatements about: (1) Forescout's sales pipeline; (2)
Forescout's sales force; (3) Forescout's channel partner
relationships; and (4) the planned merger with Advent. We
deal with each in turn.

### a. Sales Pipeline Statements

Plaintiffs alleged that Defendants misled investors by
assuring them that Forescout's sales pipeline was "strong"
and "healthy" when it was actually deteriorating. Plaintiffs
alleged that Defendants hid the true state of the sales pipeline
by blaming missed revenue projections and lowered revenue
guidance on deals having "slipped," that is become delayed,
to close by payment later than originally expected.

### i. May 9, 2019, Earnings Conference Call

On May 9, 2019, Forescout issued a press release
announcing the company's financial results for the first
quarter of 2019. Forescout reported that it had exceeded its
revenue guidance for the first quarter of 2019 (it had
projected revenues of $71.9–74.9 million; it reported
revenues of $75.6 million). Forescout stated that revenues
for the second quarter of 2019 would be $75.3–78.3 million.
This projection represented an increase of approximately
14% compared to second quarter revenues in 2018—a

disappointing prediction given that, back in February 2019, Forescout had predicted a 24% revenue increase in 2019 over the full year 2018. Despite the disappointing news about the second quarter, Forescout increased its annual revenue guidance for the fiscal year of 2019, raising projections from $363.1–373.1 million to $365.3–375.3 million.

The day of the press release, Forescout held an earnings conference call with securities analysts during which Defendants blamed the lowered second quarter guidance on "slipped" deals. When an analyst asked why the timeline was delayed on some of Forescout's deals, DeCesare responded:

> [F]irst, understand that every one of those deals is still in pipeline. . . . [W]e had an expectation that a couple of them would have been far enough along to be in guidance by this point, that's the major issue for us, right?
>
> We have a high degree of confidence they close for the year. We had originally thought they would be more naturally suited for [the second quarter] and they just slipped a little bit . . . [I]t's also worth pointing out, in every one of those deals, we have the technology win already. We've already been awarded the business.
>
> The question now is what I would call the business win, which is when we actually get the money and the commitment towards timing. So that's why we have a fairly high degree of confidence that they will materialize in the back half of the year.

On the same call, an analyst asked Defendants about the "slipped" deals and whether there was any risk that the deals would not close until 2020. Harms responded:

> So let's address that directly. As it relates to the second half of the year, kind of reiterating some of the points [DeCesare] hit upon. Those deals are ones where we've already got the tech win. There are kind of each nuanced elements to why we still feel we're going to close those deals in 2019, we just weren't prepared to put them into our guidance for [the second quarter]. So inclusive in that, as we're looking at that second half of the year, we feel like we've got plenty of pipeline for the coverage of what we need to do. Those deals are part of the portfolio that we look at. Those, we still have a very high degree as we're assessing the deals that are taking shape . . . we feel like there is plenty of pipeline to deliver upon the guidance we've given you for the full year.

Another analyst asked Defendants why Forescout increased revenue guidance for the year despite the anticipated poor performance for the second quarter. The analyst asked:

> You missed [the second quarter] guidance, but you are raising [the yearly guidance]. You're not keeping . . . the guidance for the year[;] you're raising the guidance for the year. So that means you have some kind of confidence on the materialization of the

contracts in the second half. Can you share
with us what is—what kind of arrangement
you have for these contracts? Why are you
increasing the guidance for the year? And
what's the risks [sic] that it doesn't
materialize? I just want to understand on
what basis you're increasing the guidance?

DeCesare answered:

I think, as we said, in the second quarter,
this is a deal timing issue for us right? When
we started off the year, we had more of
substantial pipeline, we had a number of
larger deals that we thought at that point were
much more naturally going to close in the
second quarter, and we're now realizing that
they need a little bit more time in the oven
before they're going to be done. As I've
mentioned, we have tech win[s] in those
accounts, meaning that they've chosen us. So
it's very,—it's not common for a customer to
award a technology win to a vendor and then
not buy their [sic] product for an extended
period of time. So that gives us a high degree
of confidence.

We've also got 50% of our sales
organization, as we mentioned, at the end of
2018 is ramped, which means they've been in
their territory for more than a couple of years.
So many of these deals are into accounts that
we've had the same account manager on the
same accounts for a longer period of time,
which gives us more visibility. So obviously,

we would not raise 2019 if we did not have a very high degree of confidence. The building of pipeline, the maturation of our reps, the success we're seeing in some of the international territories that were kind of later high risk for us from a cohort perspective are all giving us that confidence.

Later, on the same call, DeCesare stated:

We have a very large pipeline. We've been working this [sic] for many years to build pipeline. So we are not dependent on those deals in the second half for us to be able to be successful. We're just pointing out to you that we had maybe a sense that they were going to close a little bit earlier, and now we've got a high degree of confidence that they're going to close in the back half of the year. So it doesn't have a material impact on kind of the overall productivity, we've got hundreds of sales reps. We feel good about those transactions in the second half of the year. . . . I feel our pipeline is large enough where we can still achieve our capacity expectations without those deals closing in the second quarter.

### ii.    *August 7, 2019, Earnings Conference Call*

On August 7, 2019, Forescout released its second quarter financial results. Forescout reported $78.3 million in revenue—within the guidance provided to investors in May. Forescout predicted third quarter revenues of $98.8–101.8

million. It again forecasted annual revenues of $365.3–375.3 million for 2019.

During a conference call on the same day, DeCesare stated that Forescout's rate of closing deals "remain[s] very strong" and "very healthy," blamed poor performance on "pent-up demand," and said Forescout was "very comfortable in our pipeline, rolling in both the third and the fourth quarter, but we think we've kind of measured those two things appropriately in our guidance." On the same call, Harms stated, "the pipeline is absolutely taking shape very effectively," and "we're quite happy with the level of pipeline we're building."

### iii.    August 12, 2019, KeyBanc Capital Markets Technology Leadership Forum

On August 12, 2019, Harms participated in the KeyBanc Capital Markets Technology Leadership Forum. At the event, he stated that Forescout raised its full year revenue guidance for 2019 during the second quarter of the year because "we still had great visibility into the rest of the year and still the confidence we have about how deals were taking shape." Harms also stated that he and DeCesare "spent a lot of our July time frame really diving into the field to shape how [the third quarter] was taking shape, [and] how [the fourth quarter] was taking shape, so that we could reflect that additional insight and give you an appropriate level of guidance, which the [third quarter] was still very solid, consistent with how I guided at the beginning of the year."

### iv.    October 10, 2019, Press Release

On October 10, 2019, Forescout issued a press release announcing preliminary financial results for the third quarter of 2019. Forescout announced expected third quarter

revenues of $90.6–91.6 million, about 7% lower than the projections announced in August. In the press release, DeCesare attributed the results to "extended approval cycles which pushed several deals out of the third quarter" due to deteriorating conditions in Europe, the Middle East, and Africa (the "EMEA region"). DeCesare further stated that the fundamentals of the business had not changed and the sales pipeline "continued to grow."

> *v. November 6, 2019, Press Release and Earnings Conference Call*

On November 6, 2019, Forescout issued a press release announcing its third quarter revenue results of $91.6 million—7% lower than Forescout's August guidance. Forescout predicted revenues of $93.5–96.5 million in the fourth quarter of 2019 and $339–342 million for the fiscal year of 2019 (a decrease from the prior guidance of $365.3–375.3 million). DeCesare again blamed the missed revenue goal on "extended sales cycles" in the EMEA region.

> *vi. Summary of Sales Pipeline Statements*

The sales pipeline statements can be distilled into the following six assertions: (1) Forescout's disappointing financial performance in the second quarter was due to "slipped" deals; (2) the "slipped" deals were "tech wins," meaning the business had been awarded to Forescout; (3) each of the "slipped" deals was still expected to close by payment within the year; (4) Defendants believed they could meet the full year revenue guidance even if the "slipped" deals did not close; (5) the pipeline was large, healthy, and continuing to grow; and (6) the third quarter revenue miss was due to delays in closing caused by economic conditions in the EMEA region.

### b. Statements Regarding the Sales Employees' Experience

Plaintiffs alleged that Forescout misled investors as to the level of experience of Forescout's employees. Plaintiffs focus specifically on one particular metric: the percentage of "ramped up" or "tenured" sales employees. Forescout defined "ramped up" or "tenured" employees as those having two or more years of experience in the same territory. According to Plaintiffs, Forescout misrepresented this percentage to investors and, as a result, misrepresented Forescout's sales capacity and overall productivity.

#### i.   *March 4, 2019, Investor Day*

On March 4, 2019, Forescout hosted an investor day in San Francisco, California. During this event, DeCesare stated:

> [A]t the end of 2016, 14% of our sales organization was what we call tenured. That is a[n] arbitrary definition for us. We have chosen that to be two years in your territory. We think it's about two years when a rep[']s in the same territory, not just for the company but in their territories, that's when they start to really get kind of the pipeline, everything else that we need flowing. That rose to 35% at the end of 2017 and 50% at the end of 2018. I don't ever expect this to get to 100%.
>
> We're obviously hiring like crazy and not everybody works out. So there's going to be a good kind of critical mass that we get to, but we still think there is upside above and beyond the 50% for sure. The new step we

> want to share with you is where we are on
> pipeline. So this shows you what the total
> pipeline would be as a multiple of our internal
> bookings plan which is, no, we are not
> disclosing to you. But it gives you a sense of
> how big that multiple could be at the start of
> the year. So, that was 3.8% start of 2016;
> 3.4% at the end of 2017; and then $4.2
> million as we go into 2019.
>
> So, it's given us increased visibility
> which is [what] you'd expect as reps are
> longer and the marketing team is getting
> going, we get kind of better visibility into
> pipeline. This is something that we certainly
> track on a very, very, very consistent basis.

The key assertions contained in this statement are that:
Forescout consistently tracked the percentage of its sales
representatives who had two years of experience in the same
territory; Forescout's "visibility" into the sales pipeline
increased as this percentage of its experienced sales
representatives increased; at the end of 2018, this percentage
was at 50%; and Forescout expected the percentage to
continue rising above 50%.

### ii.    *May 9, 2019, Earnings Conference Call*

During the May 9, 2019, earnings conference call, a
financial analyst asked DeCesare: "[D]o you have comfort
in the current levels of capacity that you have? Or should we
anticipate there should be sort of a ramp in rep hiring, in
capacity hiring as we progress through the year?" DeCesare
responded:

> Yeah, no, consistent with the theme I just hit
> upon, look, we feel like we are tracking very
> well against our sales productivity, the
> investment levels that we have been making
> and plan to make through the rest of the year,
> follow the—that path to profitability and
> investing at levels below where our top line
> is growing. Nothing has changed at those
> levels.

Harms agreed with DeCesare's response. The key assertion
contained in the above statement is that "[n]othing ha[d]
changed" regarding Forescout's "sales productivity" levels.

Later, during the same call, DeCesare responded to a
question about his confidence in revenue projections for the
second half of the year. DeCesare stated:

> We've also got 50% of our sales
> organization, as we mentioned, at the end of
> 2018 is ramped, which means they've been in
> their territory for more than a couple of years.
> So many of these deals are into accounts that
> we've had the same account manager on the
> same accounts for a longer period of time,
> which gives us more visibility.

DeCesare also listed "the maturation of our reps" as a reason
for his confidence in the 2019 revenue guidance.

In response to a different question about the effect of
"slipped" deals on sales capacity, DeCesare stated, "it
doesn't have a material impact on kind of the overall
productivity, we've got hundreds of sales reps."

### iii.    *August 7, 2019, Earnings Conference Call*

During the August 7, 2019, earnings conference call, DeCesare again discussed the percentage of "ramped up" sales representatives:

> And just to remind you, that our definition of ramped is they've been with Forescout for more than two years and they're in the territory for more than two years. That was 50% at the end of 2018 up from 35% a year prior, and although it's tracking very well for us, we're going to hold-off on disclosing what that percentage is until we finish 2019. With that said, you're kind of looking at like softer data points that are underneath that, we're quite happy with the level of pipeline we're building, the percentage of our sales reps that have been hired in the more recent cohorts like Asia-Pacific that did very well this quarter for us, there's a lot of indicators for us inside the business that are pointed in the right direction. You can always do better here, and until you're at a place where every single sales rep is making their numbers and producing results.

The key assertion in this phrase was that the percentage of ramped up sales representatives was "tracking very well" for Forescout.

### c.    **Channel Partner Statements**

On February 6, 2020, Forescout announced the planned merger with Advent. Plaintiffs alleged that Forescout misled

investors in subsequent SEC filings by failing to disclose
that the company had lost business with three major channel
partners as a result of the merger announcement.

### i.    February 28, 2020, Form 10-K

On February 28, 2020, Forescout filed with the SEC a
Form 10-K for 2019—an annual report containing an
overview of the Company's business and financial condition
and any significant risks the company faced. The Form 10-
K stated under the title "Our Growth Strategy" that a primary
driver of growth was "[e]xpand[ing] our presence in the
market by leveraging our ecosystem of channel partners."
The Form 10-K also stated, "[t]he announcement and
pendency of our agreement to be acquired by Advent *could*
adversely affect our business." (emphasis added).

### ii.    March 24, 2020, Proxy Statement

On March 24, 2020, Forescout filed a proxy statement in
connection with the planned acquisition. The proxy
statement listed as a risk factor of the acquisition, "the effect
of the announcement of pendency of the merger on our
business relationships, customers, operating results and
businesses generally." The proxy statement also
incorporated by reference the 2019 Form 10-K filed on
February 28, 2020.

### d.  Merger Statements

Forescout announced the pending merger with Advent
on February 6, 2020. Following this announcement,
Forescout made several statements assuring investors that
the company still expected the merger to close. Plaintiffs
argue that these assurances were misleading because
Defendants knew at the time of the statements that Advent
was reconsidering the merger.

### i. *April 23, 2020, Extraordinary Shareholders' Meeting and Press Release*

On April 23, 2020, Forescout held an extraordinary shareholders' meeting. At this meeting, Forescout's general counsel stated, "We currently expect the merger to be consummated on or about May 18, 2020[.]" The same day, Forescout issued a press release stating:

> Forescout continues to expect the transaction to close in the second calendar quarter of 2020 following the completion of a customary debt "marketing period" by Advent. Upon completion of the transaction, Forescout common stock will no longer be listed on any public market.

The press release was attached as an exhibit to a Form 8-K filed with the SEC the next day.

### ii. *April 29, 2020, Form 10-K/A*

On April 29, 2020, Forescout filed a Form 10-K/A with the SEC. The Form 10K/A incorporated the 2019 Form 10-K by reference and stated:

> Forescout expected to hold its 2020 Annual Meeting of Stockholders ("2020 Annual Meeting") in late May 2020; however, Forescout expects the proposed acquisition of Forescout by entities affiliated with Advent . . . to close in the second quarter of 2020 and, as such, our Board of Directors has decided not to hold the 2020 Annual Meeting at this time.

### iii.    May 11, 2020, Press Release

On May 11, 2020, Forescout issued a press release disclosing revenues of $57 million for the first quarter of 2020, $5 million less than the projection for the quarter, which had earlier been provided to investors. The press release quoted DeCesare as stating, "[w]e look forward to completing our pending transaction with Advent."

## III. LEGAL STANDARDS

### a.  Standard of Review

We review de novo a district court's dismissal for failure to state a claim. *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 617 (9th Cir. 2022). In determining the adequacy of the complaint, we accept all factual allegations as true and view them in the light most favorable to Plaintiffs. *Id.* In addition to the factual allegations in the complaint, we may consider any materials incorporated into the complaint by reference. *Id.*

### b.  Rule 12(b)(6)

A 12(b)(6) motion tests the adequacy of the complaint's allegations. Fed. R. Civ. P. 12(b)(6). Except where a heightened pleading standard applies, a motion to dismiss under Rule 12(b)(6) is analyzed using the pleading standard of Rule 8(a). *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). Rule 8(a) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The court does not blindly defer to the "labels and conclusions" provided by the complaint, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), nor to any "'naked assertions' devoid of 'further factual enhancement,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557) (alteration

adopted), but rather must demand that a complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### c. Section 10(b) and Rule 10b-5

This appeal centers on Plaintiffs' allegations under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Section 10(b) makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 implements Section 10(b) by making it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To assert a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [("falsity")]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citation omitted). At issue in the present case are the elements of falsity and scienter.

A statement is false or misleading if it "directly contradict[s] what the defendant knew at that time" or "omits material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008–09 (9th Cir. 2018). In determining whether a statement is misleading, the court applies the objective standard of a "reasonable investor." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021). When defendants "tout positive information to the market," they must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) (quotation marks and citation omitted). However, "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

The falsity analysis is slightly different when the challenged statements contain opinions. A statement of opinion, even if literally accurate, may be rendered misleading by the omission of a material fact. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186–87 (2015); *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (applying *Omnicare* to Section 10(b) and Rule 10b-5 claims). "A statement of opinion is not misleading just because external facts show the opinion to be incorrect" or the "issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 575 U.S. at 188–89. However, a reasonable investor expects that the issuer's

opinion "fairly aligns with the information in the issuer's possession at the time." *Id.* at 189. To state a claim that an opinion is false or misleading, the investor must identify particular material facts regarding the basis for the issuer's opinion, the omission of which make the statement "misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194.

"Scienter" as used in the federal securities laws means the "intent to mislead investors" or deliberate recklessness to "an obvious danger of misleading investors." *NVIDIA*, 768 F.3d at 1053, 1059. Deliberate recklessness is a higher standard than mere recklessness and requires more than a motive to commit fraud. *Schueneman*, 840 F.3d at 705. Rather, "deliberate recklessness is 'an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Id.* (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)). "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Nursing Home Pension Fund, Local 144 v. Oracle Corp*, 380 F.3d 1226, 1230 (9th Cir. 2004) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999)).

### d.  Section 20(a)

Section 20(a) of the Exchange Act imposes liability on certain "controlling" individuals for violations of Section 10(b) and its underlying regulations. 15 U.S.C. § 78t(a); *Twitter*, 29 F.4th at 623. Section 20(a) claims are derivative. *Twitter*, 29 F.4th at 623. "A defendant employee of a corporation who has violated the securities laws will be

jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco*, 552 F.3d at 990 (quoting *No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003)).

### e.  **Rule 9(b)**

Plaintiffs' claims are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *Twitter*, 29 F.4th at 617–18. Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To comply with Rule 9(b), allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993)). "The complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Neubronner*, 6 F.3d at 672.

### f.  **PSLRA Pleading Requirements**

The PSLRA imposes "formidable pleading requirements to properly state a claim and avoid dismissal" under Rule 12(b)(6). *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). The pleading requirements imposed by the PSLRA vary depending on the element of the claim at issue.

> To plead *falsity* adequately under the
> PSLRA:

> the complaint shall specify each statement
> alleged to have been misleading, the reason
> or reasons why the statement is misleading,
> and, if an allegation regarding the statement
> or omission is made on information and
> belief, the complaint shall state with
> particularity all facts on which that belief is
> formed.

15 U.S.C. § 78u-4(b)(1). In doing so, the plaintiff must
"reveal 'the sources of [his] information.'" *In re Daou Sys.,
Inc., Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005)
(quoting *Silicon Graphics*, 183 F.3d at 985). Confidential
witnesses are a potential source of such information. *See
infra* Part III.g.

To plead *scienter* adequately under the PSLRA, the
complaint must "state with particularity facts giving rise to a
*strong inference* that the defendant acted with the required
state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis
added). A "strong inference" exists "if a reasonable person
would deem the inference of scienter cogent and at least as
compelling as any opposing inference one could draw from
the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights,
Ltd.*, 551 U.S. 308, 324 (2007). This court conducts a dual
inquiry when assessing whether the strong inference
standard is met: first, it determines whether any one of the
plaintiff's allegations is alone sufficient to give rise to a
strong inference of scienter; second, if no individual
allegations are sufficient, it conducts a "holistic" review to
determine whether the allegations combine to give rise to a
strong inference of scienter. *Zucco*, 552 F.3d at 992.

28    GLAZER CAPITAL MGMT., L.P. v. FORESCOUT TECHS., INC.

In the past, this court has taken a combined approach to assessing the adequacy of pleadings of falsity and scienter. In *Ronconi v. Larkin*, we discussed the pleading standards for falsity and scienter as "a single inquiry" when both are at issue. 253 F.3d 423, 429 (9th Cir. 2001). In other words, we held that falsity and scienter should be analyzed together when both are at issue. In employing this single inquiry, we said that "[t]he stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002); *see also In re Daou*, 411 F.3d at 1015. Under our combined standard, we looked not just for allegations giving rise to a strong inference of scienter, but for allegations giving rise to "a strong inference of fraud." *In re Vantive*, 283 F.3d at 1092; *see also In re Read-Rite Corp.*, 335 F.3d 843, 848 (9th Cir. 2003).

The combined approach used in *Ronconi*, *In re Vantive*, *In re Daou*, and *In re Read-Rite Corp.* was abrogated by subsequent Supreme Court decisions that treated falsity and scienter as separate requirements. *See Tellabs*, 551 U.S. at 315–18; *Matrixx Initiatives*, 563 U.S. at 37–49. The separate approach employed by the Supreme Court is "clearly irreconcilable" with *Ronconi*'s combined approach. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). Thus, although some facts might be used to support both an inference of scienter and an inference of falsity, our decisions issued after *Tellabs* have consistently refrained from co-mingling the inquiries. *See, e.g.*, *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877–83 (9th Cir. 2012); *Zucco*, 552 F.3d at 989–99; *Metzler*, 540 F.3d at 1065–70. To be abundantly clear, this means that we do not impute the strong inference standard of scienter to the element of falsity; we do not require a "strong inference of

fraud." Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a *strong inference* standard of plausibility.

### g.  Use of Confidential Witnesses

The PSLRA does not necessarily require that a plaintiff name his confidential witnesses. *In re Daou*, 411 F.3d at 1015. However, to comply with the PSLRA's particularity requirement, plaintiffs must "reveal with particularity the sources of their information." *Id.* A complaint relying on confidential witness statements must describe the confidential witnesses "with sufficient particularity to establish their reliability and personal knowledge." *Zucco*, 552 F.3d at 995.

Confidential witnesses may be used in two situations. First, if a complaint relies on a confidential witness and other factual information, the confidential witness need not reveal his sources provided the other facts provide an adequate basis for believing the defendant's statements were false. *Id.* Second, if the complaint relies on a confidential witness and no other information, the complaint must describe the confidential witness with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). In determining whether the complaint has "provide[d] an adequate basis for determining that the witnesses in question have personal knowledge of the events they report," the court considers the level of detail provided by the confidential witnesses, the plausibility of the allegations, the number of sources, the reliability of the sources, corroborating facts, and similar indicia of reliability. *Id.*

### h. **PSLRA Safe Harbor for Forward-Looking Statements**

Even when a plaintiff has adequately pleaded all six elements of a Section 10(b) claim, the defendant may be protected under the PSLRA's "safe harbor" provision for forward-looking statements. Forward-looking statements include "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B). Pursuant to the safe harbor, an issuer will not be liable with respect to any forward-looking statement if: (A) the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; or (B) the plaintiff fails to prove that the statement "was made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). In other words, "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017).

## IV. SECTION 10(b) AND RULE 10b-5

For the reasons discussed below, the court holds that Plaintiffs have adequately pleaded both falsity and scienter as to some of the challenged statements. We also hold that the PSLRA's safe harbor does not preclude liability as to some of these statements. We discuss each grouping of statements in turn.

#### a. Sales Pipeline Statements

##### i.  Falsity

Plaintiffs argue that the sales pipeline statements were misleading because they did not reflect the actual state of Forescout's affairs at the time the statements were made. The sales pipeline statements can be summarized as making the following assertions: (1) Forescout's disappointing financial performance in the second quarter was due to "slipped" deals; (2) the "slipped" deals were "tech wins," meaning the business had been awarded to Forescout; (3) each of the "slipped" deals was still expected to close by payment within the year; (4) Defendants believed they could meet the full year revenue guidance even if the "slipped" deals did not close; (5) the pipeline was large, healthy, and continuing to grow; and (6) the third quarter revenue miss was due to delays in closing caused by economic conditions in the EMEA region. We hold that Plaintiffs have adequately alleged falsity as to each of these assertions.

First, the court finds that Plaintiffs have met the particularity requirement imposed by the PSLRA. As discussed above, the PSLRA provides that "if an allegation regarding the [misleading] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Here, Plaintiffs' argument for falsity is based on Plaintiffs' beliefs that: the cybersecurity market shifted in 2018, Forescout employees struggled to make sales in 2019, the "technical wins" were illusory deals rather than actual awards of business, the illusory deals were included in Forescout's revenue projections, and there was a pressure campaign at Forescout to categorize deals as "committed" even when they were not likely to close by

payment. As the court will discuss, Plaintiffs support each of these beliefs with detailed factual allegations and therefore satisfy the PSLRA's particularity requirement.

In support of their belief that the market shifted in 2018, Plaintiffs alleged the following: There was a market shift in 2018 to cloud computing that rendered many of Forescout's products obsolete. David Linthicum, an expert in cloud computing, asserted that the market began to shift towards the cloud technology between 2018 and 2020 and, based on his research of Forescout's product offerings, Forescout could not keep up with the shift. Forescout told investors in 2019 that it did not expect to launch its core cloud-based product until late 2020. Multiple CWs blamed the declining revenue on pricing pressure and superior cloud-related products offered by competitors.

In support of their belief that Forescout employees struggled to make sales in 2019, Plaintiffs alleged the following: CW8 stated that sales substantially decreased in 2019 because customers preferred Forescout's competitors' products. CW8 was able to achieve only 25% of CW8's $3 million quota for the year before CW8 left Forescout in October 2019. CW1 stated that sales development representatives had difficulty meeting their quotas for the sales pipeline because of intense competition and lack of customer interest. CW1 stated that most sales development representatives met only 50% of their targets in the beginning of 2019. CW2 stated that Forescout products were difficult to sell, causing many employees to leave. CW1, CW3, and CW4 stated that customers preferred larger cybersecurity firms to Forescout. CW17 stated that some sales employees quit because of difficulty selling Forescout's outdated products. CW17 stated that Forescout lost every customer in CW17's territory prior to April 2019,

and Forescout lost its largest customer in Texas by May 2019.

In support of their belief that at least some of the "technical wins" were actually illusory, Plaintiffs alleged the following: CW18 stated that Forescout identified deals with only a 50% chance of success as "committed." CW18 stated that Forescout failed to implement a new revenue projection system in early 2019, which would have included steps such as securing "tech wins," i.e., firm commitments to do business with Forescout, from representatives of buyers with economic decision-making authority. CW18 stated that abandoning this system resulted in Forescout's failure to meet its sales targets. CW18 stated that an $80 million deal repeatedly slipped in 2019. CW18 estimated that one out of every five deals in the global sales pipeline was miscategorized as "committed" and one out of every three seven- or eight-figure deals was miscategorized as "committed." CW12 stated that "committed" deals "evaporated" in the middle of 2019. CW10 inherited $1 million of deals that Forescout had predicted would close, but when CW10 spoke to the customers they told CW10 that they were not interested in Forescout's products. CW12 stated that sales employees became concerned in 2019 that "committed" deals would never close.

In support of their belief that illusory deals were included in Forescout's revenue projections, Plaintiffs alleged the following: CW15 stated that "committed" deals lingered in the forecast file for months or years without closing. CW19 stated that "committed" deals (including illusory deals that were mischaracterized as "committed") were included in forecasts. CW20 stated that deals were forecasted to close within weeks of a quarter, despite the actual length of the sales cycle. CW20 stated that deals were regularly forecasted

improperly because the steps required to close the deals had not taken place.

In support of their belief that there was a pressure campaign at Forescout to categorize illusory deals as "committed," Plaintiffs alleged the following: Multiple CWs stated that sales representatives, themselves included, were pressured by senior executives to identify numerous seven-figure deals as "committed" when, in fact, the buyers had no interest. CW13 stated that the pressure campaign also applied to deals involving SecurityMatters, which was acquired by Forescout in 2018. CW19 stated that he saw and heard the head of Americas for Forescout instruct sales representatives to identify deals as "committed" in Forescout's Salesforce platform based on only a single conversation with a senior executive of the customer in the negotiations stage, despite a lack of actual commitment. CW9 was pressured by Forescout management to identify a $1 million deal with only a 50% chance of success as "committed" even though the buyer had no interest in the product at that date. CW9's immediate boss instructed CW9 to move a $1 million deal to the "committed" category in the Salesforce platform so the platform would show a $1 million increase in revenue for the quarter, even though the deal was not committed. CW7 heard a customer inform Niels Jensen (Forescout's Senior Vice President of Sales for the Americas) that it would not place a purchase order before September 2019, but Jensen pressured CW7 to list the close date on or before the end of September 2019.

Requiring more detail than those presently alleged would transform the PSLRA's formidable pleading requirement into an impossible one. "The PSLRA was designed to eliminate frivolous or sham actions, but not actions of substance." *Oracle*, 380 F.3d at 1235. As demonstrated by

this court's recitation, in perhaps tedious detail, of Plaintiffs
allegations, Plaintiffs have met their burden under the
PSLRA by stating with particularity the facts supporting
each of their beliefs as to why the challenged statements
were false or misleading. Defendants' argument that
Plaintiffs alleged "insufficient particularized facts" as to the
sales pipeline statements asks the court to impose an
impossibly high burden on securities action plaintiffs.

The district court's holding to the contrary relied on a
misinterpretation of the challenged statements. The district
court reasoned that Plaintiffs "fail[ed] to provide sufficient
facts indicating any of the 'committed' deals were *falsely*
reported as 'committed.'" Defendants echo this reasoning by
arguing that Plaintiffs failed to show that Defendants
referred to any *specific* misclassified deals when they spoke
about having "technical wins" and about deals remaining in
the pipeline. This argument fails because Plaintiffs alleged
particular facts supporting their belief that the company had
a widespread practice of classifying illusory deals as
"committed" and including these deals in their forecasts.
When Defendants blamed missed projections on deals
having "slipped" and stated generally that "every one of
those deals is still in the pipeline," Defendants did not refer
to any *specific* deals—they themselves never identified
which deals were the "slipped" deals leading to the revenue
miss. A finder of fact could reasonably conclude that, in a
company with a widespread practice of including illusory
deals in forecasts, some of the deals identified as
"committed," but that did not close in a given quarter, were
indeed illusory.

Next, Defendants argue that Plaintiffs failed to connect
their allegations that deals were wrongfully marked
"committed" in internal company software with the

misleading nature of the statements. This argument fails
because Plaintiffs also alleged facts showing that deals
internally marked "committed" were included in company
projections. It follows that, when Forescout missed revenue
projections, at least part of the reason for the poor
performance was because the projections included these
illusory deals, and these deals never closed by payment into
Forescout's revenue. It therefore follows that at least one
reason for missed revenue projections was the mislabeling
of illusory deals as "committed," making it reasonably
plausible that Defendants' statements blaming the missed
revenue on "slipped" deals was misleading.

The same reasoning applies to Defendants' statements
blaming missed revenue guidance on conditions in the
EMEA region. It follows that, if a significant cause of the
missed revenue guidance was the misclassification of
illusory deals, it was misleading to blame the revenue miss
entirely on EMEA conditions (even if EMEA conditions
were also a factor in the financial performance).

Defendants also argue that most of the challenged
statements are "nonactionable puffery." Defendants argue
that phrases such as "tracking very well" or "very large
pipeline" are nonactionable because they do not convey
concrete, verifiable facts. We reject this argument. Although
"vague statements of optimism" are generally not actionable
because investors "know how to devalue the optimism of
corporate executives," *In re Cutera Sec. Litig.*, 610 F.3d
1103, 1111 (9th Cir. 2010), "general statements of optimism,
when taken in context, may form a basis for a securities fraud
claim." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir.
1996). In *Warshaw*, for example, the court held that a
biotech company president's statement that "everything
[was] going fine" was actionable when made in response to

market fears about the company securing FDA approval on a major product. 74 F.3d at 959.

Here, Plaintiffs have plausibly alleged that the challenged statements "contravened the unflattering facts in [Forescout's] possession." *Id.* at 960. The statements went beyond mere optimism by "provid[ing] a concrete description of the past and present state of the pipeline." *Quality Sys.*, 865 F.3d at 1143–44 (holding that statements representing that a company's pipeline is "very consistent," "deep," and "keeps growing," and that "[t]here is nothing drying up" were actionable and not mere puffery). Moreover, many of the challenged statements were made during earnings conference calls after Forescout announced disappointing financial predictions or results, and most of the challenged statements were made in response to specific questions asked by financial analysts. Given this context, the statements cannot be discounted as mere "puffery."

Similarly, we reject Defendants' argument that the challenged statements were "nonactionable opinions." When Defendants "repeatedly reassured investors during the class period that the number . . . of prospective sales in the pipeline was unchanged . . . and reassured them that the pipeline was full and growing," they "affirmatively create[d] an impression of a state of affairs." *Id.* at 1144 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). These concrete assurances did not "fairly align[] with the information in [Forescout's] possession at the time" and are therefore actionable. *Omnicare*, 575 U.S. at 189.

Next, Defendants challenge Plaintiffs' reliance on CWs. The SCAC contains statements by twenty CWs, all former employees of Forescout. According to Defendants, "the CWs provide no basis for any personal knowledge of

corporate-level pipeline . . . sufficient to plead falsity." We reject this argument. The adequacy of the SCAC does not depend on each CW possessing inside knowledge about corporate-level trends; Plaintiffs need only provide a basis for each CW's knowledge about the specific statements he made. The SCAC meets this burden. For example, the SCAC describes CW17 as a "Strategic Account Manager . . . at Forescout from April 2019 to February 2021, who sold Forescout's products to large enterprises in Houston, Austin and San Antonio." This description adequately explains how CW17 possessed the personal knowledge that Forescout lost its largest customer in Texas in May 2019. Each of the CWs worked at Forescout during the Class Period or immediately prior to the Class Period. Many of the CWs described conversations that they themselves heard (e.g., CW19 heard an executive tell employees to mark a deal as committed) or practices to which they themselves were subjected (e.g., multiple CWs were pressured to list deals as "committed"). The SCAC thus sufficiently explains how each CW possessed knowledge about the statements he made. *Cf. Zucco*, 552 F.3d at 996 (reasoning, for example, that a human-resources employee was not positioned to know the workings of the finance department, and CWs who were not employed during the class period were not positioned to know about accounting practices during that time). Though the CWs, as individuals, might not have known about corporate-level trends, their statements combine to tell a plausible story about Forescout's pipeline.

Defendants take particular issue with Plaintiffs' reliance on CW18, the "senior executive" who estimated that one out of every five deals and one out of every three seven- or eight-figure deals was illusory. Unlike most of the CW statements, which regarded only personal experiences or regional trends,

CW18's estimates pertained to the sales pipeline on a company-wide level. According to Defendants, "Plaintiffs say nothing to establish CW18's personal knowledge of global . . . pipeline." We disagree.

The SCAC describes CW18 as "a former senior executive at Forescout who served as the Global Talent and Enablement Manager ("GTEM") . . . from June 2018 to December 2020 and trained and supervised [account managers] and other sales representatives." CW18's title alone suggests that CW18 dealt with the company on a "global" level. Further, based on CW18's alleged supervision of sales representatives, it is plausible that CW18 would have knowledge about the way such employees classified deals in the pipeline. Though CW18's estimates might not be 100% perfect, the court can consider the fact that they are estimates—not hard facts—without disregarding them entirely.

Lastly, we reject Defendants' argument that Plaintiffs "simply juxtapose [the] CWs' subjective assessments of deals with managers' conflicting business judgments." Although some of the CW statements contain subjective assessments of deals (e.g., CW18's estimate that 1 out of every 5 deals was illusory), the SCAC contains plenty of allegations of verifiable facts (e.g., CW17's statement that Forescout lost its largest customer in Texas in May 2019). Having considered the level of detail of the CW statements, the number of CWs, and the consistency between the CW's statements of subjective opinion and those of verifiable fact, we find that the CWs tell a reasonably plausible story about Forescout's state of affairs. *See Zucco*, 552 F.3d at 995.

### ii.   Scienter

Plaintiffs' allegations of a company-wide pressure campaign, on their own, are sufficient to raise a strong inference of scienter. Plaintiffs argue that Defendants must have known that deals were being miscategorized because the Individual Defendants themselves participated in the widespread pressure campaign to do so. The SCAC contains the following allegations: CW18 stated that it was normal practice to misidentify deals with only a 50% chance of closing as "committed." CW7 and CW14 stated that Steve Redman (Forescout's Chief Revenue Officer) pressured sales representatives to identify illusory deals as "committed." Jensen and Redman pressured CW7 and CW14 to report that a $2 million deal would close before September 2019 even though the client had told Jensen in a conference call with CW7 that it could not meet this timeline. CW13 stated that sales employees at SecurityMatters, an acquisition of Forescout, were pressured to list deals as "committed" even though they knew there was no actual commitment from buyers, that the head of SecurityMatters left Forescout in January 2020 because he was upset with the pressure campaign, and that the pressure campaign came directly from DeCesare. At a breakout session during a "sales kickoff" event in January 2020, CW19 heard Matt Hartley (Forescout's Vice President of the Americas) instruct sales personnel that deals should be identified as "committed" in the Salesforce platform "once negotiations started" even though there was no real commitment from customers.

These facts raise a strong inference that DeCesare participated in the alleged pressure campaign and therefore knew that illusory deals were included in sales projections. CW13's allegations are particularly persuasive. CW13 was

a Senior Administrative Assistant and Office Manager at Forescout from November 2018 to March 2020, and joined the company through its acquisition of SecurityMatters. As an administrator and office manager, it is likely that CW13 regularly communicated with the employees who were themselves subject to the pressure campaign. Defendants argue that CW13's statements are the equivalent of generally alleging that conditions in a company are "known internally." We reject this argument. CW13 did not state that conditions were generally known or merely "known internally" at Forescout. Instead, CW13 identified a specific group of employees (sales employees at SecurityMatters) who were subjected to the alleged pressure. CW13 also identified a specific high-level employee (the head of SecurityMatters) who found the pressure campaign so burdensome that he left the company. These particularized facts support the inference that Forescout executives exerted pressure on SecurityMatters employees and in turn corroborate Plaintiffs' allegations of a widespread pressure campaign at Forescout.

The inference of scienter is bolstered by Plaintiffs' allegations that DeCesare had access to information about the sales pipeline and the status of deals through internal reports and Clari, a revenue platform used to track deals. As to the internal reports, Plaintiffs alleged: CW20 was a Senior Deal Desk Manager at Forescout. CW20 reported to Mick Roberts (Forescout's Director of the Global Deal Desk), who reported to Aaron Martin (Forescout's Senior Vice President of Revenue Operations), who reported to DeCesare. CW20 gathered information from sales representatives and prepared updates using Smartsheet, a software program that gathers information from Salesforce data concerning the status of deals. These updates contained information

regarding deals valued at $500,000 or more, including the status of negotiations, the steps remaining to close a deal, and the expected dollar amount for each deal. Roberts told CW20 that the Smartsheet updates were required because Martin presented this information to DeCesare in weekly meetings.

As to Clari, Plaintiffs alleged: CW17, CW18, and CW20 stated that DeCesare, Redman, and other executives used Clari to track sales and monitor sales representatives, deals, and forecasts. Clari contained real-time information on a company-wide level that would allow Individual Defendants to learn when the company was short on its pipeline, identify deals that were at risk, and predict outcomes early in the quarter. DeCesare publicly stated, "Clari provides new visibility into the sales execution process that is unparalleled."[4]

Individual Defendants' access to internal reports and Clari support the inference of scienter. First, Plaintiffs alleged with particularity that DeCesare accessed the internal reports. *See Okla. Police Pension & Ret. Sys. v. Lifelock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019) (finding a witness's assertions that the witness's supervisor and the defendant met regularly to discuss reports prepared by the witness sufficient to establish, at the pleading phase, that the defendant had access to the information in the reports). As to Clari, three different CWs, including CW18—a "senior executive" and "Global Talent and Enablement Manager"—alleged that DeCesare himself accessed Clari. The CW allegations are corroborated by DeCesare's public statement implying that he himself used

---

[4] The district court took judicial notice of this statement.

the system. Although Defendants point out that DeCesare's public statement is undated, the fact that CW17, CW18, and CW20 were all employed during the Class Period strengthens the inference that DeCesare used Clari during the Class Period.

Second, Plaintiffs adequately alleged the contents of the information Individual Defendants accessed because the SCAC includes particularized details about the data to be reviewed. In *Oracle*, the court found access to information allegations sufficient to support scienter where the complaint included specific facts similar to those alleged here. *Compare* 380 F.3d at 1231 (observing that the defendant "maintained an internal database covering global information about sales" including "up to the minute" information), and *id.* (noting that former employees "testif[ied] to a major slowdown in sales"), and *id.* (stating that "by the summer 2000, the telephones in General Business West 'went dead'"), *with* SCAC ¶ 43 (describing Clari's forecasts regarding deals, sales, and employees as "up-to[-]the-minute" and "company-wide"), and *id.* ¶ 36 (recounting five CWs' statements that Forescout struggled to sell products because customers preferred other vendors), and *id.* ¶ 99.C ("CW17 states that Forescout lost every single customer in CW17's territory in southern Texas by April 2019."). These particularized allegations regarding Individual Defendants' access to information about the pipeline further enhance the inference of scienter.[5]

---

[5] We offer no opinion as to whether the access to information allegations, on their own, would support a strong inference of scienter. We hold only that these allegations enhance the strong inference already raised by the pressure campaign allegations.

### *iii. Forward-looking Statements*

Although Plaintiffs have adequately pleaded falsity and scienter as to all of the sales pipeline statements, some of these statements are protected by the PSLRA's safe harbor for forward-looking statements. The sales pipeline statements are forward-looking to the extent they assert that (1) each of the "slipped" deals was still expected to close within the year, and (2) Defendants believed they could meet the full year revenue guidance even if the "slipped" deals did not close. These statements are forward-looking because they constitute "statement[s] of future economic performance." 15 U.S.C. § 78u-5(i)(1)(C); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021). Forescout identified these statements as forward-looking during the May 9, 2019, and August 17, 2019, earnings conference calls during which they were made. During these calls, Forescout directed investors to its SEC filings and earnings statements made on the same dates. The relevant earnings statements contained meaningful cautionary language listing specific factors that might affect the company's likelihood of closing on its deals and achieving its revenue goals. For example, the May 9, 2019, earnings statement provides, "[these] forward-looking statements . . . involve risks and uncertainties . . . [including] the evolution of the cyberthreat landscape. . . developments and trends in the domestic and international markets for network security products . . . fluctuations in our quarterly results of operations and other operating measures; increasing competition." The August 17, 2019, statement contains similar meaningful cautionary language. These statements are therefore protected by the safe harbor. *See* 15 U.S.C. § 78u-5(c)(1).

Forescout's statements are not forward-looking to the extent they assert that (1) Forescout's disappointing

financial performance in the second quarter was due to "slipped" deals; (2) the "slipped" deals were "tech wins"; (3) the pipeline was large, healthy, and continuing to grow; and (4) the third quarter revenue miss was due to delays in closing caused by economic conditions in the EMEA region. Such statements describe past and current conditions, rather than plans or objectives for future operations. *See Quality Sys.*, 865 F.3d at 1143 (holding that statements addressing the past and current state of the sales pipeline, such as "[o]ur pipeline continues to build to record levels," were non-forward-looking statements). Because these statements are not forward-looking, they are not protected by the safe harbor.

### b. Sales Employee Statements

First, we take the time to clarify those aspects of the statements that Plaintiffs alleged to be misleading. The district court interpreted the SCAC as alleging that Forescout misled its employees as to the amount of hiring or firing taking place in the Company. The district court reasoned that "Defendants' alleged misstatements did not indicate there would be no employee turnover," and that, although the CWs stated many employees left Forescout during the Class Period, the CWs also stated that Forescout was hiring. But the assertion Plaintiffs challenge here is narrower: Plaintiffs argue that Forescout misled investors as to the level of *experience* of its sales force at the time of the statements.

Specifically, Plaintiffs alleged that Forescout misled investors about the percentage of sales employees who were "ramped up"—a figure Plaintiffs often referred to in the SCAC as Forescout's "sales productivity." According to the SCAC, Forescout defined "ramped up" employees as those having two or more years of experience in the same territory.

Plaintiffs argue that the percentage of "ramped up" employees was material to investors because "the Company informed investors that its sales representatives' productivity is directly tied to the duration of their tenure, with a 100% increase in productivity after the second year at Forescout, and 50% higher than second-year productivity in the third year at Forescout." During the May 9, 2019, earnings conference call, DeCesare tied the amount of time a Named Account Manager had been at Forescout to the "visibility" of the Company's pipeline. It is unclear exactly what DeCesare meant by "visibility of the Company's pipeline," but the SCAC describes this statement as meaning that "the longer a sales representative was at Forescout, the greater the likelihood that the sales representative would generate more deals and greater revenue." For these reasons, Plaintiffs are concerned not with Forescout's turnover rate on a general level, but with the number and percentage of "ramped up" sales employees in Forescout's sales force at the time of the statements.

Defendants argue that Plaintiffs conflate "sales productivity" with the percentage of "ramped up" sales representatives and note that this percentage did not track employees' sales productivity, total employment duration, or general sales experience. We recognize that the percentage of "ramped up" employees is not a perfect proxy for "sales productivity." But read in context, most of the allegedly misleading statements specifically address this percentage. For example, during the August 7, 2019, earnings conference call, DeCesare mentioned that the percentage of "ramped up" sales employees was 50% at the end of 2018, then said that the current percentage was "tracking very well for us." In this context, DeCesare clearly meant that the percentage of "ramped up" employees was

"tracking very well," not Forescout's sales productivity overall.

DeCesare's statement during the May 9, 2019, earnings conference call, however, did not specifically address the percentage of "ramped up" employees. In response to an analyst's question about "sales capacity," DeCesare stated, "we feel like we are tracking very well against our sales productivity" and "[n]othing has changed at those levels." The SCAC does not indicate that DeCesare and the analyst ever specified that "sales productivity" or "sales capacity" referred to the percentage of "ramped up" sales employees. It is therefore unclear that this statement was rendered misleading by the omission of facts relating to a decline in the number of "ramped up" sales employees.

However, even if we accept for the sake of argument that the percentage of "ramped up" sales employees was a sufficient indicator of Forescout's "sales productivity," Plaintiffs' argument fails because Plaintiffs did not allege with particularity that the number or percentage of Forescout's "ramped up" sales employees had dropped *by the time Forescout made the allegedly misleading statements*. The relevant statements occurred on March 4, May 9, and August 7 of 2019. In support of their belief that the percentage of "ramped up" sales employees had fallen by these dates, Plaintiffs offered numerous CW statements regarding employee turnover *throughout* 2019.

The CWs stated that: Forescout's total sales force declined from 400 employees in 2018 to 300 employees by the end of 2019 and the beginning of 2020. Between 2019 and 2020, "Forescout replaced 100 experienced sales representatives with inexperienced ones who were unable to close deals given the lengthy sales cycle." Significant cuts

were made in the commercial division in February 2019. An entire sales team was cut in the spring of 2019. A total of twenty-five to thirty "Business Development Representatives" and "Sales Development Representatives" were terminated or left Forescout in the first months of 2019. Layoffs occurred in five rounds in 2019 and 2020, with most cuts made in 2019. Around May 2019, Forescout made plans to terminate more employees that summer. In 2019, Forescout terminated or lost 25–30 of its "Named Account Managers" with two or more years of experience in their territories. There were numerous hiring freezes in 2019. In August 2019, Forescout laid off "a significant number" of sales representatives dedicated to the healthcare and financial services industry. In the third quarter of 2019, an entire section of a major division was eliminated. In addition to the CW statements, Plaintiffs noted that, according to Forescout's 10-K for 2019, the percentage of Forescout's "ramped up" sales employees declined from 50% to 38% between the end of 2018 and the end of 2019.

Although the CWs asserted that numerous layoffs occurred at some point in 2019, these statements are unclear as to the actual timeline at which company-wide layoffs occurred. Plaintiffs' belief that company-wide lay-offs had already begun at the time the statements were made is simply not supported by the CWs' vague statements that layoffs occurred in "spring 2019," "summer 2019," or just "2019." Similarly, the allegation that "Forescout replaced 100 experienced sales representatives with inexperienced ones" *between 2019 and 2020* does not establish that Forescout made such replacements *prior to March 4, May 9, or August 7, 2019*. The allegation that significant cuts were made in the commercial division in February 2019, does not establish that company-wide lay-offs had occurred by February 2019.

The fact that the percentage of "ramped up" sales employees declined to 38% by the *end* of 2019 is similarly unhelpful as it offers no insight into the percentage at the time the statements were made. Accordingly, Plaintiffs failed to plead with particularity that Forescout's statements about the experience of its sales force were false or misleading.

Plaintiffs accord too much weight to Forescout's "specific admission" that the percentage of "ramped up" sales employees declined to 38% by the end of 2019. Plaintiffs argue that this post-class period disclosure supports a finding that the relevant percentage had fallen by the date of the statements. The problem with Plaintiffs' "admission" argument is not that Forescout's *disclosure* occurred after the statements were made, but that the disclosure pertained only to *conditions existing after the statements* were made (at the *end* of 2019). Forescout made no admissions about the relevant percentage as of the dates of the challenged statements.

Similarly meritless is Plaintiffs' reliance on *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005). In *In re Daou*, the court reversed dismissal of the plaintiffs' claim that the defendant company understated the rate of employee attrition. *Id.* at 1020. The complaint alleged that "[e]mployee turnover, especially among Field Service engineers, exceeded 40%," but the defendants stated that "attrition within the technical ranks of employees was only 6.8%." *Id.* This court found that the plaintiffs adequately alleged falsity by alleging "[s]uch discrepancy between what [the defendants] reported and the allegedly true state of affairs of [the company]." *Id.* at 1021. Plaintiffs argue that the district court failed to follow *In re Daou* by overlooking the allegation that 100 experienced sales representatives were replaced with inexperienced employees. However, unlike in

*In re Daou*, Plaintiffs have failed to allege the "true state of affairs" at the time of the alleged misstatements. The SCAC does not specify *when* in 2019 these experienced employees were replaced or specify the percentage of "ramped up" employees at the time of the statements. Accordingly, Plaintiffs have failed adequately to plead falsity as to the sales employee statements.

### c.  Channel Partner Statements

Plaintiffs argue that Forescout misled investors by stating that the company *might* lose business as a result of announcing the merger with Advent and failing to disclose that Forescout had *already* lost three major channel partner relationships because of the announcement. This argument fails because Plaintiffs failed to plead with particularity that the channel partner relationships terminated prior to the date on which Forescout made the alleged statements, and therefore failed to plead falsity.

Forescout announced the planned merger with Advent on February 6, 2020. On February 28, 2020, Forescout filed with the SEC a Form 10-K for 2019, which stated, "[t]he announcement and pendency of our agreement to be acquired by Advent *could* adversely affect our business" (emphasis added). Forescout included a similar disclosure in a proxy statement issued on March 24, 2020, in connection with the planned acquisition. On May 19, 2020, Forescout filed the Delaware Complaint, which revealed that the February 6, 2020, announcement of the deal with Advent led to the termination of three major channel partner relationships, resulting in the loss of tens of millions of dollars of potential profits to Forescout. Based on these dates, the channel partner losses occurred sometime between February 6, 2020, and May 19, 2020.

Plaintiffs argue that, because the channel partner losses occurred as a result of the February 6, 2020, announcement, they must have occurred prior to the February 28, 2020, and March 24, 2020, statements. However, this court recently held that "temporal proximity alone does not satisfy the particularity requirements." *Twitter*, 29 F.4th at 622. In *Twitter*, the plaintiffs alleged that Twitter misled investors by stating on July 26, 2019, and July 31, 2019, that Twitter was working on the performance of its products and that some products might contain undetected software errors. *Id.* at 621. On August 6, 2019, Twitter tweeted that it "recently discovered" software bugs in one of its products. *Id.* at 617. The Twitter investors argued that the August 6 tweet was sufficient to show that Twitter *already* knew about existing software bugs when it made its July statements. *Id.* at 622. This court rejected the argument, finding the temporal proximity of the August 6 tweet insufficient to plead with particularity that Twitter knew of the software bugs in late July. *Id.* at 621.

*Twitter* is on point with the present issue. It is inconsequential that Plaintiffs rely on an event *prior* to the alleged statements (the February 6, announcement of the merger), rather than an event *after* the alleged statements (like the August 6, tweet, in *Twitter*). We see no reason why temporal proximity would be sufficient to plead that an event occurred shortly *after* another event if it is not sufficient to plead that an event occurred shortly *before* another event.

Plaintiffs also alleged that Advent "received alarming news" on March 20, 2020, and argue that this news must have been related to the channel partner terminations. In support of this theory, Plaintiffs alleged that Advent had access to Forescout's sales pipeline predictor tool; presumably such access would allow Advent to learn of

business developments such as channel partner terminations prior to the general public or Forescout's investors. Plaintiffs' argument fails, however, because Defendants stated in the Delaware proceeding that the "alarming news" Advent received on March 20, 2020, was Forescout's preview of its first quarter results, and Plaintiffs have failed to provide any particularized allegations suggesting that the "alarming news" was anything other than the first quarter results. The mere fact that Forescout announced disappointing financial results for the first quarter of 2020 is not enough for Plaintiffs to have alleged with particularity that the specific channel partner relationships at issue terminated during that quarter.

Lastly, Plaintiffs argue that they need not identify the precise dates of the channel partner losses because falsity is not subject to a heightened pleading standard, so Plaintiffs must show only that their falsity allegations are *plausible*. Plaintiffs are correct that falsity, unlike scienter, is not subject to the "strong inference" pleading standard. However, Plaintiffs confuse *particularity* (the level of detail required in the allegations) with *plausibility* (the strength of the inference that an element of the claim is satisfied based upon the facts alleged). Thus, while it may be plausible (under the reasonable inference standard of *Twombly/Iqbal*) that the channel partner losses occurred prior to Forescout's statements, Plaintiffs' claim nonetheless fails for lack of detail.

### d. Merger Statements

#### i. Falsity

Plaintiffs adequately pleaded falsity as to the May 11, 2020, statement that Defendants expected the merger to close. As a preliminary matter, the district court erred in

reasoning that the merger statements did not create an affirmative impression that the merger would close. The district court relied on *In re Lifelock, Inc. Securities Litigation*, in which this court affirmed the district court's holding that the phrase "our compliance with the FTC order" did not create an affirmative impression that the defendant was actually in compliance with the FTC order. 690 Fed. App'x 947, 951–52 (9th Cir. 2017). The statement in *Lifelock* is not analogous to the statements here. In its full context, the statement in *Lifelock* read, "On January 17, 2014, we met with FTC staff . . . to discuss issues regarding allegations . . . against us relating to *our compliance with the FTC order*." *Id.* at 951 (emphasis added). The reference to "our compliance with the FTC order" is merely a description of the topic of communication—nothing in the sentence implies that the defendants were or were not in compliance with the order. In contrast, here, a plain reading of the statements does suggest that Defendants believed the merger would close on May 18. The fact that the statements include phrases such as "[w]e look forward to" and "[w]e currently expect" might render the statements *opinions* rather than assertions of concrete fact, but it does not follow that the statements do not create an affirmative impression that there was an expectation the merger would close on time.

We next turn to the question of whether Defendants' statements of opinion that the merger would close were misleading. To plead adequately that the merger statements were false or misleading, Plaintiffs were required to allege particular material facts regarding the basis for Forescout's opinion that the merger with Advent would close, the omission of which made the statements "misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. Plaintiffs identified

two communications by Advent to Forescout, the omission
of which they contend rendered Forescout's merger
statements misleading. First, in an April 20, 2020, letter,
Advent expressed concerns about Forescout's deteriorating
performance and said it was reviewing Forescout's business
to assess whether closing conditions would be satisfied.
Second, on May 8, 2020, Advent's head of technology
investment told DeCesare during a phone call that Advent
was considering not closing the merger and that Advent
could not "make the numbers work."

We agree with the district court that Forescout did not
mislead investors by failing to disclose Advent's April 20,
2020, letter. As the district court reasoned, Advent's
statement that it was "assess[ing] conditions to closing" was
consistent with a review of conditions resulting in an actual
close of the merger. However, the omission of the May 8,
2020, phone call, in which Advent informed Forescout that
it was considering not closing the merger, was certainly
inconsistent with Forescout's May 11, 2020, statement that
it expected the merger to close. Even if Forescout's
executives sincerely believed that the merger would still
close as planned, Forescout's May 11 statement did not
"fairly align[] with the information in the issuer's possession
at the time"—i.e., that Advent was reconsidering the deal.
*Id.* at 189; *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200,
1208–09 (9th Cir. 2016).

We reject Defendants' argument that Forescout did not
mislead investors because it made "multiple specific
warnings" about the transaction, including that the timing of
closing was uncertain and that closing conditions might
impact the deal's course. Defendants cannot rely on
boilerplate language describing *hypothetical* risks to avoid
liability for the failure to disclose that the company *already*

had information suggesting the merger might not ensue. *See In re Alphabet, Inc.*, 1 F.4th at 702 (holding that the plaintiffs alleged actionable misstatements because the defendant company included as a risk factor concerns about data security but did not mention a security vulnerability that the company had already discovered). We therefore hold that Plaintiffs adequately pleaded falsity as to the May 11, 2020, statement.

> ### ii.   Scienter

We also hold that Plaintiffs adequately alleged scienter as to the May 11, 2020, statement. That DeCesare and Harms were the corporate officials responsible for communicating with Advent, is corroborated thoroughly by Defendants' allegations in the Delaware Complaint. Moreover, Defendants themselves alleged in the Delaware Complaint that Advent's representative told DeCesare directly during the May 8, 2020, phone call that Advent was considering not closing the merger. The fact that DeCesare was aware as of May 8, of Advent's reconsideration of the merger is sufficient to raise a strong inference that Defendants knew of the possibility of misleading the shareholders by stating on May 11, 2020, "[w]e look forward to completing our pending transaction with Advent."

Defendants argue that they lacked scienter because they were confident that the transaction was binding, as evidenced by Forescout's seeking specific performance of the merger in Delaware Court. This argument is not persuasive because whether the original merger agreement was binding on Advent is not relevant. The issue is whether Defendants knew that Advent was reconsidering the original merger agreement—it was Advent's reconsideration of the

merger, not whether such reconsideration was proper, that rendered the May 11 statement misleading to shareholders.

Defendants also argue that Advent's true intentions were unknown before May 15, 2020, as evidenced by the Delaware Complaint, in which Forescout stated: "At first, it seemed that Advent was testing Forescout's appetite to reprice the deal." There is little persuasive value in Defendants' own assertions that they did not believe that Advent was seriously reconsidering the merger. If anything, the fact that Defendants suspected that Advent wanted to reprice the deal supports the inference that Defendants were not confident the merger would close on its original terms, and therefore knew it would be misleading to investors to state otherwise. Because the May 11, 2020, press release stated that management looked forward to closing the merger deal but omitted management's thought that Advent was perhaps seeking a different price, it is, at best, a half-truth.

### iii.   Forward-Looking Statements

The May 11, 2020, merger statement is not protected by the safe harbor for forward-looking statements because it was not accompanied by meaningful cautionary language.[6] To be "meaningful," the cautionary language must "identify[] important factors that could cause actual results to differ." 15 U.S.C. § 78u-5(c)(1)(A)(i).

Here, the most relevant risk disclosed by Defendants was "the risk that the conditions to the closing of the transaction are not satisfied or that the transaction is not consummated."

---

[6] Because we find that there was no meaningful cautionary language, we do not consider Plaintiffs' argument that the merger statement was not "forward-looking" within the meaning of the statute.

We agree with Plaintiffs that this language is not "meaningful" because it amounts to only a boilerplate listing of generic risks and does not mention the specific risk to which Forescout had been alerted—the risk that Advent would back out of the merger. Our conclusion is bolstered by the fact that Defendants did not meaningfully update the risk disclosure after the May 8, 2020, phone call to reflect the new development that Advent was reconsidering the transaction.[7]

When analyzing the falsity element of a securities claim, this court has held that risk disclosures can be misleading to investors when they "speak[] entirely of as-yet-unrealized risks and contingencies" and do not "alert[] the reader that

---

[7] The February 6, 2020, press release, which announced the pending merger, listed as risks associated with the merger: "the risk that the conditions to the closing of the transaction are not satisfied, including the risk that required approvals from the stockholders of the Company for the transaction or required regulatory approvals are not obtained; potential litigation relating to the transaction; uncertainties as to the timing of the consummation of the transaction and the ability of each party to consummate the transaction; risks that the proposed transaction disrupts the current plans and operations of the Company . . . ." The May 11, 2020, press release, which included the challenged statement, listed as risks associated with the merger: "the risk that the conditions to the closing of the transaction are not satisfied or that the transaction is not consummated; potential litigation relating to the transaction; uncertainties as to the timing of the consummation of the transaction and the ability of each party to consummate the transaction; risks that the proposed transaction disrupts our current plans and operations . . . ." The risk disclosures before and after the May 8, 2020, call were nearly identical, except for the addition in the May 11, 2020, press release of the risk "that the transaction is not consummated." The court is not persuaded that this update meaningfully reflected the risk of which Forescout and its executives were aware: that Advent would seek to terminate the merger.

some of these risks may already have come to fruition." *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985–87 (9th Cir. 2008); *In re Alphabet, Inc.*, 1 F.4th at 703. The same logic follows in the context of the safe harbor: cautionary language is not "meaningful" if it discusses as a mere *possibility* a risk that has already materialized. As of May 11, 2020, the risk that Advent would terminate merger proceedings had not yet become an absolute certainty. However, Forescout was aware of a significant likelihood that the risk would materialize and did not sufficiently apprise its investors of this development. The risk disclosure contained in the May 11, 2020, press release was therefore not "meaningful cautionary language" as required for safe-harbor protection.

Finally, Defendants cannot invoke safe-harbor protection on the basis that they lacked "actual knowledge of falsity," because DeCesare himself received the news that Advent was reconsidering the merger.

## V.  SECTION 20(a)

The district court dismissed Plaintiffs' Section 20(a) claims on the basis that Plaintiffs failed adequately to allege Section 10(b) violations. Because the court holds that Plaintiffs adequately stated claims under Section 10(b), we reverse the district court's dismissal of the Section 20(a) claims and remand for further proceedings.

## VI. CONCLUSION

We affirm the district court's dismissal of the claims regarding the following challenged statements: (1) the statements made on May 9, 2019, asserting that: (i) each of the "slipped" deals was still expected to close within the year, and (ii) Defendants believed they could meet the full

year revenue guidance even if the "slipped" deals did not close, because these statements are protected by the PSLRA's safe harbor for forward-looking statements; (2) all statements regarding Forescout's sales force, because Plaintiffs have failed adequately to plead falsity as to these statements; (3) all statements regarding the channel partner losses, because Plaintiffs have failed to plead with particularity that the channel partner losses occurred prior to the statements; and (4) the April 23, 2020, and April 29, 2020, statements that Forescout expected the merger with Advent to close, because Plaintiffs have failed to plead that Advent evinced an intent to renege on the merger prior to these statements.

We reverse and remand for further proceedings consistent with this opinion the claims regarding the following challenged statements: (1) the statements made on May 9, 2019, August 7, 2019, August 12, 2019, October 10, 2019, and November 6, 2019, asserting that (i) the disappointing second quarter performance was due to "slipped" deals, (ii) the "slipped" deals were "tech wins," (iii) the sales pipeline was large, healthy, and continuing to grow, and (iv) the third quarter revenue miss was due to delays in closing caused by economic conditions in the EMEA area; and (2) the May 11, 2020, press release stating that Forescout "look[ed] forward to completing [the] pending transaction with Advent."

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

60    GLAZER CAPITAL MGMT., L.P. v. FORESCOUT TECHS., INC.

HAWKINS, Circuit Judge, concurring in part and
dissenting in part:

I agree with my friends in the opinion except for Part
IV.a. regarding the sales pipeline statements. The majority
concludes that the Plaintiffs have successfully alleged falsity
and scienter with respect to four statements that are not
forward-looking and protected by the PSLRA safe harbor:
(1) that Forescout's second quarter performance was due to
"slipped" deals; (2) that the slipped deals were "tech wins";
(3) that the pipeline was large, healthy and continuing to
grow; and (4) that the third quarter revenue miss was due to
declining economic conditions in the EMEA region. I
disagree and would affirm the dismissal of these claims as
well.

The district court determined the amended complaint
failed to adequately plead the falsity of Defendants'
statements. A statement is considered false if it directly
contradicts what the defendant knew at that time or omits
material information. *Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988, 1008–09 (9th Cir. 2018). "A statement of
opinion is not misleading just because external facts show
the opinion to be incorrect." *Omnicare, Inc. v. Laborers
Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175,
188–89 (2015). Statements that are not capable of objective
verification are "puffery" and cannot constitute material
representations. *Oregon Public Emps. Ret. Fund v. Apollo
Group Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

I see these statements by Defendants as reflecting
business judgments and opinions about the timing of deals
and the underlying causes of missing second quarter
forecasts. Plaintiffs' complaint reflects a difference of
opinion between the CWs and upper management as to when

to characterize a deal a "tech win" or "committed," and how much time to allot to closing such deals when including them in earnings forecasts.  The complaint alleges the company had an "inadequate internal system for projecting future revenue," but this is hardly the same as intentional falsification and scienter.  "Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994).

Defendants may have underestimated the amount of time required for some deals to close, leading to them "slipping" into later quarters, but many of the deals did eventually close, and the company missed its upwardly-revised projections in the fourth quarter of 2019 by only 2.4 percent. Anecdotal evidence that a few deals did not close at all (comprising a relatively small fraction of annual sales revenue) is not enough to render the pipeline "illusory" and make more general statements about a strong and healthy pipeline actually false.  At most, the CWs' statements reflect a subjective disagreement with the Defendants' more optimistic business analysis. *See Wochos v. Tesla*, 985 F.3d 1180, 1194 (9th Cir. 2021) (employee pessimism insufficient to establish knowledge; no indication defendants "shared that gloomy view" at time statements were made).

Likewise, Defendants publicly opined that the company missed second quarter projections in part because of the deals that slipped into later quarters, but also because of declining economic conditions in the EMEA region. Plaintiffs disagree with this assessment but allege no facts indicating this opinion was verifiably false, i.e., that these economic conditions did not partially contribute to missing the projections, especially when coupled with the deals that slid into later quarters.

For me, the determination Plaintiffs failed to adequately plead scienter with respect to these statements is on solid ground. Scienter requires an intent to mislead or a deliberate recklessness to an obvious danger of misleading investors. *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). Deliberate recklessness is an "extreme departure from standards of ordinary care" and "so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

As the district court noted, Plaintiffs failed to identify specific information within internal reports or data that conflicted with public statements, or other facts that would have made it "so obvious" that Defendants *must* have been aware that their assessments of the pipeline and slipped deals were incorrect. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2012). The complaint also lacks a sufficient indication that the CWs would have access to company-wide global sales information or information about the personal knowledge of the individual Defendants. *See Zucco Partners*, 552 F.3d at 996–97 (CWs "not positioned to know the information alleged" and statements that executives "had to have known what was going on" is a generalized claim of knowledge and not sufficient indication of scienter).

Plaintiffs also rely on the Defendant's decision not to implement a new forecasting system called "CEP" which had been recommended by a consulting firm the company employed in 2018. According to Plaintiffs, many of the deals Defendants classified as "tech wins" or projected to close by end of second quarter would have been analyzed differently, and more accurately, by CEP. The continued use of an older, outdated system may not have been a wise business decision, but it is hardly the type of "extreme

departure from standards of ordinary care" that gives rise to an inference of scienter. *Id.* at 991.

So, I would affirm the dismissal of these claims as well and remand only with respect to the statements concerning the Advent acquisition.

Case: 21-15076, 03/23/2023, ID: 12679272, DktEntry: 55-2, Page 71 of 73





Advertisement

Dictionary > Risk Management > Channel Partner

# Channel Partner

Last updated: June 11, 2019

## What Does Channel Partner Mean?

A channel partner is a third-party organization or individual that markets and sells products, services or technologies for a manufacturer or service provider via a partnering relationship.

Major technology organizations, like Microsoft, AMD, IBM, SAP and Oracle, form channel partner relationships at different levels to multiply product sales and distribution.

A channel partner relationship is also known as co-branding.

Advertisement

Case: 21-15674, 03/28/2023, ID: 12675212, DktEntry: 55-2, Page 682 of 63
Case: 21-15674, 03/23/2023, ID: 12679510, DktEntry: 53-2, Page 68 of 69

# Techopedia Explains Channel Partner

A channel partner may be a retailer, software/hardware vendor, distributor, original equipment manufacturer (OEM), systems integrator (SI) or value-added reseller (VAR).

Two well-known channel partner programs are:

- Managed Services Channel Program (MSCP): Defines best practices for channel partner market or industry services. Best practice compliance validates channel partners and services.
- Outsourcing Channel Program: Designed for channel partners handling asset management for a specified period. Includes combined manufacturer, service provider or data center technologies.

A referral partner is a sales representative, consultant or customer that enhances marketing and boosts sales by directly referring customers to manufacturers via multiple channels.

Channel and referral partners are often compensated with gratis discounts, training, technical support or lead generation tools.

cited in Glazer Capital Management, L.P. v. Forescout Technologies, Inc.
No. 21-16671 (argued March 14, 2023)

Advertisement

Case: 21-16876, 03/23/2023, ID: 12679272, DktEntry: 55-2, Page 69 of 69

Share this Term

  

**Related Terms**

cited under Blazer Capital Management, L.P. v. Forescout Technologies, Inc.
No. 21-16876 archived March 14, 2023

Business Services Provider

Service Provider

Co-marketing

Collaboration

Co-branding

Referral Partner

Original Equipment Manufacturer

Relationship Marketing

Enterprise Relationship Management

Order Management System